# Exhibit H

## Jeffrey Scott Smith Deposition Excerpts

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO. 7:16-CV16-RJ

CYBERNET, LLC and ALADDIN REAL        )
ESTATE, LLC,                          )
                                      )
            Plaintiffs,               )
                                      )
      vs.                             )    D E P O S I T I O N
                                      )
JONATHAN DAVID, in his personal       )
capacity and his official capacity    )
as District Attorney for the 13th     )
Prosecutorial District of North       )
Carolina; JAMES McVICKER, in his      )
personal capacity and his official    )
capacity as Sheriff of Bladen         )
County, North Carolina; and TRAVIS    )
DEAVER, in his personal capacity      )
and his official capacity as a        )
Deputy Sheriff of Bladen County,      )
North Carolina,                       )
                                      )
            Defendants.               )
------------------------------------

---

JEFFREY SCOTT SMITH

---

TAKEN AT THE LAW OFFICES OF:
MORNINGSTAR LAW GROUP
112 West Main Street, Second Floor
Durham, NC  27701

            09-26-17
            10:03 O'CLOCK A.M.

            ---

            Cindy A. Fletcher
            Court Reporter

        Chaplin & Associates
20006 North Cove Road, Suite 100
        Cornelius, NC  28031
          (336) 992-1954

### APPEARANCES OF COUNSEL

Patrick G. Spaugh, Esquire
**WOMBLE CARLYLE SANDRIDGE & RICE, L.L.P.**
One West Fourth Street
Winston-Salem, NC  27101


David J. Adinolfi II
Special Deputy Attorney General
**STATE OF NORTH CAROLINA**
Special Prosecutions
9001 Main Service Center
Raleigh, NC  27699-9001


William J. Brian, Jr., Esquire
**MORNINGSTAR LAW GROUP**
112 West Main Street, Second Floor
Durham, NC  27701


Alan Maynard, Esquire
**MAYNARD LAW FIRM**
121 Courthouse Drive
Elizabethtown, NC  28337


### OTHER APPEARANCES

Holly Smith

1     A.  It was emailed to me -- I could not -- I
2  can't tell you the exact date that I received it.
3  I'm sure it was soon after it was drafted here.
4     Q.  Were you aware prior to receiving the
5  document that we planned to take your deposition
6  in this case?
7     A.  My attorney called me ---
8        MR. BRIAN:  Objection.  Don't --
9  don't tell them what your attorney told you.
10       THE WITNESS:  Okay.  I don't know
11  if it was prior to seeing this document or after
12  it was emailed or what have you, but I was
13  notified verbally that this document was coming or
14  existed, that I was going to have my deposition
15  taken.
16    Q.  (Mr. Spaugh)  And what did you do to
17  prepare for the deposition from the time that you
18  first received notice?
19    A.  I prepared for it by re-reading a lot of
20  materials that has been put out as exhibits,
21  reviewing the depositions that we've already taken
22  related to this case.  I had some, you know,
23  conversations with the attorneys on some questions
24  I had.
25    Q.  How many conversations with your

1  attorneys did you have?
2     A.  I would be speculating if I told you how
3  many I -- several.
4     Q.  Strictly for preparation of the
5  deposition, would it be more or less than five?
6     A.  Strictly for the deposition, less than
7  five.
8     Q.  Were any of those in person?
9     A.  Yes.
10    Q.  Do you know how many of those were in
11  person?
12    A.  One.
13    Q.  When was that?
14    A.  Yesterday afternoon.
15    Q.  How long?
16    A.  Probably an hour and a half, two hours
17  maybe.
18    Q.  Okay.  Who was present for that
19  conversation?
20    A.  Mr. Brian and Mr. Anthony.
21    Q.  Did you relay to anyone the contents of
22  that conversation?
23    A.  No.
24    Q.  Was that meeting here in this office?
25    A.  Right here.  Actually -- no, you weren't

1  there.  Holly and I probably talked about it some,
2  you know, after we got back to the -- we -- we
3  stayed her last night at a hotel room, so...
4     Q.  What did you -- what did you share with
5  Holly?
6        MR. BRIAN:  Objection.  I instruct
7  you not to answer.  Attorney/client privilege and
8  husband/wife privilege.  Attorney/client
9  privilege, believe marital privilege only applies
10  in criminal matters.  I've instructed him not to
11  answer.
12       MR. SPAUGH:  Okay.  And is it your
13  contention that Ms. Smith is a part to this
14  lawsuit?
15       MR. BRIAN:  My contention is that
16  Mrs. Smith is a client since she's part of the
17  team, so I suppose it would be work product as
18  well.
19    Q.  (Mr. Spaugh)  Did you review any videos
20  to prepare for the deposition?
21    A.  I've reviewed videos from the beginning
22  of this whole process, yes.
23    Q.  What -- what would those videos be?
24    A.  They would be the videos that were
25  provided to you guys.  If you want to label them

1  and -- I mean, they were -- they were probably
2  four or five maybe videos that you guys -- maybe
3  less, maybe three -- somewhere between three and
4  five videos that were given to you guys and those
5  have been reviewed over the last month and a half.
6  Yeah.  That was part of it -- part of what we've
7  given you guys.
8     Q.  What was depicted in those videos, just
9  generally?
10    A.  You'll have to -- you'll have to get
11  more -- more specific on which video you're
12  referring to.
13    Q.  Okay.  Well, you said there were four to
14  five videos.  Can you just tell me what each of
15  them have or what ---
16    A.  There's one video that -- that shows --
17  regarding a -- some cut coaxial cable from a Time
18  Warner cable box that was left at the scene.
19  There was a short video showing where -- showing
20  the box, showing the cable cut, showing where it
21  was at.  There was another video that shows me
22  walking around the outside perimeter and -- those
23  are the two main videos.  You'll have to -- if
24  there's any other ones, I'll have to -- for me to
25  give a description for you I'll have to see it and

1  I'll give you the description.
2      Q.  Were there any other videos other than
3  those two video that you reviewed to prepare for
4  today?
5      A.  All the videos that I'm aware of you
6  guys have been provided, so if you want to see how
7  many there were, I can probably -- I can find out.
8  I can pull them up on the laptop, but I -- I don't
9  want to give you an exact -- I don't know if it
10  was three, four or five because ---
11      Q.  I'm not trying to pin you down to a
12  number.  I was just generally asking.
13      A.  Yeah.
14      Q.  Okay.
15      A.  So I know that all the videos that I
16  would have -- that I would have reviewed were
17  videos that were presented to you guys.  There's
18  actually one -- one video that you guys have
19  not -- that you will be getting, but it was a
20  video that was created from a security tape.
21      Q.  Can you tell me what that video shows
22  generally?  Can you describe it?
23      A.  That video shows the first -- I think it
24  was 15 minutes of the initial entry into the
25  building.

1      Q.  Were there any -- the alleged misconduct
2  occurring during that first 15 minutes you saw in
3  the video?
4      MR. BRIAN:  Object to the form of
5  the question.  Could you be more specific about
6  what ---
7      MR. SPAUGH:  No, because the
8  alleged misconduct is in allegations in the
9  complaint.
10      Q.  (Mr. Spaugh)  Did you review the
11  complaint prior to today's deposition?
12      A.  Yes.
13      Q.  So you're familiar with the conduct of
14  the sheriff's office in particular, which are my
15  clients and what's been alleged in terms of their
16  actions during the execution of this search
17  warrant.  And just for the record, to be clear,
18  when I talk about execution of the search warrant,
19  raid, whatever, you understand that as being May
20  29th, 2015 in big and little Aladdin in Dublin,
21  North Carolina, is that correct?
22      A.  Yes.  I -- for sake of simplicity, if
23  you just want to call it the raid?  That's what I
24  call it.  We'll be on the same page.
25      Q.  I'll probably call it execution of

1  search warrant, either way it works, as long as we
2  both understand each other.
3      So there was alleged misconduct,
4  destruction of property, which is why we're here
5  today, correct?
6      A.  That's correct.
7      Q.  Okay.  Did you see anything that
8  concerned you during that video, that first 15
9  minutes that relates to that?
10      A.  It was apparent that -- and it was David
11  Borreson, I will say, that -- that came in and did
12  this.  It was apparent that they wanted to remove
13  the cameras, and I think this was prior to them
14  finding where the DVR was located.  They wanted to
15  remove all camera footage until they could figure
16  out where the DVR was at.
17      And so -- so he removed -- he actually
18  took the cover off one for the cameras and turned
19  it up to the ceiling.  He removed -- and other
20  cameras are catching him as he's doing this, so I
21  guess he thinks he's not being covered because the
22  camera angles cover other areas of the building.
23  And so it clearly shows him removing one camera
24  and then as he goes up to the other one, it shows
25  his hand on it and he's moving it up and moving it

1  around.  And then he takes the cover off of it and
2  -- at any rate.
3      So it was clear that they wanted to
4  conceal what they were doing before locating the
5  DVR.
6      Q.  And that was David Borreson you reported
7  or testified who was the one moving the cameras?
8      A.  That's correct.  David Borreson
9  initially came into the building.  It shows him
10  coming in and then he gets on a cell phone and
11  that's where he's making the call, I guess, to the
12  other folks who are at the meeting location.
13      He goes over to a couple of customers
14  that were in the building, informs them of
15  something.  They get up from where they're at and
16  -- and I'm not sure where they get -- I think they
17  get taken into the middle room or something like
18  that.  I'd have to look back at the video.
19      Q.  Was there any audio?
20      A.  There's no audio of that, no.  He
21  then -- curiously, after he's there he's got a
22  very identifiable attire that he's wearing -- just
23  very identifiable attire, so he then -- he then
24  proceeds to go out to his vehicle and he comes
25  back in the -- in the building with a mask on -- a

1  full mask over his head. I'm not sure what the
2  purpose was of that, but like I said, you guys
3  will have a copy of this video.
4       And then that -- he, you know, he --
5  like I said, he proceeded to -- that's -- with the
6  mask on is when he proceeded to -- to remove
7  the -- the two cameras or disengage the two
8  cameras that I'm referring to.
9    Q. Did you see, or is there anyone on this
10  video from the Bladen County Sheriff's office,
11  direct David Borreson to do those actions?
12    A. Well, again, there's no audio, so I
13  can't -- I can't speak to what was being said. I
14  do know that all of the officers -- there were
15  several officers that came in in the first ten
16  minutes and the conversations I can't speak of
17  that because there was no audio.
18    Q. So back to just generally this lawsuit
19  and the actions you've taken since it's been
20  filed, have you communicated with anyone other
21  than your attorneys or apparently Ms. Smith, based
22  off your counsel's objection, about the -- your
23  claims in this lawsuit?
24    A. I may have had some conversations with
25  various people in the past that's -- you've got to

1  understand, after this -- after this happened, I
2  live in a small town, so I have been very -- and
3  still am -- upset regarding the way that this
4  happened, the damage that was done, all the things
5  surrounding it, so I've had conversations with
6  various people. I'm not going to sit here and try
7  to give you a list of all of them because I would
8  be speculating if I did. But in and around town,
9  there -- there are plenty of people that are aware
10  that -- that I have filed a lawsuit against the
11  county.
12      I also think that -- that it was
13  publicized in a local paper. So due to that fact,
14  I get questioned about it often when I'm out
15  grocery shopping or whatever, you know, because it
16  was published in some form of media. It might
17  have been on Bladen Online or what have you , but
18  anyhow, it's just not -- it's -- it's a common
19  knowledge thing that I have a lawsuit due to the
20  destruction of the property.
21    Q. Do you have any written communications
22  with individuals about this lawsuit, other than
23  the people in this room?
24    A. Not that I recall.
25    Q. Do you have social media accounts?

1    A. I do, actually. I have a Facebook
2  account. I got a Twitter account, but I swear I
3  have not gone to it in a long time. I don't know
4  if I've -- and that would be the extent of it.
5    Q. Do you know your Twitter user name?
6    A. It's been a long time. I would be
7  speculating if I gave it exactly to you. I log
8  into it with my email address, which you guys have
9  that as well. I'm pretty sure that's how I log
10  into it. So I just haven't logged into it in
11  probably over a year or better.
12    Q. Have you ever used your Facebook or
13  Twitter accounts to discuss this case?
14    A. Not -- not -- not that I recall at all.
15    Q. What about to discuss Sheriff McVicker
16  or Travis Deaver?
17    A. Not on Facebook. I'm a -- I'm a very --
18  I'm a reader, not a poster, if that makes sense.
19  If I have I don't recall it and I certainly ain't
20  aware of it and -- that's just not my style.
21    Q. Have you ever been convicted of a crime?
22    A. No -- well, seat belt ticket. Is that a
23  crime? I'm just cov -- trying to cover my bases
24  here. So...
25    Q. I appreciate it. Have you ever been

1  arrested?
2    A. Yes.
3    Q. Okay. And again, I'm sorry for some of
4  the obvious questions that are being asked. It's
5  just part of how this process works. Can you
6  detail for me, from most recent to oldest, the
7  arrests that you've had?
8    A. Let's see. Is this specific to -- in
9  North Carolina?
10    Q. Any criminal arrests.
11    A. Okay. So I think the last arrest that I
12  was arrested for and I -- all charges were what
13  they call nolle prossed and have seen been -- I
14  haven't heard anything from it since. It was in a
15  business that I owned in Virginia. And there was
16  a -- a raid in that business. All the equipment
17  was seized similar to what we have here. All the
18  charges were nolle prossed. I was given the
19  equipment back and was given the okay to reopen
20  the business and it's currently reopened.
21    Q. What is the name for that business?
22    A. The name of that business is Crazie
23  Overstock Portsmouth.
24    Q. And what is your relation at that
25  business? What is your role in that business?

1    A.   I really don't remember the details.  I
2  just -- seems like I remember getting a -- maybe
3  it was a warning or how -- it's just some sort of
4  traffic stop.
5    Q.   When was your next interaction with
6  Sheriff McVicker?
7    A.   My next interaction personally with him
8  would have been on September the 20th, 2014.
9    Q.   On September 20th, 2014, was Sheriff
10  McVicker the Sheriff of Bladen County?
11    A.   No.
12    Q.   Had you ever had any contact or
13  interaction with Travis Deaver prior to September
14  20th, 2014?
15    A.   No.
16    Q.   Were you even aware who Travis Deaver
17  was?
18    A.   I think I have seen him around
19  Elizabethtown in uniform.
20    Q.   So turn to September 20th, 2014 -- can
21  you hand me that document?  Can you tell me a
22  little bit about that interaction and how it came
23  about?  Well, start from the beginning.  How did
24  you come to ---
25    A.   With Travis Deaver?

1    Q.   No.  With Sheriff McVicker on September
2  22, 2014.  How did you come to meet with Sheriff
3  McVicker?
4    A.   I came to meet with him through a
5  meeting that was set up.  He was running a
6  campaign to become sheriff at that time and there
7  was a meeting set up by his campaign manager for
8  me to meet with him.
9    Q.   When did you -- who was his campaign
10  manager?
11    A.   Landon Bordeaux.
12    Q.   Did you know Landon Bordeaux prior to
13  September 2014?
14    A.   Yes.
15    Q.   In what capacity?
16    A.   We live in a small county with small --
17  you know, everybody knows everybody.  I've known
18  his family -- his brother and I are -- were -- I
19  won't say best friends, but pretty close to it,
20  during -- his brother and I are the same age.  We
21  graduated high school together.  I used to do
22  sleep overs at each other's house.  Landon's
23  probably three, four years younger than -- than
24  his brother, but I've known his mom and dad as far
25  back as I can remember in kindergarten and first

1  grade when I started going to school with his
2  brother.
3    Q.   What does Landon do currently?
4    A.   He is an insurance salesman.
5    Q.   I guess he also dabbles in politics if
6  he is a campaign manager?
7    A.   Apparently, he was in this -- yeah.  He
8  was -- he was, I guess, tapped to be the campaign
9  manager.
10    Q.   And do you have any experience with
11  politics?
12    A.   Yeah, somewhat.
13    Q.   Can you tell me about that?
14    A.   My experience with politics, there's --
15  in different -- you need to get more specific.
16  There's ---
17    Q.   Have you ever run for office?
18    A.   Yes.
19    Q.   Can you tell me about that?
20    A.   I ran for office -- I think the first
21  year was 2001.  I ran for Town Commissioner of the
22  town I live in, which is the Town of Dublin.  And
23  I think I lost that election 18 to 16.
24        And then I subsequently -- I re -- I ran
25  again in 2005 -- don't hold me to these dates, but

1  just from my memory recollection -- 2005 was the
2  second time that I ran for that same seat and --
3  and I was successful in that election.  And I've
4  been re-elected two more terms -- four year terms.
5    Q.   Did you have any opponents in your
6  subsequent elections?
7    A.   The last election I did, yes.
8    Q.   Did your and Mr. Bordeaux's paths cross
9  at all during your experience in politics from
10  2001 on, other than this incident, which we're
11  about to discuss?
12        MR. BRIAN:  Object to form.  You
13  can answer.
14        THE WITNESS:  As it relates to my
15  office or town commissioner office, no.  I've had
16  no interaction with Landon Bordeaux.
17    Q.   (Mr. Spaugh)  Like campaigns?
18    A.   Campaigns.  Let me be clear on -- on --
19  on something, too, because -- and maybe we can
20  save some questions later on.  I did not have to
21  nor did I run a campaign when I was -- when I
22  filed for election.  I raised zero money.  I
23  signed a paper saying I wasn't raising any money
24  and I've never -- I've never campaigned.
25        I did not run a campaign.  I've not

1 bought the first campaign sign or anything like
2 that. Just letting you know that the extent of my
3 campaign is -- is just my personal relationships
4 with the people in the town that I've been there
5 forever.
6      Like I said, the first election I lost
7 18 to 16, so you can see that the -- the size of
8 the town or the people that I would need to know
9 to -- to -- to become elected is not an extremely
10 high number.
11     Q. When were you last re-elected?
12     A. Let me think back.
13     Q. Well, let me put it this way. Are you
14 currently serving as a Dublin Town Commissioner?
15     A. Yes.
16     Q. Okay. When does ---
17     A. So ---
18     Q. --- your term expire?
19     A. It expires January first of this year.
20     Q. Will you be running again this fall?
21     A. Yes. I have filed for re-election.
22     Q. What party affiliation are you?
23     A. Unaffiliated.
24     Q. So you met with Sheriff McVicker through
25 a meeting set up with Landon Bordeaux who you

1 previously had knowledge of. How did you come in
2 contact with Landon Bordeaux?
3     A. Landon contacted me. I mean, I was --
4 you know, if we -- Landon and I saw each other
5 around town or whatever, which we would from time
6 to time. We -- we've always been plea -- I mean,
7 we've always been friends, that's fair to say, so
8 I mean, I've came in contact with him over the
9 years all the time.
10     It's a small town where you've got one
11 restaurant in the town, you know, that sort of
12 thing. We both eat there from time to time. We
13 both see each other from time to time at gas
14 stations or whatever.
15     But as far as having any communications
16 with him regarding this campaign, he contacted me
17 on the 18th at 3:24 in the afternoon.
18     Q. That's rather specific. How are you
19 able to have such great recollection of that?
20     A. I -- I had my phone records produced.
21     Q. Do you -- did you answer that call or
22 did you have to call him back?
23     A. I answered that call.
24     Q. How long was your discussion?
25     A. That first discussion at 3:24, he asked

1 me if I was around the Dublin area -- if I was
2 close by. I said, "Yeah, I'm close by." He said
3 he'd like to talk to me. I said, "That's fine.
4 I've got time." And -- and he -- I don't remember
5 the exact place that we met. He just came into
6 Dublin and we met right around -- in the Dublin
7 area. Dublin's a very small town as you're aware,
8 so I don't know exactly what specific location
9 that we met at, but we met in Dublin.
10     And the conversation lasted about a --
11 probably less than a minute. It was basically,
12 "Are you" -- "are you around town now"? I said,
13 "Yeah. I'm here." "Have you got time to meet me
14 for a few minutes"? "Sure." "All right. Meet me
15 in Dublin," and that's -- what's basically the
16 extent of that conversation. So that's what we
17 did.
18     Q. What happened during that conversation?
19     A. He -- I knew Landon was -- was --
20 actually I really -- I'm not sure if I knew what
21 his capacity was at the time or not. I may have,
22 but I knew that he had had interest in the
23 McVicker sheriff campaign and at the time, I had
24 expressed zero interest in the sheriff's race.
25     I had no -- to me it was not on my radar

1 at all what was going on in the sheriff's race.
2 And he approached me. The -- some of the initial
3 things that he said, in no particular order, was
4 that the incumbent sheriff -- that he had
5 information that the incumbent sheriff was looking
6 to raid my business in Dublin to try to create a
7 splash, was the exact word that he used actually -
8 - that the incumbent sheriff was -- was going to
9 create -- try to create a splash in Dublin to help
10 garner votes in my precinct and that he had inside
11 information that this investigation had already
12 started and he had sources that was giving him
13 that.
14     He then informed me that -- like I said,
15 the order of this may have been a little bit in
16 and out, but he then informed me that -- that
17 Sheriff McVicker was obviously running for sheriff
18 and that some of the big things that the sheriff
19 was interested in doing was controlling the costs
20 of the jail, running the jail in general, changing
21 the way that that was operating.
22     I think he may have mentioned, you know,
23 maybe some training or what have you, that the
24 officers lacked a lot of training and that was
25 part of his agenda and that -- that drugs was

1 another big area of his agenda that he wanted to
2 try to focus on if he became sheriff, all of which
3 I'm, you know -- was -- was -- was good news for
4 me. I thought all of those things probably could
5 use some attention. And he -- I think the word
6 that he used was -- excuse my French, but I'll use
7 the same word that he used -- he told me that
8 Sheriff McVicker did not have a hard on for my
9 type of business.
10      And so he said that he -- you know, he
11 would like -- he would be -- you know, he would
12 like to get my support if he could. But the
13 sheriff -- or the campaign, I guess, is the best
14 way to refer to it, the campaign would like my
15 support in their election, and that, you know,
16 that support would -- obviously they were also
17 seeking contributions. And so I said okay.
18      I said I would be interested in learning
19 more. I told him that -- I think it was at that
20 point I told him that I would like to, you know,
21 have a discussion with the sheriff regarding his
22 goals and various things and talk with him. And
23 that was the -- there may have been a couple of
24 bits and pieces that I might can recall later on,
25 but that was the main gist of that initial meet --

1 face to face meeting that we had, was to let me
2 know that there was -- that the incumbent sheriff
3 was -- was -- was in the process of doing an
4 investigation of -- that he had inside information
5 that a raid was going to be occurring and they
6 were trying to do so because they needed votes in
7 my precinct. And that Sheriff McVicker didn't
8 have a hard on for my type of business or the
9 business I was in, I think is the way he put it,
10 not my words, but his words.
11      Q. His being Bordeaux?
12      A. That's correct. And that he told me the
13 things that the sheriff was interested in doing,
14 you know, which I've already said.
15      Q. What did you -- did you take any action
16 in light of the news that the current sheriff
17 planned to conduct an investigation or execution
18 of a search warrant at Big and Little Aladdin?
19      A. Did I take any action that day?
20      Q. Just after finding out that news as it
21 relates to the stores.
22      A. Well, I'm assuming you've got multiple
23 questions you're going to go in this line of
24 questioning and so in the -- yes. In the course
25 of -- of -- of this, lack of better words -- of

1 this relationship or whatever you want to call it,
2 in the course of this support, we had several
3 conversations and -- and that did -- the
4 conversation that I'm sure you'll ask about at
5 some point in the future, that led to that, Landon
6 got specific and said that the -- that he had --
7 he actually informed me that -- who one of his
8 informants was. And he stated that the 26th of
9 September -- I believe it's the 26th -- you'll
10 have to look up the calendar -- it was -- it
11 was -- it was a Friday -- was going to be the
12 target date of when they -- when it appeared to be
13 that they were going to be doing their -- their
14 raid on my business.
15      And so I shut the business down the day
16 before. It was on a Friday that he said they were
17 going to come and do the raid. I shut the
18 business down on a Thursday, and that was at his
19 encouragement to do so. I was not afraid of
20 anything, but at that point -- and on other
21 conversations he had given me enough information
22 to let me know that -- that Sheriff McVicker
23 was -- was -- or current sheriff McVicker at the
24 time -- candidate McVicker -- was -- was not going
25 to, you know, just be a complete adversary to me

1 or a thorn in my side related to -- to being in
2 business, and that the current sheriff was.
3      And so they were going to do this raid.
4 And so he basically -- I don't know if I should
5 use this word, but he basically bribed me for
6 their support by telling me exactly -- what he
7 said was going on with -- based on his inside
8 information that he was getting -- that his
9 campaign was getting -- to shut my business down.
10      So it was like you've got a sheriff that
11 -- that's about to raid you and do your business
12 and on the other hand you've got a sheriff that --
13 that is -- that his campaign manager is telling me
14 doesn't have a hard on and my business is not --
15 not something that he's interested in -- in giving
16 problems with.
17      And so anybody -- I think me being a
18 businessman would -- would take that into
19 consideration. And so that's why I attempted to
20 support him.
21      Q. Why did you shut down the businesses
22 after learning this information?
23      A. I shut down the businesses because
24 Landon told me that there was inside information
25 that they were coming to raid me on that Friday

1 and that I could avoid that by closing the
2 businesses. And so I didn't have anything -- the
3 -- the problem I had was that if they came in and
4 did a raid, I wasn't concerned about legality at
5 all, but it they come in and did a raid, then I've
6 got -- I've got another year of -- historically,
7 what's been a year of waiting to -- to get to
8 trial.
9     So the best thing for me to have done at
10 his encouragement -- and to help McVicker's
11 campaign because he consistently said that they
12 were looking to do this so that they could get
13 votes in my district, that he -- that it was the
14 im -- that the thought process of the incumbent
15 sheriff that if they did this raid that they were
16 going to get a bunch of votes because, for
17 whatever reason, they had that belief. I'm not --
18 I don't -- I can't speculate on that reason.
19     Q. Do you know why they thought that would
20 make an impact in the end?
21     A. I -- it would be pure speculation on my
22 part why they thought that. I don't -- I have no
23 idea.
24     Q. Do you have a personal opinion why you
25 think they thought it would have an impact.

1     MR. BRIAN: Objection. Form of the
2 question. Calls for speculation.
3     THE WITNESS: I -- again, I would
4 be speculating. I -- I don't want to speculate on
5 anything here if I can help it. So I guess to
6 finish answering your question, I shut down ---
7     Q. (Mr. Spaugh) Well, let me ask you a
8 question.
9     MR. BRIAN: What were you about to
10 say?
11     THE WITNESS: To -- I shut down
12 based on the campaign manager giving me the
13 information that they were going to be raiding my
14 business, which would have cost me a lot of extra
15 legal fees.
16     Q. (Mr. Spaugh) You mentioned you don't
17 know -- don't want to speculate why it would make
18 a splash to -- you seemed to take the news as
19 credible, so did you think that might-- did you
20 think at the time that the sheriff, in fact,
21 thought that would impact the votes -- Sheriff
22 Benston?
23     MR. BRIAN: Objection to the form.
24     MR. SPAUGH: He's -- I'll rephrase
25 that question.

1     Q. (Mr. Spaugh) Did you think at the time
2 that Sheriff Benston believed that conducting a
3 raid or excuse me, a search warrant, would impact
4 votes in his favor?
5     MR. BRIAN: Still object to the
6 form of the question. Calls for speculation.
7     THE WITNESS: I -- I didn't know
8 whether it would to not -- this is what his
9 campaign was telling me. Landon was telling em
10 that -- that -- that the -- Benston felt like that
11 it would have some impact on his campaign. I
12 don't know whether time would or not and I'm not
13 going to speculate that it -- that if it -- it
14 would to wouldn't. I don't know. I'm just saying
15 that was the information that was gave to me and
16 from my perspective, shutting down versus getting
17 raided and having the legal expense of defending
18 myself again, plus this was going -- if -- if his
19 campaign felt like it was going to help them for
20 me to shut down and take that tool out of their
21 toolbox, then that's what I did.
22     Q. (Mr. Spaugh) Did you later or --
23 whether or not Sheriff Benston, in fact, planned
24 to conduct that search on the 26th of September?
25     A. I did.

1     Q. What -- what did you learn?
2     A. I talked to Sheriff Benston personally
3 and Sheriff Benston indicated that there was no
4 such raid -- I like to use that word raid -- was
5 in the works. He may have used the word --
6 something else, but I'm calling it a raid.
7     Q. When did you talk to Sheriff Benston?
8     A. I don't know the exact rate (sic), but
9 it's this summer -- the date. I don't know the
10 exact date, but time was this summer. Summer of
11 2017.
12     Q. Was this in person communication, phone
13 or was ---
14     A. Phone.
15     Q. Do you remember -- have you looked at
16 your phone records for that?
17     A. No.
18     Q. Do you know how long the conversation
19 was?
20     A. Thirty minutes, maybe.
21     Q. Was the entire scope of the conversation
22 this specific issue?
23     A. No.
24     Q. Was there any other discussion about
25 this case?

1    A. I don't -- Yeah, I don't recall. There
2  may have been a mentioning of it. There was no
3  detailed discussions about it. I'll put it that
4  way. It might have been brought up that, you
5  know, yeah, I'm in -- currently in federal court,
6  stuff that's publicly available. But I don't --
7  there was no details, specifically that I can
8  recall.
9    Q. What did -- what all did Sheriff Benston
10  tell you?
11    A. He told me that there was no pending
12  raid that was going to be occurring. That was --
13  that was inaccurate.
14    Q. Who was the specific informant that
15  Landon Bordeaux provided you?
16    A. Landon Bordeaux told me that Atlas
17  McVicker who had -- he said Atlas -- he didn't go
18  into detail -- he said Atlas has some sort of dual
19  role with the HP and the sheriff's department.
20  And he didn't elaborate on what that dual role
21  was, but he said that some of this information was
22  coming from Atlas and that he also stated that
23  Tommy Lindsey was not -- was not -- you know, I
24  guess Tommy Lindsey was one that was being tasked
25  to do this, according to Landon, and that he was

1  not really wanting to do it -- that it was not
2  something that -- he was -- he was not wanting to
3  do the investigation or anything like that.
4    And so he did not say that Tommy Lindsey
5  was one that was giving him that information. He
6  just said that Tommy Lindsey was not very excited
7  about doing an investigation on the business.
8    But he did tell me that Atlas McVicker
9  was the source and he was able to get that
10  information because of his -- some dual role that
11  he had where he was interacting with the
12  detectives on a frequent basis.
13    Q. So going back to the first meeting that
14  you had with Landon Bordeaux, he -- you testified
15  that you expressed to him that you would be
16  willing to discuss these issues with Sheriff
17  McVicker. What happened next?
18    A. Well, I told him that I'd like to have a
19  -- you know, that I would like to meet Sheriff
20  McVicker and have a discussion with him. I didn't
21  say anything about issues or anything like that,
22  just have a discussion with him - just a general
23  discussion.
24    Q. And -- and thank you for clarifying
25  that. Did -- at that first meeting, did Bordeaux

1  go ahead and ask you for a campaign contribution
2  then?
3    A. That he was seeking contributions --
4  that was the purpose of -- I mean, that was --
5  that was the reason why he met with me, was two
6  fold -- was to give me information that would, I
7  guess in his viewpoint, that would give me a
8  reason to support McVicker because the other
9  candidate is going to be raiding me. That was --
10  and then, secondly, to solicit campaign and get my
11  support and any campaign contribution.
12    Q. Was there -- was there an affirmative
13  ask at that meeting? Could you contribute it at
14  that meeting?
15    A. I was not -- no. At that meeting, no.
16  There was no -- this meeting -- when he called me
17  and ask me to meet him in Dublin, what have you, I
18  -- I didn't know exactly what it was that he was
19  calling -- wanting to meet about. It was just
20  like, you know, he's a friend of mine so, hey, I
21  figured he had something he wanted me to -- tell
22  me or be aware of or whatever. So I did not offer
23  or anything like that. At that meeting, it was
24  basically -- the way that that meeting ended was
25  that, you know, I'd like to have a discussion with

1  McVicker at some point.
2    Q. You testified that your first meeting
3  with Sheriff McVicker, other than a potential stop
4  in the 90's, was on September 20th. Did you have
5  any communications -- how was that meeting
6  arranged? Did y'all discuss the details at this
7  first meeting or was that subsequent to that?
8    A. Okay. You're asking multiple questions,
9  so let's take one question at a time.
10    Q. If you'd just walk me though them then.
11  If that would be easier.
12    A. Okay. So that same -- Landon and I met
13  on the 18th after that initial phone call. We
14  discussed the campaign support, as well as
15  contribution. He did call me at 6:17 that same
16  day. This was after we had already met. He -- he
17  called me again at 6:17 and during that
18  conversation, one of the things that he discussed
19  was that -- that they did not want -- you know, I
20  offered to write him a check for a contribution
21  and that's what they were seeking at the time.
22  That was kind of left off at the earlier meeting.
23    And he said that he thought about it --
24  he said that they were going to -- or basically
25  there was going to have to be a -- a campaign

1 disclosure of finances a week or so before the
2 actual election and that a -- the other side would
3 get that disclosure and that he was concerned that
4 they would question -- and it could be a problem
5 for them -- they may try to use a check from --
6 from me against the campaign.
7     And so I said okay. He said we need to
8 basically find another way for you to contribute.
9 And so I said okay and that was -- at that point
10 in time he said he was going to get -- he was
11 going to try to schedule -- get a meeting set up
12 for -- with McVicker.
13     That conversation was probably seven or
14 eight minutes long. And he discussed with me how
15 things were kind of going with the campaign as far
16 as different things that they were doing, you
17 know, for the campaign or what have you, and we
18 had some of those discussions in the initial
19 meeting as well. You know, we just -- he
20 discussed some of the strategies and things that
21 the campaign was doing or what have you and -- so
22 I said okay and that was the end of that
23 conversation.
24     At that point in time -- okay. Let's go
25 to -- what's your next question?

1     Q. I mean, you're doing a great job thus
2 far. I guess, what happened next?
3     A. Yeah.
4     Q. The conversation at 6:17, had you set an
5 affirmative date and time to meet with Sheriff
6 McVicker during that conversation?
7     A. Not at -- not at that time, no.
8     Q. So when did that take place?
9     A. Okay. On the 20th around 6:54 p.m.
10 Landon called me and said that he had -- McVicker
11 was ready to meet with me and so we met, I think,
12 maybe a half hour later, probably 7:30, eight
13 o'clock, somewhere around there.
14     Q. Was there any communications on the 19th
15 about Sheriff McVicker's campaign? We went from
   th
16 the 18th to the 20 , I think.
17     A. Yeah. Your question asked me when was
18 the next time as far as the setting up the
19 meeting ---
20     Q. Yes, that's what.
21     A. That's when the meeting was set up.
22     Q. Yeah. I just wanted to see if there was
23 any communications on the 19th.
24     A. There was another communication on the
25 18th, that night. On the 19th, I'm not -- if

1 there was, I'm just not recalling at the time.
2     Q. What time was the other communication on
3 the 18th?
4     A. Around 9:42 p.m.
5     Q. Can you tell me about that conversation?
6 What took pla -- what it was about?
7     A. That conversation was -- he wanted to --
8 like I said, at the end of the 6:24 conversation,
9 he wanted a different -- he didn't want me to show
10 up in his campaign contribution report. So I had
11 a -- I had an idea. I called a -- you know, I had
12 an idea of a different way.
13     Q. Can you tell me what that idea was?
14     A. That idea -- and I ran it by Landon at
15 the time -- was that I thought I possibly could
16 get a contribution from someone else. And Landon
17 didn't have a problem with that. He thought that
18 was a good idea.
19     Q. Did you have someone else in mind?
20     A. I did.
21     Q. Who was that individual?
22     A. It's a business partner of mine -- or a
23 partner that I've done business with in the past
24 and his name is Ted Lyda.
25     Q. Can you spell the last name please?

1     A. L-y-d-a.
2     Q. What type of business partner is that --
3 what entities has he helped you with?
4     A. Ted -- he does some distribution for me
5 for Crazie Overstock right now. I've known him as
6 a friend for a while, just -- I think I've known
7 him probably since 2009 or so.
8     Q. Does Ted live in North Carolina?
9     A. He does.
10     Q. What county does he live in?
11     A. I'm not a hundred percent sure.
12     Q. Do you know what city?
13     A. He lives out in the country. He doesn't
14 live in a city.
15     Q. Eastern North Carolina?
16     A. Middle.
17     Q. Had you communicated with Ted prior to
18 calling him to -- let me clear it up. This nine
19 P.M. communication on the 18th, did you initiate
20 that call?
21     A. The nine P.M. call to Landon, I did
22 initiate that call.
23     Q. Prior to initiating that call, had you
24 spoken with Mr. Lyda?
25     A. Yes.

1    Q. Did you relate to Mr. Bordeaux during
2  that nine P.M. conversation that you would be
3  picking up the check the next day?
4    A. I don't know for sure if I did, but most
5  likely. I had -- that conversation nine P.M. was
6  to go up -- was to let him know what -- how I
7  intended to -- you know, what my idea was of doing
8  this and run it by him to see what his opinion
9  was. And he was okay with that.
10    Q. When you had -- so that's three
11  different communications with Mr. Bordeaux on the
12  18th, correct?
13    A. That's correct.
14    Q. Were you and he the only participants in
15  these conversations?
16    A. There was as conversation I had with
17  him.
18    Q. So on your end it was just you?
19    A. Yes.
20    Q. And did you have any understanding
21  whether or not somebody else was listening on the
22  other end of the line?
23    A. Well, the first conversation, we met in
24  person. There was no one there. The second
25  conversa -- yeah. I mean ---

1    Q. So now we'll go on to the 20th, 6:27
2  P.M. you received a call from Mr. Bordeaux, is
3  that correct?
4    A. 6:54 P.M.
5    Q. All right. And I think you testified
6  that he mentioned that they were ready to have
7  their meeting with you?
8    A. Yes. He said -- he said that he had
9  gotten in touch with Mr. Mc -- or that he had
10  scheduled a meeting with Mr. McVicker and asked me
11  if I would, you know, come to it. And I was. I
12  was able to.
13    Q. What were the details of that
14  arrangement in terms of who was going to be there
15  and what time it would be?
16    A. I didn't know who was going to be there,
17  first of all. I just know that Landon had -- I
18  know that Mr. McVicker was going to be there. I
19  didn't even know if Landon was going to be there,
20  but I knew that Mr. McVicker was going to be there
21  because that's who he said he had set the meeting
22  up with. And he told me that it would be at his
23  grandmother's house, which everybody refers to
24  that house as the roadhouse. That's just the name
25  it's given. His grandmother's deceased and Landon

1  uses that house for a variety of reasons. And
2  that's -- and it's right in front of his house and
3  directly behind -- in front of a barn that he's at
4  on a daily basis.
5    So I knew the area. I mean, it's right
6  close to my home and that's where he'd set up the
7  meeting for.
8    Q. So when you arrived at the meeting, were
9  you the first person there?
10    A. No. When I arrived at the meeting the
11  other people were there.
12    Q. What happened after you arrived?
13    A. I walked into the roadhouse and Mr.
14  McVicker, his wife and Landon were there -- well,
15  I think Landon met me outside, whatever, and then
16  walked me to the back door entrance. I walked in
17  with Landon, if I -- if I recall correctly. And
18  when I walked in Mr. McVicker and his wife were
19  sitting -- there's a couch and a chair here
20  (indicating) and a chair over here (indicating)
21  and a coffee table right here (indicating). So
22  Mr. McVicker and his wife were sitting on the
23  couch, I sat in the recliner over here
24  (indicating) and Landon sat in a chair/recliner
25  over here (indicating) and there was a coffee

1  table in the center.
2    Q. Who initiated the discussion?
3      MR. BRIAN: Object to the form.
4      THE WITNESS: I don't -- I really
5  don't -- I mean, I'd speculate. I don't know who
6  initiated it.
7    Q. (Mr. Spaugh) Can you tell me what you
8  remember about after y'all arrived and were
9  seated?
10    A. We exchanged pleasantries, you know,
11  that sort of thing. I was officially introduced
12  to Mr. McVicker, I met his wife and I guess he was
13  officially introduced to me. Landon did the
14  introductions, basically. Next question.
15    Q. Well, what happened next?
16    A. We -- I don't know the order of the
17  questioning, but we basically, you know,
18  started -- I don't know if we started the --
19  probably was discussing some of the reasons why
20  the sheriff was running, some of the things that
21  he wanted to accomplish as -- as -- as sheriff.
22    Q. I guess when was your contribution
23  brought up?
24    A. The contribution was -- like I said, I
25  talked to Landon on the 18th at nine-something and

1  he agreed that that would be the proper -- that
2  would -- that would be something that would work
3  for them -- and the contribution was -- when was
4  it -- I don't know that it was -- it was kind of
5  -- I know when it was given, but as far as when it
6  was brought up during the conversation, I -- I
7  mean, we talked about several different things.
8     Q.  Was the contribution brought up during
9  the discussion?
10     A.  It was -- it was brought up that I would
11  -- that a contri -- I was there for a
12  contribution.  That was -- I don't know that I --
13  I don't know that it was verbally said, but it was
14  understood.  It was understood.  Landon had
15  already made that very clear when he set up the
16  meeting that I would be meeting for him -- meeting
17  with them, and as a result of that meeting, unless
18  something was way out of line, that I would -- you
19  know, I would give their support and a
20  contribution.
21     Q.  You mentioned that you do remember when
22  it was given.  When and how was it given?
23     A.  At the conclusion of our meeting, I
24  placed a check on a -- on the coffee table and
25  then -- and that's where I set it at and then we

1  walk -- we -- all of us or maybe not his wife, but
2  at least McVicker and Landon and I walked out of
3  the house and had some -- you know, a few other
4  discussions out in the yard.
5     Q.  And was this the check that you had
6  picked up from Mr. Lyda?
7     A.  Yes.
8     Q.  You mentioned that you discussed some
9  other issues that evening.  Did you discuss the
10  operations taking place at Big and Little Aladdin?
11     A.  Not the specific operations, no.
12     MR. SPAUGH:  Wait.  Off the record.
13  (Off record)
14     THE WITNESS:  Could you restate the
15  question just to ---
16     Q.  (Mr. Spaugh) Yeah.  So did you discuss
17  the operations at Big Aladdin and Little Aladdin?
18     A.  Specifically, no.
19     Q.  Okay.  Did you discuss the legality of
20  the operations at Big Aladdin and Little Aladdin?
21     A.  I told Mr. McVicker that I had multiple
22  opinion -- you know, that I had gotten legal
23  support or legal counsel, that I explained to him
24  that I had already went through a nine-day trial
25  in 2013 and that I was not found guilty, that it

1  was a mistrial and that as a result for that, I
2  had reopened my business, and that I was -- you
3  know, based on information that I knew and because
4  we'd already went through a trial that I was --
5  had a lot of reason to believe that -- that I was
6  legal.  And I knew I was legal.  There was no
7  question about it.
8     In fact, I told him if I -- I wouldn't
9  be open at that point, which I was, if I didn't
10  think I was legal.  I was in a clearly open
11  business.
12     Q.  I'm going to hand you what we'll mark as
13  Exhibit Four.
14     MR. SPAUGH:  Is that correct?
15  Exhibit Four?
16     (DEPOSITION EXHIBIT
17     NUMBER FOUR WAS MARKED
18     FOR IDENTIFICATION)
19     Q.  If you'd turn to page ten, Mr. Smith.
20  Look at that last sentence in paragraph ten for me
21  and let me know if you know anything about that.
22     A.  The last sentence of paragraph ten?
23     Q.  No, excuse me.  The last sentence of the
24  first paragraph on page ten.
25  (Witness examines document)

1     A.  Okay.  I've read it.
2     Q.  Is that -- is that accurate?
3     A.  With some clarification.  Okay.  The
4  check that was given to him -- I'm not a -- I'm
5  pretty sure it was from a joint account from Ted,
6  I think probably with his wife.  It was -- I was
7  given it to them.  I mean, I personally brought
8  the check to him and laid it on the coffee table.
9  And that's what the amount of the check was -- is
10  accurate.
11     Q.  Okay.  I just wanted to clarify that the
12  check was not, in fact, from you in this sentence.
13     A.  It was not from an account from myself
14  and Mrs. Smith, that's correct.
15     Q.  Thank you.
16     A.  It was a -- as I've already disclosed,
17  it was a check.
18     Q.  All right.  Now if you could turn to the
19  previous page.
20     A.  Okay.
21     Q.  All right.  Near the bottom of par --
22  the last paragraph -- it should be the answer to
23  Interrogatory 14, it states, "Mr. Smith spent over
24  an hour explaining how his promotions operated and
25  complied with the law."  Can you tell me to the

1 best recollection, what the contents of this
2 conversation was -- what this explanation was?
3      MR. MAYNARD: Objection. I'm
4 instructing him not to answer.
5      MR. SPAUGH: On what grounds?
6      MR. MAYNARD: As I've stated
7 previously, he is not going to -- I am instructing
8 him not to answer any questions that deal with his
9 defenses in the criminal actions ground.
10      MR. SPAUGH: Okay. So -- I just
11 want to make sure it's on the criminal actions
12 ground.
13      MR. MAYNARD: Correct.
14      MR. SPAUGH: Okay. So is this a
15 Fifth Amendment?
16      MR. MAYNARD: It is a non-discovery
17 -- your discovery order -- that -- that you folks
18 enter into in this other case.
19      MR. SPAUGH: Mr. Maynard, I
20 don't -- I mean, do you have standing to raise
21 that objection under discovery order?
22      MR. BRIAN: Well, he is Mr. Smith's
23 attorney.
24      MR. SPAUGH: In the criminal
25 action.

1      MR. BRIAN: Right, but you're also
2 his attorney.
3      MR. SPAUGH: He's -- I mean, it's a
4 genuine question.
5      MR. BRIAN: I mean, I think he does
6 have standing to -- to -- to prevent what's
7 essentially an attempt to do discovery that would
8 support the criminal action.
9      MR. SPAUGH: And I'm not trying to
10 do that. I want to be very clear. I have -- I
11 don't care at all about the criminal actions,
12 truly. I'm not here for that.
13      MR. BRIAN: Okay. Well, then this
14 -- this -- this line of questioning ought to be
15 very short.
16      MR. SPAUGH: The issue is that
17 statements have been made -- well, I'm going to
18 ask you some questions, Mr. Smith.
19      MR. BRIAN: That would be good.
20      Q. (Mr. Spaugh) Are you alleging that
21 Sheriff McVicker had malice -- or acted with
22 malice towards you?
23      A. In the complaint -- have you read the
24 complaint?
25      Q. I have.

1      A. Yes. We're alleging that.
2      Q. Okay. And can you explain to me some of
3 the grounds in which you believe that malice is
4 based?
5      MR. BRIAN: Object to the form of
6 the question. Go ahead and answer it if you can.
7      Q. (Mr. Spaugh) or why you think Sheriff
8 McVicker has malice towards you.
9      MR. BRIAN: That's better.
10      THE WITNESS: Why does Sheriff
11 McVicker have malice towards me? There are -- I
12 believe that he is -- you know, his raid -- I'll
13 call it a raid -- is -- he's pandering towards
14 different folks that he relied on during his
15 election. I think that -- he admitted that he
16 went to a conference of preachers or what have you
17 and that they asked him about that and I think
18 that he had political aspirations of continuing
19 going on, and that he would do whatever it took to
20 -- to make his constituents -- specifically the
21 preachers that he is saying came and -- came to
22 him and questioned why I was in business and that
23 sort of thing.
24      I think he would -- he was willing to go
25 to any extent to make them feel justified that

1 they're -- that they were being answered. I think
2 he done so in a way that was over and above board.
3 I think there was a significant amount of damage
4 that we are claiming in here. He's the sheriff of
5 that department. He could have done more to
6 ensure that damage like this did not occur.
7      I think he wanted maximum publicity. I
8 find it -- I find it very disingenuous to suggest
9 that -- that the helicopter land in Dublin. There
10 are a lot of obstacles, including power lines, in
11 the location that the helicopter landed at.
12 There's never been a helicopter land, from the
13 sheriff's department, in the history for the
14 sheriff's department having a helicopter, land in
15 the Town of Dublin.
16      It's not familiar territory for them to
17 land in. It's not like a football field in
18 Elizabethtown Middle School where they -- or
19 primary school where they were at prior that day.
20 So for him to coordinate and tell an officer to
21 drive -- not to drive five more minutes down the
22 road to meet a helicopter that was supposedly
23 already landed at some school and to ask that
24 helicopter to fly up, come to Dublin, fly around,
25 take some pictures, land in a unfamiliar territory

1   amongst power lines and trees and everything else,
2   have dinner with these folks as if the urgency is
3   not even there, was all to -- yeah. He might have
4   a reason for that guy to get in this -- this
5   helicopter to fly to go do some other things, but
6   it just doesn't make sense for him not to tell
7   this guy, go five minute -- five minutes down the
8   road and get in this helicopter that's already on
9   the ground and -- as opposed to telling this
10  helicopter to expend fuel, expend gas and fly and
11  land in an area that they've never landed at
12  before, and that would -- it's not like a
13  helicopter pad that -- that medical helicopters
14  land on that's designed for helicopter landings.
15  So they're landing in an area that they've never
16  landed at before.
17      So for him -- for him -- and he's
18  already said in his deposition, for him to make
19  the decision to have a helicopter come and do that
20  -- he was -- he was attempting and did effectively
21  create maximum publicity and embarrassment for my
22  wife and I. That there's no -- there's absolutely
23  no -- no reason for him not to have had that
24  officer go five minutes down the road other than
25  to make sure that that helicopter was shown

1   present at that location.
2       There was no reason for him -- for the
3   entire morning to have his sheriff's deputies
4   vehicles in the parking lot with flashing blue
5   lights for the majority of the morning. They had
6   already secured the area. Why do you want -- why
7   would you -- why do officers flash their blue
8   lights on something in a secure area? To draw
9   maximum attention to that area. He didn't have to
10  do that.
11      He blocked off a portion of the road for
12  a -- granted, it probably wasn't for a very long
13  period of time, but there was a portion of the
14  road blocked off and re-routed traffic around the
15  entire intersection with cops blocking the road
16  just so it would -- it would be known that there
17  was a major happening occurring there on the
18  corner of the building. That was done for maximum
19  publicity purposes.
20  Q.  (Mr. Spaugh) What is the basis of your
21  belief that the portion of the road is blocked off
22  to create publicity?
23  A.  The basis of my belief is that from
24  aerial photos and all the other photos that I've
25  seen, all the police vehicles and other vehicles

1   were contained in the parking lot. They were all
2   already parked in the parking lot. If a police
3   officer can't cross the road without having the
4   road blocked, I think that's an issue.
5   Q.  What about instead of backing in a
6   moving truck ---
7       MR. BRIAN:  Objection to the form.
8   It calls for speculation.
9       THE WITNESS:  First of all, the --
10  from the direction of the -- from the photographs
11  that I've seen that had this -- I don't know which
12  ones they are, but there were some photographs
13  that had the U-Haul truck in it. Do you recall
14  those photographs? Okay. From the direction that
15  the truck was in in those photos, he didn't back
16  in. He pulled into the parking lot.
17      He would not have had to -- and they
18  would not have -- I mean, the difference between
19  blocking a road and -- and a police officer in the
20  middle of the road for two seconds saying, "Hold
21  up. Let this guy come -- pull forward and back
22  up," that's two different things. And from my
23  understanding listening to other folks, the road
24  was blocked for, not a long period of time but a
25  short period of time, at some point.

1   But all the blue lights going on, all
2   that was designed for maximum publicity. There
3   was -- and I know you'll get into this question
4   earlier -- there is absolutely no justification
5   for Officer Deaver to be on top of the building
6   and rip 3,000 whatever amount linear foot of LED
7   lights off that are in tracks -- the wiring is --
8   the wiring in the tracks is not doing anything.
9   There's not dispute about that -- and throw it on
10  the ground in the back of the building and leave
11  it there. None.
12      Did they even think that they -- well,
13  maybe these lights use electricity. Maybe I
14  should kill the power. No. None. They just do
15  this stuff with -- without know -- without
16  thinking.
17      Officer Tyler said he witnessed -- he
18  wouldn't give his name -- he said he couldn't
19  recall his name, but he witnessed an officer
20  ripping off a mural on the front window of the
21  building. I had, and I'm recalling a conversation
22  at some point with one of the employees of --
23  of -- of the business next door -- I don't know
24  their name. I just recall -- I happened to be at
25  the building when this conversation happened and

1   this was in the future after the raid -- that they

2   had seen the mural in the dumpster that day.

3       I don't think there's no dis -- if there

4   is disputing this, Officer Tyler has already

5   called it unprofessional because he said -- he

6   said that it would be unprofessional for them to

7   seize anything and it not be on that inventory

8   list. That mural was not on that inventory list.

9       We've got a request to go view the

10   inventory and I bet you ten to -- nine to one --

11   ten to one that we're not going to find that mural

12   in their inventory. It's not going to be there.

13       Why is it not there? Because it wasn't

14   seized. Why wasn't it seized? Because they threw

15   it in the trash can. And can they dispute that?

16   No, because they don't have it. That -- everyone

17   of those are instances of malice. Sheriff

18   McVicker is in charge of every one of those

19   officers. If he put so much control in all of his

20   captains and he believes, as he said the other

21   day, that if his captains did it, then he's --

22   he's behind them. So if he has that much control

23   over all of his captains, then he's approving

24   everything that his captains do.

25       And his captains sit there and watch

1   that, don't know if it was copied on the inventory

2   list, but just assume that it was. So is that

3   professional? No. Captain Tyler said it would be

4   unprofessional for them to throw it away. He's

5   already said that in his deposition.

6       So the fact that -- that -- that they

7   were being professional, as Sheriff McVicker

8   conveyed in his press conference, that they had

9   been professional or whatever or -- or, you know,

10   they collaborate on that, it's totally untrue.

11       His officers are -- are negating --

12   they're already saying that if this happened, this

13   is not professional. I don't think McVicker's

14   even talked to his officers to see what happened.

15   I don't think that he knows these LED lights were

16   thrown on the back of the ground. He acted like

17   he'd never seen the pictures before.

18       He doesn't know what's going on because

19   he doesn't care. And if he cared he would -- it

20   wouldn't have happened like that. So, yes. I

21   hope I've answered your question. Tons of malice,

22   tons of publicity and -- and he's trying to please

23   his preacher friends who -- who he feels like he

24   gets a lot for support from in elections. And who

25   -- he's got another election he's going to be

1   running. So he's going to do whatever he -- he

2   does and cause maximum publicity and try to do

3   whatever he can to get their votes next time

4   around.

5      Q.  There have been a lot of questions in

6   depositions that you have heard about the need to

7   conduct an investigation at all because of your

8   offer to the -- alleged offer to the sheriff to

9   have him come in an check things out and to

10   explain to him how the games worked. Do you

11   recall those questions that were asked of other

12   people?

13      MR. BRIAN: Objection to form.

14   Answer.

15      THE WITNESS: Okay. So ---

16      MR. BRIAN: Yeah, answer the

17   question, Jeff.

18      THE WITNESS: Yes. I offered the

19   sheriff to come and review the operation at any

20   time and I'd be happy to go over it with him.

21      Q.  (Mr. Spaugh)  And is part of your malice

22   claim based off of his refusal to do so?

23      A.  Is part of my malice claim based off his

24   refusal to do so?

25      Q.  Uh-huh (yes).

1      A.  His refusal to do that shows that it

2   didn't matter what I would have said or what I

3   would have offered. He was going to do what he

4   wanted to do. He was going to do what those

5   preachers wanted him to do. That's what that

6   shows.

7      Q.  If he had agreed to come and see, what

8   would you have told him?

9      A.  We wouldn't be standing here today.

10      Q.  And why is that?

11      A.  We wouldn't be standing here today

12   because I think he -- it would have been handled a

13   lot differently.

14      Q.  And why do you think it would have been

15   handled differently?

16      A.  I just -- I just know that it would.

17      Q.  What would you have told him to make it

18   be handled differently?

19      A.  What would I have told him that it could

20   be handled differently?

21      Q.  What would you have told him that would

22   have ensured that it would have been handled

23   differently?

24      A.  Well, if he believed that after I give

25   him a demonstration -- if he believed that the

business was illegal, I would not have argued with him. I would have -- and I told him this -- I would have -- and I did this in October -- I would have closed that business down and I would have done other remedies -- I would have had other remedies and I would have sought other remedies to get that business open to where he wouldn't have had any question whether it was legal or not.
Q. What would you have shown him during the demonstration to demonstrate the legality.
A. I would have shown him the business and that's too broad. I can't -- I would have shown him the business in its entirety and showed him how it operated.
Q. Can you ---
A. And if he would have came back and said, "I think that's illegal," then I would have used other remedies to -- I would have shut the business down, which if avoid -- we wouldn't be here today if that was the case and I would have used other remedies to resolve the problem.
Q. Okay. Can you try and explain to me what you would have told him?
MR. BRIAN: Objection. Asked and answered.

THE WITNESS: I just said --- I just said ---
MR. SPAUGH: He said it's broad and I'm explaining that we have four hours left.
THE WITNESS: Are you talking about the business?
Q. (Mr. Spaugh) Yeah.
A. How -- how ---
Q. You said -- you said -- you claimed that if Sheriff McVicker had taken you up on your offer to come and inspect this, that we wouldn't be here today and this would have never happened.
A. That's correct.
Q. And do you believe that his -- as a result that he didn't, that that constitutes malice.
A. I believe that his -- he had the option as he's already said at his deposition -- he could have given me what he referred to as a target letter, but after speaking with -- I don't know what capacity Ronnie Mitchell has with the sheriff's department -- if it's a part-time -- a favor capacity or whatever it is -- that Ronnie Mitchell apparently pulled the right string and told him not to do that, to go ahead and just

raid. Yes. I believe -- I believe that lack of communication -- because when we left that meeting, communication with me was something that I expressed that I felt like -- and he agreed that he would do so -- if there was any issues with my business he would pick the phone up and call me.
If we couldn't resolve the issue that -- do whatever. And if there were any issues with my business and he called me and told me, I would close the business. Period. We wouldn't be here today.
The fact that he listened to Ronnie Mitchell and ignored everything that he gave me in a -- what I will -- what I will refer to as a gentlemen's agreement, "I will call you if there's any problems," there's nothing unreasonable about that. I wasn't asking for any favors. All I wanted him to do was call me if there was any issues. He agreed to that. He said, "I'm not going to come there with no SWAT-like stuff. You know, I'll call you."
But the fact that he jumped over that -- what -- and -- and -- and did not do that and went straight to Ronnie Mitchell and done exactly what Ronnie Mitchell told him to do as opposed to

making his own decisions, I think he could care less of what -- how -- what effect it had on me -- me and my family.
And as a result of him not caring, yes. That was malice.
Q. So his inability then -- you're claiming that his inability or his lack of reaching out to you in coming to inspect constitutes malice, which as you know is an essential part of this case in this specific phase. So as a result what would you have demonstrated to him had he come to inspect?
A. I would have demonstrated the operation and I can't -- there's no way I can demonstrate the operation in verbal format to you in this room. In order for me to demonstrate the operation, we would have to be at the operation.
Q. To the best of your extent, please tell me how it is legal in your mind.
MR. BRIAN: Objection. Instruction you not to answer.
THE WITNESS: There -- are you ---
MR. BRIAN: Instruct you not to answer.
THE WITNESS: Yeah. I'm not

1     sheriff's office's determination that there is
2     probably cause to believe that the operations at
3     Big Aladdin were illegal?
4           MR. MAYNARD: Jeff, again, I'm
5     instructing you not to answer that question.
6           THE WITNESS: I'm not going to
7     answer that question based on the advice of my
8     attorney.
9           MR. SPAUGH: Yeah, that's fine.
10     And I just want to build the record here. I'm
11     going to ask the questions and if you make that
12     instruction, that's fine. I just want to build
13     the record.
14           MR. MAYNARD: That's fine.
15         Q. (Mr. Spaugh) What about -- same
16     question as to Little Aladdin.
17           MR. MAYNARD: Same instruction.
18           THE WITNESS: I'm not going to
19     answer that based on the advice of my attorney.
20         Q. (Mr. Spaugh) Were the games being
21     conducted in Big Aladdin the same as the games
22     being conducted in Little Aladdin?
23           MR. BRIAN: Objection on the
24     grounds of lack of foundation.
25         Q. (Mr. Spaugh) Were the operations at Big

1     Aladdin identical to the operations at Little
2     Aladdin?
3           MR. MAYNARD: Same advice.
4         Q. (Mr. Spaugh) Okay, so you're not going
5     to answer.
6         A. I'm not going to answer based on the
7     advice from my attorney.
8         Q. Do you believe that Sheriff McVicker has
9     any personal animosity towards you?
10         A. That would be speculation on my part.
11         Q. Is there anything that would lead you to
12     believe that prior to the execution of the search
13     warrants in May 2015?
14         A. He indicated me -- he indicated to me at
15     our meeting that we had -- initial meeting on the
16     20th that if there were any issues with my
17     business that he would contact me first, so the
18     fact that he didn't contact me at all is a -- you
19     know, I think shows, among other things, his
20     integrity.
21         Q. But why do you think -- assuming that
22     these facts contained in the response to
23     interrogatories are true that a campaign donation
24     was made, multiple campaign donations, to benefit
25     Sheriff McVicker, why would he be out to get you?

1           MR. BRIAN: Objection for lack of
2     foundation.
3         Q. (Mr. Spaugh) You can answer.
4         A. I'm going to -- and I think this is no
5     excuse on his behalf, but the only reason why
6     he -- I don't think -- maybe his campaign manager
7     and him were not fully communicating entirely on
8     what was going on. That's his campaign's fault.
9     That's McVicker's fault. It's his choice of
10     campaign manager. If that is the case, then to me
11     it would make no sense.
12         Q. How were you informed that the check was
13     going to be returned to you?
14         A. Landon gave it to me. He informed me
15     that -- that the sheriff or candidate at the time,
16     that they had decided that they needed to give it
17     back and that it would -- and I'm paraphrasing
18     here, but it was a $4,000 check, so it would be
19     scrutinized by the incumbent's campaign.
20         Q. How was that conversation initiated?
21         A. Landon basically had to, you know -- he
22     would -- I'm not sure the exact -- how it was
23     initiated. He basically said that, you know, the
24     sheriff doesn't want to take it, you know, as if
25     he had tried to get the sheriff to take it and the

1     sheriff didn't want to take it. And the basis for
2     it was what I just said already.
3         Q. Did he -- did Landon contact to set up
4     that meeting?
5         A. Did Landon contact me to set up the
6     meeting?
7         Q. To return the check?
8         A. It was -- I can't remember -- I rode
9     over there -- I think I ran -- I basically rode
10     over there to -- where I knew he was at every
11     afternoon and it might have been conveyed to me
12     that Landon needed to talk to me or something.
13     But at any rate, he did not call me directly. It
14     was conveyed to me that he needed to talk to me,
15     and I can't remember where that came from.
16         Q. Okay.
17         A. But at any rate, I drove over there on
18     my own accord to his barn, which is where, like I
19     said, he's at every afternoon.
20         Q. Who all was present during that
21     conversation?
22         A. Just Landon and I. I think maybe a
23     couple other people came up while I was there, but
24     we went into a -- an area where we could have a
25     conversation without other people hearing it.

1    Q.  What did you do to the check after it
2  was returned?
3    A.  Destroyed it.
4    Q.  Did you throw it in the trash?
5    A.  I don't know if I threw it in the trash
6  or -- I don't know what I did with it, but I
7  destroyed it.
8    Q.  When you had that meeting with Landon,
9  were arrangements made for you to present the cash
10  contribution instead?
11    A.  It was -- it was -- not at that time
12  when the contribution will be made, but it was
13  discussed that I would make -- that the
14  contribution would be made differently.
15    Q.  How was it set up to make the cash
16  contribution?  Can you just walk me through that?
17    A.  Landon called me on the 23rd, I believe
18  it was.  I don't have the time exactly in front of
19  me, but it was on the 23rd and asked me to -- the
20  $4,000 that I had initially done -- asked me to
21  give that to a gentleman named McCrae Dowless.
22    Q.  Who is that?
23    A.  McCrae Dowless is someone that the
24  campaign had hired to assist with getting the vote
25  out in a variety of ways.

1    Q.  Were you aware of that at the time
2  or ---
3    A.  Yes.
4    Q.  Did Landon tell you that?
5    A.  Yes.  I was fully aware of that.  That
6  was no secret.
7    Q.  So the process of getting the cash --
8  did you take cash from your home or how did you
9  obtain the cash?
10    A.  It was personal cash that I had.
11    Q.  Did you withdraw it from a bank?
12    A.  I don't recall if I did or didn't or --
13  I'm not sure.  I -- I -- I don't recall that.
14    Q.  Would there be any documentation of the
15  presentation of cash on your end?  In terms, did
16  you keep any receipts or pull anything from a bank
17  deposit?
18    A.  I -- like I said.  I don't -- I don't
19  recall.
20    Q.  When you went to a -- can you tell me
21  about how you gave it to McCrae?
22    A.  With my hand.
23    Q.  You know what I mean.
24    MR. BRIAN:  Actually, I don't know
25  what you mean.

1    THE WITNESS:  How did I give it to
2  him?  He -- he was -- he had been made aware to
3  come see me.  Apparently he had a conversation
4  with -- with Landon and he was made aware that he
5  needed to come see me.  Landon had already called
6  me and asked me to give it to him, so I knew that
7  that was what was going to happen and apparently
8  he must have had a conversation with -- with
9  McCrae and told him to come see me, that I would
10  give him the cash.
11    Q.  Where did he come see you?
12    A.  You know, I'm not a hundred percent sure
13  about the answer to that question.  I don't re --
14  it was in Dublin.  That's about as specific as I
15  can say.  I'm pretty sure it was in Dublin.
16    Q.  Was anyone else present when the cash
17  exchanged occurred?
18    A.  I don't recall that, no.
19    Q.  I mean, how long was the process of you
20  giving the cash to him?  I mean, did y'all talk or
21  did you hang out?
22    A.  I'm sure we had some pleasantries
23  exchanged.  All I know is that he was -- he was
24  running -- he was working for their campaign
25  heavily and doing what he was doing and I was

1  aware that he was doing that stuff for the
2  campaign.  I was aware that he was working for the
3  campaign and if that's what his campaign mana --
4  if that's what the campaign manager asked me to do
5  after we'd agreed that that's what would happen,
6  that's -- that's what I did.
7    Q.  Can you talk to me now about the second
8  conversation -- second contribution and how that
9  came about?  Did Landon contact you?
10    A.  He did.
11    Q.  Okay.  The discovery responses mentions
12  later.  Were you able to look at your phone
13  records and ascertain when that occurred?
14    A.  That occurred -- that occurred on
15  October 23rd at 9:24 a.m. in the morning.
16    Q.  And how long was that conversation?
17    A.  It was very brief.  It was -- it was
18  basically, you know, do you -- would you
19  contribute another -- at the time it was $900 --
20  would you contribute $900?  We're going into early
21  voting.  We're -- you know, our internal polling
22  shows us neck and neck and we need this -- we need
23  this money to continue.  McCrae -- McCrae needs
24  money and we -- and he -- he needs it to continue
25  his operation, basically.

1    So he asked me to contribute an
2  additional $900.
3    Q.  Was there anyone else on the call other
4  than you to your knowledge?
5    A.  Not to my knowledge.  It was a very
6  brief conversation.
7    Q.  What happened after that?
8    A.  A similar scenario that happened the
9  initial time.
10    Q.  And what is that?
11    A.  That McCrae apparently had a
12  conversation with Landon.  Landon told him that he
13  needed to come -- that he had spoke with me or
14  whatever, that I was contributing an extra $900.
15  McCrae came, I gave him $900.
16    Q.  How did it end up being $1800?
17    A.  There was two $900 contributions.  The
18  second one occurred -- I'll have to look at the
19  calendar -- I'm still waiting the phone records
20  for that particular month, but it was -- it was
21  the day before -- my understanding, it was the day
22  before a local festival called the Bees' Fest.
23    Q.  Was that arranged in the same manner
24  with Landon calling you?
25    A.  Yes.

1    Q.  And then McCrae coming to you to pick up
2  the contribution?
3    A.  That's correct.
4    Q.  Was anyone else, to your knowledge, on
5  the phone when Landon called you that day?
6    A.  Not to my knowledge.
7    Q.  How soon after these conversations did
8  McCrae come to pick up the cash?
9    A.  I'm sure it was that same day.  I don't
10  know.  I'm sure it was that same day.
11    Q.  Do you know whether or not you have any
12  bank records or statements reflecting a withdrawal
13  of that cash amount?
14    A.  I don't recall.
15    Q.  Which bank do you use?
16    A.  In that time frame?
17    Q.  Yeah.
18    A.  I don't know.  I don't use them anymore.
19  I honestly -- I've changed banks a few times.  I
20  don't know -- I can't tell you what bank I was
21  using at that time.  It might have been -- I don't
22  know.  I'd be speculating because I've changed
23  banks a couple -- few times.  I don't know what
24  bank I was using at that point ---
25    Q.  That's okay.

1    A.  --- for my personal account.
2    Q.  These are not paid out of business
3  accounts?
4    A.  No.
5    Q.  Were you and Holly present during the
6  execution of the search warrants on May 29th,
7  2015?
8    A.  No.
9    Q.  Where were you?
10    A.  Let's see.  I think we were both in
11  Cumberland County.
12    Q.  What were you doing in Cumberland County
13  that day?
14    A.  I'm not sure -- she'll have to ask
15  you -- you'll have to -- we weren't together.  She
16  might have been getting her hair done or some -- I
17  don't know.  I can't remember what she was doing.
18    I was -- I had stopped at McDonalds I
19  think in Grays Creek and was eating.
20    Q.  Is that the only reason you went to
21  Cumberland that day was to go to McDonalds?
22    A.  I went to the grocery store -- I had
23  plans to go to the grocery store.
24    Q.  Can -- can you just walk me through your
25  activities that day, specifically from ten A.M. to

1  five P.M.?
2    A.  I left the house that morning, headed to
3  Fayetteville.
4    Q.  What were you going to do in
5  Fayetteville?  And that is Cumberland County,
6  correct?
7    A.  Yeah.  You know, I don't remember what
8  exactly I had planned to do that day to be honest
9  with you.  I'd be speculating.  I just know I was
10  headed to Fayetteville.  I do a variety of normal
11  things in Fayetteville that everybody else does,
12  so I don't know what my reasoning was.  It might
13  have been getting a part or something like that.
14    Q.  Would this be a part for a car or a part
15  for a business component?
16    A.  I'm -- I would be -- Patrick, I would be
17  a hundred percent speculating.  I'm just saying
18  that that's one of the many reasons why I go to
19  Fayetteville is to get computer parts, car parts.
20  I don't want to speculate.  You don't want me to
21  speculate either, so...
22    Q.  How did you learn about the searches
23  being executed?
24    A.  I had a couple phone calls.  And I think
25  Holly was one of them actually.  She -- like I

1 voting precinct. Of course, I had already given
2 my support in a lot of other ways and so I agreed
3 to do so.
4 So I used my tent, my tables, my chairs
5 and several people that -- that I know and we --
6 Sheriff McVicker's wife was gracious enough to
7 come by and give all of us, including one that I -
8 - that I received -- a t-shirt for his campaign,
9 all the literature was provided to us. So the --
10 and she subsequently, a couple times during that
11 early voting week, brought lunch, water. She was
12 making sure that we had the attire that we needed
13 and on some occasions were fed and had plenty of
14 water.
15 I personally talked to McVicker, which
16 he's already testified to at the -- at that voting
17 precinct. He thanked me for helping at that
18 precinct and doing the things that I was doing for
19 his campaign. No problems at all at that time.
20 He was fully aware of that -- like I said, his
21 wife was apparently in charge of the t-shirts in
22 general.
23 So -- so yeah. I hope that answers your
24 question. So we -- so basically -- and I ended up
25 having to -- those people had to be paid that

1 worked there and he was aware of that. So his
2 campaign was aware of that.
3 Q. This is fast-forwarding back to the
4 execution of the search. We've already talked a
5 little bit about Deputy Deaver and his role in the
6 search. Do you believe that he has any personal
7 animosity towards you or do you have any reason to
8 believe why he would?
9 A. I believe that he received some
10 instruction within the sheriff's department to do
11 the damage that he did. Where that instruction
12 came from, we have not apparently deposed that
13 person yet, but I think he was following orders
14 and those orders came from the top, which was
15 McVicker, trickled down through his hierarchy of
16 commanders and chiefs and majors and captains.
17 Q. Do you believe he -- Deputy Deaver, or
18 Corporal Deaver now, has any reason to have
19 personal animosity or do you know of any reason
20 why he would have something personally against
21 you?
22 A. I think he -- he -- he admitted and he
23 was not doing -- his action's were not based on
24 rouge actions. I think he was instructed to do
25 what he did. I'm not sure who that instruction

1 came from. If it was his superior or subordinate.
2 I don't know. But as far as -- I don't know
3 Deputy Deaver personally. He's admitted not
4 knowing me personally. So based on that, I don't
5 think that Deputy Deaver personally has an issue
6 with me. I think he was follow -- he obviously --
7 I don't think -- he obviously was following
8 instructions from his superiors.
9 Q. So we're now going to transition to the
10 post-search events and kind of what happened after
11 that sequence of events. So after you turned
12 yourself in what were your -- let me -- let me go
13 back to that. On the day of May 29th, can you
14 tell me about any conversations that you had with
15 Scott Long?
16 A. On the day of the raid?
17 Q. Uh-huh (yes).
18 A. I'm not sure that I -- if I did have any
19 conversations on that day -- I'm not a hundred
20 percent sure. I had talked to him at some point
21 after the raid. Whether they were on the 29th, I
22 don't recall.
23 Q. Okay.
24 A. They could have been. They may not have
25 been. I just don't -- I'm not going to try to put

1 a time on exactly when my conversations --
2 conversation with him occurred.
3 Q. What was the content of that
4 conversation when it did occur?
5 A. There was some -- try to recall his
6 conversations -- the conver -- the next
7 conversation that I can clearly talk on that I
8 recall would be that he was -- when we had the
9 electrical fire that was a byproduct of the manner
10 -- manner in which they took the LED lights off
11 the building. He was at the location there before
12 I got there with the fire marshall and we
13 discussed what we were looking -- you know,
14 everything that as going on with that.
15 Q. We'll get to that in a second.
16 A. Okay. Well, that -- the conversation
17 prior to that, I'm not -- I don't necessarily
18 recall it and I'm not going to speculate on what
19 was said or not said.
20 Q. You mentioned a few people or multiple
21 people who called you the day of the raid, and so
22 I was just trying to figure out who some of those
23 people were. Was Robert Britt one of those
24 people?
25 A. He could have been. I really ---

1   Q.  If you don't recall, it's fine.
2   A.  Yeah.
3   Q.  What about Billy Jackson?
4   A.  I'm sure I spoke to Billy that day.
5   Q.  Okay.  And how are you sure of that?
6   A.  Because Billy was -- Billy was one for
7   the folk that were working across the street that
8   observed all those things and I -- I speak to
9   Billy often on a daily basis.  So I'm sure I spoke
10  to him at some point during that day.  And I think
11  he may have called me, too.  He may not have been
12  the first person to call me.  I think probably
13  Holly was, but I think he was one of the people
14  that maybe called me that morning and let me know
15  that he didn't know what was going on, but there
16  was a bunch of officers at -- at the Big Aladdin,
17  Small Aladdin.
18  Q.  This is a little awkward because Holly's
19  in the room, but I'm going to ask you and only you
20  can answer.  But did Holly relate to you how she
21  found out about the execution of the search
22  warrants?
23  A.  I don't recall.
24  Q.  So did -- on your way back to Bladen
25  County and to your attorney's office, did you

1   drive by the Big and Little Aladdin?
2   A.  No.
3   Q.  Did you instruct anyone else to go to
4   Big and Little Aladdin after the search warrants
5   had been executed?
6   A.  Not that I recall.  I mean, if I did,
7   I'm not recalling it.
8   Q.  After you turned yourself in, what did
9   you do?  Like, after you get released and to
10  through that whole process and everything, what
11  were your actions after that?
12  A.  I think I had -- went over to my
13  attorney's office and we had some conversations
14  about the events that day.
15  Q.  Okay.  Did you that evening to go Big or
16  Little Aladdin?
17  A.  Yes.
18  Q.  Who went with you?
19  A.  My wife, Holly.
20  Q.  Was anyone else there?
21  A.  I'm not recalling anybody at the time.
22  Q.  What did you do that evening when you
23  arrived there?
24  A.  Well, before I arrived there I made sure
25  I brought my -- I brought -- I had my phone and

1   stuff with me and I took video.
2   Q.  Those are the videos being ---
3   A.  Those are the videos before I even --
4   yes.  Yes.  Some of the videos -- some of the
5   videos I may have took the following day.  I'm
6   sure I did some of the video when I get there that
7   day.  I have to go back and look at it.  Anyhow, I
8   just basically surveyed the -- the damage.
9   Q.  Were you able to go inside?
10  A.  Yes.
11  Q.  How long did you stay inside?
12  A.  I don't know, maybe 15, 20 minutes.  I'm
13  just guessing.
14  Q.  Other than the videos, how many pictures
15  did you take, if any?
16  A.  I don't know the specific count.  I have
17  provided you guys some pictures that I took.
18  There are probably between ten and 20, I'm
19  thinking.
20  Q.  Did you give any instructions after
21  getting on scene for -- for other people to come
22  and check it out?
23  A.  On the 29th?
24  Q.  Yeah.
25  A.  I don't recall doing that.

1   Q.  Was the power on when you got there on
2   the 29th?
3   A.  Yes.
4   Q.  Okay.  How were you able to turn it on?
5   A.  Lights.
6   Q.  What time was it that evening when you
7   got there?
8   A.  Shortly after six -- sometime after six
9   o'clock.
10  Q.  Was the power on to the entire building?
11  A.  Yes.
12  Q.  Are you aware of anybody gaining access
13  to the buildings between you -- your arrival and
14  the sheriff's departure?
15  A.  No one -- no one would have gained
16  access.
17  Q.  And why is that?
18  A.  Well, because based on the time lines
19  that's already been discussed in depositions, the
20  sheriff's department was still securing the scene
21  and had crime tape around the scene until
22  approximately 5:30.  I got there just a few
23  minutes after six, so they couldn't have been gone
24  but a handful of minutes.  And I hadn't had any
25  conversations with nobody and when I got there it

1   was a ghost town. I don't think nobody wanted to
2   come near the crime scene tape that was still
3   strung up around the building.
4       So I'm certain that that's -- I was the
5   first one -- Holly and I were the first ones on
6   site.
7       Q. Were you aware of -- how were you made
8   aware of the press conference that occurred that
9   day?
10      A. How was I made aware of the press
11   conference? I don't know that I was aware that it
12   happened that day on the 29th. I was made aware
13   of it obviously, but I don't -- I'm not going to
14   say for sure that I was aware of it that day. I
15   became aware of it, but I don't know that I was
16   aware of it that day when it occurred.
17      I did happen to see McVicker walking
18   across the street at some point. I think it
19   was -- yeah. It was before -- it was -- when I
20   got there he was walking across the street. And
21   from my recollection of what he was wearing during
22   the press conference that's what he was wearing
23   when he was walking across the street. Kind of
24   like a sweater vest and kind of like what I've got
25   on.

1       Q. Was he wearing a sheriff's hat?
2      A. I don't recall a hat. And there might
3   have -- you know, now that I think about it, there
4   may have been some mentioning between when I
5   turned myself in in Alan's office that there was a
6   press conference that he was at or that he was
7   going to. That may have been something that
8   Hakeem -- I can't recall exactly. It's very
9   vague.
10      Q. After -- from the execution of the
11   search warrants until Sheriff McVicker's
12   deposition, did y'all have any interactions?
13      A. Sheriff McVicker and I?
14      Q. Yeah.
15      A. I think we may have crossed paths in the
16   courthouse once to twice, no lang -- no verbal
17   interaction that I'm aware of that I can recall.
18      Q. What about Deaver?
19      A. First time I seen Deaver was -- since
20   this happened was in our deposition the other day.
21   I'd seen him prior to that, but I hadn't seen him
22   during our entire -- that I recall.
23      Q. How did you -- when you got to the
24   stores, did you -- were they locked or how did you
25   gain access?

1      A. I have a key.
2      Q. Okay. Does anyone else have a key?
3      A. They confiscated the keys from my two
4   employees that were there that day. Billy has a
5   key. I've had him do some work for me, but he
6   wasn't there that day. And other than Billy,
7   those two keys that were confiscated and my key --
8   if there's another key out there I'm not -- I'm
9   not the one to answer that question. That would
10   be something that Holly would have given a key to
11   another person, but I don't -- I don't think there
12   were any other's out there.
13      Q. I just want to clarify what you mean by
14   Billy wasn't there that day. Where was Billy that
15   day?
16      A. He -- he wasn't -- he was not at the Big
17   Aladdin from the time the crime scene tape came up
18   until it came down, and I'm almost certain that
19   the crime scene tape was still up whenever I came
20   back. So -- and he -- he would never -- unless --
21   unless I asked him to go do something like that,
22   he would never go in the building. So it's just
23   not -- he's not going to do -- especially after I
24   hadn't even been there. He's not going to go
25   there before I get there. And I know that the

1   crime scene tape was up and the -- the deputies --
2   according to their crime log were there until 5:30
3   and I got there shortly afterwards.
4      Q. Where was he working that day?
5      A. He was at the -- he was at a -- a unit
6   adjacent to the Little Aladdin.
7      Q. Was that across the street from Big
8   Aladdin?
9      A. Yes.
10      Q. Did you ever talk to Billy about
11   potentially repairing the alleged damaged?
12      A. Some of it.
13      Q. When did those conversations occur?
14      A. I don't -- I don't know. I mean,
15   sometime after.
16      Q. Did he, in fact, perform that work?
17      A. I had him do some things, yes.
18      Q. Such as?
19      A. Such as -- the officers were so kind
20   enough as to cut the water line to my ice machine
21   and he discovered that and I asked him to repair
22   that and he repaired the water line. He had
23   replaced a portion of the water line where they
24   had cut it. That's an example.
25      Q. When did he discover that?

1    A.  I don't know the exact date.  It was
2 after the raid had occurred, but I don't know the
3 exact date.  But it was in continuous use and
4 operation while he installed the water line to it.
5 We went to turn the ice maker on and use it and
6 that's when it was discovered when the water was
7 turned on that the line had been cut.
8    Q.  What was in continuous operation?  You
9 testified something was in continuous operation.
10    A.  The -- the ice machine wasn't working at
11 the time -- I mean, we weren't using the ice
12 machine at the time but it -- prior to that had
13 been in operation.  We had stopped using the ice
14 machine and cut the water off to it.
15       We were going to start using it and
16 check it out -- you know, I was going to
17 potentially move it somewhere else and start using
18 it or whatever.  So we needed to -- he discovered
19 that the water line had been cut.  So when he
20 discovered it had been cut, he informed me of it.
21 I asked him to repair it and he repaired it.
22       And at the time there had been no access
23 to the building.  This was after the raid.  The
24 business was obviously closed down.  It was in
25 disarray.

1    Q.  You testified that the -- you believe
2 the crime scene tape was still up when you first
3 accessed the site.  Did the sheriff's office give
4 you their blessing to, like, "Hey, you can go on
5 scene"?
6    A.  Well, there was no one there.
7    Q.  I just wondered if there was any
8 conversations about that, like, during the process
9 of you turning the ---
10    A.  They -- they had -- they had left.  I
11 mean, they hadn't been gone long according to
12 their crime log, but I didn't seek permission to
13 go in my building.
14    Q.  Were you aware that they had already
15 left when you headed over?
16    A.  No.  When I left Elizabethtown, which is
17 when I turned myself in at, I didn't know if they
18 -- I didn't know -- I was going to the building at
19 that point.  I didn't know if they were still
20 there or not.
21    Q.  Was there a reason that you didn't go to
22 the -- site of the search warrants while they
23 were being executed?
24    A.  Yes.
25    Q.  And if it involves the advice of an

1 attorney don't tell me that.  But can you tell me
2 what ---
3    A.  What that reason was?
4    Q.  Yes.
5    A.  Well, I was already aware that a
6 helicopter had been -- been there.  I was aware
7 that they were doing maximum things to create
8 publicity and the last thing -- and I was aware
9 that news media was there.  The last thing that I
10 wanted to give gratification to the sheriff was
11 for them to get a picture of me in handcuffs and I
12 wasn't going to give him that gratification, so I
13 didn't go by there.
14    Q.  What news media was there?
15    A.  One of the -- one for the TV stations --
16 don't hold me to this.  I might have -- I think
17 it's Channel 6 out of Wilmington, I believe.  I
18 know it was a TV station, and based on -- Bladen
19 Online was there, which is an online newspaper and
20 the Bladen Journal was there.
21    Q.  What was Billy Jackson doing at Big
22 Aladdin on the day that he discovered the
23 smoldering?
24    A.  I ---
25       MR. BRIAN:  Objection to the term

1 smoldering.
2       THE WITNESS:  You mean the fire or
3 the ---
4    Q.  (Mr. Spaugh)  The incident involving
5 fire, smoldering, whatever you want to call it,
6 that occurred.
7    A.  Okay.  That was on Monday morning, so
8 the raid occurred on the 29th -- was that a
9 Thursday or Friday ---
10    Q.  Friday.
11    A.  Friday.  I had -- I was in Elizabethtown
12 early that morning -- real early that morning.
13 Billy was -- they were -- Billy and Scott were
14 commencing to go back to work where they left off
15 that Friday.  I called up Billy and asked him to
16 walk over to the Big Aladdin and just kind of see
17 what he thought about the damage, just -- I
18 mean -- I said see what he thought to just survey
19 the situation over there to see what we were going
20 to need to do.  And he was complying with my
21 request to go -- to leave over there where he was
22 at to walk across the street.
23    Q.  Okay.  And so you called him that
24 morning after he was already there at the ---
25    A.  Yeah.  I knew they were going to get

1 there around eight or eight-thirty, somewhere
2 around there, so I called him and said, Hey, when
3 you come in, I want you to walk across the street,
4 go in and just check and make sure everything, you
5 know -- see what you think. See what we're going
6 to have to do, you know. I've got some clean up
7 if nothing else, you know.
8      Q. What was the next you heard from Billy?
9      A. The next thing I heard from Billy? So
10 sometime after that call where I asked him to go
11 over there, he called me from inside the building
12 and said that -- that, "Hey, when I was coming
13 into the building, I seen the" -- through the
14 windows he could see the entire room filled with
15 smoke. He said, "I came in." He said, "Something
16 was on fire. I didn't know exactly where it was
17 coming from because the building was full of smoke
18 and I killed the breakers." That was the first
19 thing he did.
20      And after the killed the breakers he
21 picked up the phone and called me and was telling
22 me that there was smoke -- and at the time he had
23 not discovered exactly where the source of the
24 smoke was coming from because the room was still
25 smokey. He had opened the doors to let some of

1 the smoke out and I told him that I was, you know
2 -- that I'd call him right back. I was calling
3 the fire marshall.
4      And so I called the fire marshall's
5 office, I think -- I don't know if I called
6 them -- called them first and I think they gave me
7 Kenneth's number. And so I called Kenneth up and
8 told him -- asked him if he would come out to the
9 location in Dublin, that I wanted him to -- to
10 review what was going on there. He said, "I'll be
11 right there." He was there before I -- I don't
12 know exactly where he was at, but when I got back
13 to Dublin, he was already there when I -- when I
14 arrived.
15      Q. How was the fire or smoldering put out?
16      A. You'd have to ask Billy that.
17      Q. Did Billy put it out?
18      A. He killed he breaker and I'm assuming he
19 -- yes. I'm assuming he did. I'm assuming that
20 he did -- you'll have to ask him that.
21      Q. So it's your understanding that it was
22 out before the fire marshall arrived?
23      A. I don't know if it was completely out.
24 Maybe it was -- we'll use the smoldering at this
25 point. It was -- it was -- when I got there,

1 there was still smoldering coming from the area --
2 the bigger plume of smoke -- we had opened the
3 doors and the bigger plume of smoke had got out of
4 the building, but I could see and the fire
5 marshall could see the remnants of the smoke and
6 where it was coming from.
7      Q. Was Billy able to determine or was the
8 fire marshall -- did he relate to you how long he
9 believed that the smoldering or fire had occurred?
10      A. He said electrical fires can sometimes
11 take two or three days before they manifest or
12 longer. It just -- it just depended on the
13 individual situation, but that electrical fires
14 could take, you know, any length of time before
15 they manifested into a fire.
16      He also stated that had we been an hour
17 or more later than when we had discovered it that,
18 in his opinion, the building would have been burnt
19 to the ground because it was fat lighter and that
20 we would have no way of determining the source for
21 the fire like we were able to determine when he
22 got there.
23      So I feel very fortunate that the
24 building is standing right now based on Billy
25 getting there as early as he did.

1      Q. Did anyone go to Big or Little Aladdin
2 over the weekend in the time between the execution
3 of the search warrant and Billy on Monday morning?
4      A. I think I took some pictures the -- the
5 next day. I think maybe most of those were
6 external, you know, outside the building, the next
7 day, but no. I don't -- there was no one else.
8 Bil -- Billy's first time to that building after
9 the search warrant -- and he would -- I'm sure he
10 would tell you this for sure, but I'm pos -- I'm
11 pretty much a hundred percent sure the first time
12 that he came to that building after the search
13 warrant was when I asked him to go -- to go over
14 there that Monday morning. And no one else had a
15 key to it.
16      Q. All right. We're going to fast forward
17 to the events after the filing of the complaint.
18 Can you tell me about anything communications
19 you've had with Robert Britt regarding this
20 complaint and this lawsuit?
21      A. Regarding this lawsuit? I think he
22 might be aware that we filed one. He probably
23 doesn't know the details of it or what it
24 involves. And I think we briefly just, you know,
25 discussed what he seen that day, who he seen and

1    Q.   --- days?
2    A.   Not very long, probably a month or less.
3    I'm just -- I'm guessing a month or less, so...
4    Q.   What's the next ---
5    A.   Electronic time punch card with time
6    cards.
7    Q.   What did you use these for?
8    A.   This time punch was just a time clock
9    that employees used to punch their time in.
10   Q.   Have -- have you always had the -- or
11   has Aladdin always had the time punch mechanism or
12   did you all transition to that recently?
13   A.   You know, I think we -- we've -- I think
14   this may have been another one of those
15   transferred assets from a prior business
16   somewhere.
17   Q.   What's next?
18   A.   One small safe.
19   Q.   What was the small safe used for in Big
20   Aladdin?
21   A.   Actually I'm not sure it was being used
22   for anything at that time.  Initially it probably
23   was being used for startup amount or something
24   like that that we -- attendants would store
25   they're startup over night but I -- I -- we had

1    a break-in in that business, and I think we ceased
2    using that or whatever because we didn't have it
3    secured down.
4    Q.   Okay.  What's next?
5    A.   A bag of miscellaneous keys.
6    Q.   Do you know what ---
7    A.   Two of them.
8    Q.   --- these keys go to?
9    A.   Well, I could tell you what they don't
10   go to.  The -- the items listed to be seized says
11   that they can seize keys that allow them access to
12   the domain, I think was the word used on there.
13   These keys would have not allowed access to
14   anything.  These would have been -- these would
15   have been keys associated with -- I mean they were
16   -- I'd have to look at them.  I could tell you.
17   They're -- I think they were probably keys
18   associated with equipment that was no longer
19   there.  That's what I think these are.  That was
20   not there at the -- at the time for a previous
21   business.
22   Q.   Did any equipment at Big Aladdin require
23   a key?
24   A.   Did any equipment require a key?
25   Q.   Not referencing means of entry, just

1    general equipment.
2    A.   There was -- there was some equipment in
3    cabinets that had some key openings with it but
4    those keys were stored in a safe that was not
5    seized.  So I know it wasn't those keys.  It was
6    just -- I'm pretty sure these were keys associated
7    with equipment that was no longer in use from a
8    previous business.
9    Q.   What's next?
10   A.   ATM machine.
11   Q.   Was this ATM machine used through the
12   same company as the one at Little Aladdin ---
13   A.   No, this ---
14   Q.   --- license?
15   A.   --- ATM machine was purchased before
16   Cybernet ever existed.
17   Q.   Was it used in the same way in which the
18   one in Little Aladdin machines ---
19   A.   It was used ---
20   Q.   --- was used?
21   A.   --- for anyone that wanted to walk in
22   the -- obtain cash from an account, could do so.
23   Q.   Was it stocked by the ATM company or by
24   Big Aladdin?
25   A.   It was -- we stocked -- I stocked it.

1    However, it was not something necessarily
2    associated with Big Aladdin.
3    Q.   What's next?
4    A.   Air wireless units.
5    Q.   What are those?
6    A.   Those are my -- and there's actually
7    three of those.  They've got that miscalculated
8    there.  Those are my air conditioner control
9    units.  I had brand new air conditioner units
10   installed in the building.  There was three of
11   them, and they were, what they call, split units
12   and they were -- the entire control portion as
13   opposed to something you might would see on a wall
14   or a control with these remote controls.
15   So if you don't have the remote
16   controls, you can't turn the air conditioner on or
17   off or set the temperatures, hot, cold, whatever
18   you needed to do.
19   Q.   What's next?
20   A.   Three TVs.
21   Q.   Was their use the same as those
22   identified in Little Aladdin?
23   A.   For various purposes including standard
24   cable television, which I've demonstrated in a
25   video for you guys.

1  up the last time.

2  Q.  What's next?

3  A.  Unopened Tiger Direct boxes.

4  Q.  Okay.  Do you know what was in these

5  Tiger Direct -- or what is Tiger Direct?

6  A.  Tiger Direct is a -- an e-commerce site.

7  Q.  And what are some of the things that

8  were purchased from Tiger Direct for use at Big

9  Aladdin?

10  A.  These -- these boxes, none of -- none of

11  the boxes that they seized were purchased for Big

12  Aladdin.

13  Q.  What were they purchased for?

14  A.  They were purchased for Crazie Overstock

15  Promotions, LLC.  They did not have the Big

16  Aladdin address on them.  The UPS driver for some

17  reason dropped these off at that location probably

18  because they had to be signed for and they were

19  not -- the address they were addressed to was not

20  -- nobody was there to sign for them so they just

21  dropped them off there.  So they had nothing to do

22  with -- with the business whatsoever.

23  Q.  Would they have been used at Little

24  Aladdin then or ---

25  A.  No.

1  Q.  Okay.

2  A.  Little Aladdin was already intact.

3  Every -- well, there was nothing that I would have

4  bought that I would have added -- that I would

5  have gotten from Tiger Direct to Little Aladdin.

6  Q.  What was going to be their use for

7  Crazie Overstock?

8  MR. BRIAN:  Objection, beyond the

9  scope of discovery.

10  MR. SPAUGH:  You can answer.

11  THE WITNESS:  These were parts and

12  these would be used to -- to -- I think this

13  particular order would have been for point-of-sale

14  systems.  So I would have -- I would have made

15  point-of-sale systems with these parts.

16  Q.  (Mr. Spaugh)  Where would those

17  point-of-sale systems -- would those -- would

18  those point-of-sale systems subsequently be

19  implemented at Big Aladdin?

20  A.  No.

21  Q.  Anything on the back?

22  A.  Neon sign.

23  Q.  Okay.  What did this neon sign say?

24  A.  Open.

25  Q.  Now, same thing that we did for the last

1  one.  I think we've already discussed some things

2  today so I'll lead off here, do you believe that

3  LED lighting should have been included on this

4  list?  Or ---

5  A.  Do I believe that this ---

6  Q.  Well, let me -- let me at ---

7  A.  Okay.

8  Q.  --- least change that line.

9  A.  Sure.

10  Q.  What was the LED lighting used for at

11  Big Aladdin?

12  A.  LED lighting was installed prior to

13  Cybernet, LLC going into business there.  It was

14  used to attract attention to the business to

15  whatever business happened to be there at the

16  time.  It was put in there when -- when Cybernet,

17  LLC didn't have the business at the time.

18  Q.  What was the first business, if you're

19  aware, that it was used for?

20  A.  It was -- it was ---

21  MR. BRIAN:  I'm going to object to

22  the question as being beyond the scope of

23  discovery.

24  MR. SPAUGH:  You can answer.

25  THE WITNESS:  What -- well ---

1  MR. SPAUGH:  You can answer.

2  THE WITNESS:  --- repeat your

3  question.

4  Q.  (Mr. Spaugh)  So you mentioned -- and

5  part of the reason I ask this is because there's

6  Cybernet and then there's Cybernet, LLC on...  Was

7  -- were these installed prior to the original

8  Cybernet?

9  A.  Right, the -- the business that was

10  there prior to the original Cybernet was not

11  Cybernet.

12  Q.  Okay.

13  A.  It was a completely different business

14  called Sip'n Serve.  Cybernet was not at that

15  location until it was opened in ---

16  Q.  That's fine.  Have you been able to --

17  how many individual bulbs were damaged?

18  A.  How many individual bulbs were damaged?

19  You're talking a lot of -- of lighting.  I -- I

20  have not examined every bulb.  The best way to

21  examine them would be to power them up.  And the

22  power supply that -- that is a proprietary power

23  supply for that lighting system was burnt up in

24  the fire.  And so there's no way to power -- I --

25  I currently -- yes, I could replace that power

Case 7:16-cv-00016-RJ   Document 97-9   Filed 03/30/18   Page 28 of 29

1 mean, I'll -- I'll just -- I like the town. Like
2 the city. I thought it was really cool.
3 And why it was at Big Aladdin was
4 exactly why I said. It was there for -- to block
5 sunrays primarily and secondly I had -- it was a
6 -- something I'd rather be using than it sitting
7 in a corner collecting dust. It was an expensive
8 -- an expensive piece.
9 Q. Was it used in any way to attract
10 customers?
11 A. You know, I -- I don't know if customers
12 paid attention to it or not. That was not its
13 primary purpose but I'm sure that it had some
14 helpful advertising aspect to some customers, but
15 I don't know if it did or not.
16 Q. All right. So other than those things
17 that we just discussed, is there anything else
18 that I'm missing that you believe was damaged at
19 Big Aladdin, not structural damage?
20 A. Yes.
21 Q. Okay. What -- what are those?
22 A. If you'd like to go through the
23 complaint of each individual item, I'll be happy
24 to go over those with you. I specified them in my
25 complaint.

1 Q. Okay.
2 A. And if you would like to reference the
3 complaint, that would save time.
4 MR. BRIAN: Patrick, are you asking
5 him about personal property inside the thing or
6 are you asking him about the damaged to the
7 building?
8 MR. SPAUGH: I'm asking about
9 personal property.
10 MR. BRIAN: In addition to what was
11 in the complaint?
12 MR. SPAUGH: You know, to be
13 certain that something that hasn't been specified
14 this far. I mean, I think we've touched on most
15 of the things that were in the complaint. I --
16 I'm -- with the table ---
17 MR. BRIAN: We haven't talked about
18 that today but right.
19 MR. SPAUGH: But I -- I don't need
20 to talk about that today.
21 MR. BRIAN: Right.
22 THE WITNESS: There are things --
23 if I'll interject. There are things missing that
24 they seized that's not on this list that -- that I
25 think was unprofessional for them not to list as

1 Captain Tyler indicated.
2 Q. (Mr. Spaugh) And -- and what are those
3 things that we have not talked about at all today?
4 A. That's not on this list?
5 Q. That's not on the list.
6 A. But they seized. I'm not stating they
7 were damaged.
8 Q. Yes.
9 A. I'm just saying that it was seized.
10 Q. Yeah.
11 A. They seized an ordinary wall clock.
12 Q. Okay. Well, what was that clock used
13 for?
14 A. Time.
15 Q. For the customers or for the employees?
16 A. You know, I'd -- I'm -- I'd be
17 speculating on that answer.
18 Q. Was it out in the open or was it in the
19 back office?
20 A. It was...
21 Q. I told you I was going to have to ask --
22 ask you some obvious questions today. Anything
23 else?
24 A. I think the -- the ISP modem at Big
25 Aladdin was also seized.

1 Q. I assume it had the same use as the one
2 at Little Aladdin?
3 A. That's correct. And I think that -- I
4 think we've touched on everything else other than
5 just an inclusion on what's in the complaint.
6 Q. The complaint references, you know, gun
7 permits and potential revocation of those. but
8 were your gun permits ever revoked by the Bladen
9 County Sheriff's Office?
10 A. They did come -- they did come to our
11 house and they did take our permits from us from
12 the house. I don't know if that was officially
13 entered into the North Carolina system or how that
14 was done, but we -- officers came to our house and
15 took our gun permits, yes.
16 Q. And did you -- were they returned to
17 you?
18 A. After a hearing after I procured Alan to
19 assist me with -- with that, yes, they were
20 ultimately returned to us, but they were revoked
21 prior to that hearing.
22 Q. By revoked you mean removed from your
23 possession?
24 A. Removed from my possession and you're
25 required to -- if you're doing concealed weapon,

Case 7:16-cv-00016-RJ   Document 97-9   Filed 03/30/18   Page 29 of 29