Exhibit Y

Deposition Exhibit 81

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO.: 7:16-CV-16-RJ

CYBERNET, LLC and ALADDIN
REAL ESTATE, LLC,

                    Plaintiffs,

    v.

JONATHAN DAVID, in his personal capacity
and his official capacity as District Attorney for
the 13th Prosecutorial District of North Carolina;
JAMES MCVICKER, in his personal capacity
and his official capacity as Sheriff of Bladen
County, North Carolina; and TRAVIS DEAVER,
in his personal capacity and his official capacity
as a Deputy Sheriff of Bladen County, North
Carolina,

                    Defendants.

---

**PLAINITFFS' RESPONSES TO DEFENDANTS JAMES MCVICKER AND TRAVIS
DEAVER'S FIRST SET OF INTERROGATORIES, REQUESTS FOR
PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

       NOW COMES Plaintiffs Cybernet, LLC and Aladdin Real Estate, LLC (collectively,
"Plaintiffs"), through counsel and pursuant to Rules 33, 34, and 36 of the Federal Rules of
Civil Procedures, and hereby responds to Defendants James McVicker and Travis Deaver's
First Set of Interrogatories, Requests for Production of Documents and Requests for
Admission to Plaintiffs (the "Requests").

GENERAL OBJECTIONS

       Plaintiffs hereby incorporates the following objections (hereafter, the "General
Objections") into each of his responses:

1

**EXHIBIT**
8

1.     Plaintiffs objects to each and every one of the Requests to the extent that they seek the disclosure of information protected from discovery by any privilege, including the attorney-client privilege or the immunity for attorney work product. No such privileged or information will be disclosed.

2.     Plaintiffs objects to the Requests to the extent that they seek information which is beyond the scope of discovery in this action or which is not reasonably calculated to lead to the discovery of evidence admissible at the trial of this matter.

3.     To the extent that any information produced by Plaintiffs is responsive to more than one of the Requests, it is hereby deemed produced for all Requests to which it is responsive.

4.     Plaintiffs objects to the Requests and to the instructions contained in the "Definitions" section of the Requests to the extent they seek to impose duties or responsibilities upon Plaintiff beyond those imposed on a party responding to discovery pursuant to Rules 33, 34 and 36 of the Federal Rules of Civil Procedure. Plaintiffs will not follow the instructions, but instead will respond to the Requests in a manner consistent with the Federal Rules of Civil Procedure.

5.     Plaintiffs objects to the Requests to the extent that they call for Plaintiffs to take action other than a reasonable and thorough inquiry and a reasonable and thorough search for responsive information maintained in his possession, custody or control, in locations where such information is most likely to be found.

6.     Plaintiffs objects to the Requests to the extent that they are overly broad or unduly burdensome, require unreasonably extensive research, writing and investigation, or require the production of information which would subject Plaintiffs to inappropriate or undue annoyance, embarrassment, oppression, burden or expense.

7.     Discovery in this matter remains ongoing.  Plaintiffs therefore reserves the right to supplement his responses to the Requests and to make further objections to these Requests if and when he discovers additional information responsive to them.

8.     These responses are submitted by Plaintiffs subject to, and without waiving or intending to waive, but on the contrary, intending to reserve and reserving:

a.     All questions as to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of any of the documents referred to or answers given, or the subject matter thereof in the trial of this action or any other action or proceeding;

b.     The right to object to other discovery procedures involving or relating to the subject matter of these Requests; and

c.     The right at any time to revise, correct, add to or clarify any of the responses set forth herein.

9.     These General Objections are applicable to and incorporated into each of Plaintiffs' responses, as if specifically and fully set forth therein.  The stating of specific objections to a particular Request shall not be construed as a waiver of these General Objections. Additionally, unless otherwise specifically stated, Plaintiffs' objections to each Request apply to the entire Request.

Subject to, without waiving, or confining themselves within the parameters of these General Objections, Plaintiff responds to the Requests as follows:

## INTERROGATORIES

1.      Please identify by name, address and telephone number all persons known to you to have knowledge of any of the facts alleged in the complaint, and state the substance of the knowledge you believe to be held by each individual identified.

**ANSWER:** Objection. This interrogatory is overbroad and unduly burdensome, and therefore is not consistent with FRCP 26. Without waiving this objection, Plaintiffs state that the requested information was set forth in their initial disclosures in this matter. Additional information also is provided in response to interrogatory no. 22 below. Plaintiffs also identify the former Sheriff of Bladen County, Prentis Benston, as having knowledge of defendant David's desire to shut down all businesses that offer electronic sweepstakes or reward promotions regardless of their legality. Sheriff Benston also has knowledge to demonstrate that statements made by Sheriff McVicker to Jeffrey Smith in early October 2014 (before the Sheriff election in November 2014) that Sheriff Benston intended to raid Plaintiffs' businesses were false.

2.      State the basis of your contention in Paragraph 19 of the Complaint that the Sheriff personally directed the execution of the searches.

**ANSWER:** The Sheriff is responsible for supervising his office, including those officers employed by the Bladen County Sheriff's office. The Sheriff had knowledge of the investigation and the planning for the Raids. He was present at Store 1 and Store 2 during the Raids and could observe the actions of the law enforcement officers taken during the Raids that caused harm to Plaintiffs. Plaintiffs also have information that the Sheriff instructed the officers who were going to participate in the raids to take "every f\*\*king thing" they have got when they executed the search warrants at issue in this case.

3.      Describe in detail what "excessive and unnecessary force" resulted in substantial damage to Plaintiffs' property as alleged in Paragraph 26 of the Complaint and identify for each instance:

    a)    Who engaged in the excessive and unnecessary force;

    b)    The store in which the excessive and unnecessary force occurred;

    c)    When (e.g., specific times and not merely the date of the searches) the excessive and unnecessary force occurred;

    d)    Who observed the excessive and unnecessary force; and

    e)    What property was damaged as a result of the excessive and unnecessary force.

**ANSWER:** Objection. This interrogatory is unduly burdensome and duplicative in light of the Plaintiffs' previous disclosures and the detailed allegations of their verified complaint. Without waiving this objection, Plaintiffs state that in addition to the damages alleged in detail in their complaint, Sheriff officers also destroyed an expensive window mural, which was torn in half, crumpled, and then later found in pieces in a dumpster adjoining a nearby restaurant. The mural was not among the things itemized to be seized by the search warrants, and its destruction was gratuitous. It is unknown at this time, which officer destroyed the window mural. In addition to Defendant Deaver, every other officer present, acting at the direction of defendant McVicker, was responsible for this exercise of unnecessary and excessive force, largely at McVicker's direction. Witnesses to this use of excessive force include, in addition to those persons whose identity previously was disclosed, the officers who were present during the raids, some of whom still are with the Sherriff's department, and some of whom are not.

     4. State the basis for your contention in Paragraph 28 of the Complaint that the searches were "conducted with excessive force for the purpose of intentionally and maliciously inflicting unnecessary damage to Plaintiffs' property, and for the purpose of creating maximum publicity and to publicly embarrass the Plaintiffs, their principals and their employees."

**ANSWER:** Objection. This interrogatory is unduly burdensome and duplicative in light of the Plaintiffs' previous disclosures and the detailed allegations of their verified complaint. Without waiving this objection, Plaintiffs state that the landing of a helicopter, the use of an unusually large number of officers in the raid, along with numerous law enforcement vehicles, a moving truck, the coordinated press conference conducted by defendant David, and the release of mug shots of the Plaintiffs' principals and employees to the press, in a community as small as Dublin NC, on its face, is calculated to create maximum publicity and embarrassment for the persons in question. Coupled with defendant David's regular publicity seeking television appearances (some of which are available to be viewed on YouTube), defendant McVicker's constant electioneering and defendant Deaver's very public, gratuitous destruction of Plaintiffs' property, the defendants' intentions will be clear to any reasonable juror.

     5. Identify the total amount Plaintiffs, Jeff Smith, and/or Holly Smith have paid each of the following individuals: Sonya Silvas, Tori Regans, Brittany Meshaw, Jeffery Gurganious, Billy Jackson, Randy Deaver, Timothy McDaniel, Tina Eason, Wayne Eason, Scott Long, and Robert Britt.

**ANSWER:** Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence, and seeks the production of confidential commercial information in the form of personnel records and income and expense information about the Plaintiffs' businesses. Without waiving this objection, Plaintiffs do not oppose producing this information if a mutually agreeable protective order is entered prohibiting the improper use of this information.

6. Describe in detail how the removal of LED Lighting damaged the roof as alleged in Paragraph 38 of the Complaint.

**ANSWER:** Objection. This interrogatory is unduly burdensome and duplicative in light of the Plaintiffs' previous disclosures and the detailed allegations of their verified complaint. Without waiving this objection, Plaintiffs state that several sections of the LED Track which were secured by screws through the stucco finish of the building were forcibly pulled out of their secured position, thereby damaging the portions of the building to which they were affixed. Properly removing the lighting from its track requires the use of hand tools to release the LED's from the installed track. Ripping the LED's from the track puts undue pressure on the fasteners securing the track compromising the stucco finish. The wiring for the LED's was fed through a dedicated conduit on the roof of the building that was sealed, and which lead to an indoor power supply. This conduit is located above the entrance door on the roof, and it also was damaged when the lighting was ripped off.

7. Describe in detail the discovery "fire" and the subsequent actions taken prior to the Fire Marshall appearing at Store 1. Specifically, state (1) who discovered the "fire," (2) why said person was present at the time, (3) when exactly the "fire" was discovered, (4) what actions the discoverer took upon discovery, and (5) everyone else who examined the scene prior to the Fire Marshall's arrival.

**ANSWER:** The fire was discovered by Mr. Billy Jackson who was visiting to inspect the overall condition of the building a couple of days after the defendants' destructive raid. As he approached the building he noticed that smoke had filled the room leading into the building. Once he identified the area from which the smoke was coming he immediately turned off the breakers to the power supply for the LEDs. Mr. Jeff Smith, the owner of the building and Aladdin Real Estate, LLC, received a call from Mr. Jackson in which Mr. Jackson stated that Mr. Smith should come immediately to the building. Mr. Smith was in Elizabethtown when he received that call and immediately called the County Fire Marshall who informed him that he could arrive at the building within 10 minutes. The Fire Marshall was onsite when Mr. Smith arrived. Mr. Jackson also was on site, and Mr. Jackson had contacted Mr. Scott Long who was working across the street. All three were present when Mr. Smith arrived onsite. Plaintiffs do not know if Mr. Long was present before or after the Fire Marshall arrived.

6

8.    Describe in detail the difference between "forcibly ripp[ing]" security cameras from the wall versus "unplugging" the security cameras as alleged in paragraph 56 of the Complaint.

**ANSWER:**  The security cameras were attached to a mounting stand which is secured to the building with screws. Rather than properly using a screw driver to remove the screws, or simply removing the camera from the mounting stand, the entire unit was ripped from the walls by the defendants, damaging both the walls and the cameras.  The cameras also have cords attached to them which are approximately one foot in length and end in an RJ45 female connector. The male ends of longer cables plug into the female connector on the short cables attached to the cameras.  The other ends of these longer cables plug into a DVR unit. If defendants had unplugged this one-foot cable, that would have been all that was necessary to remove the cameras from their wiring connection.   Incidentally, it is not possible for cables attached to the cameras, to become "entangled "in the LED lighting cables, because the LED lighting cables were installed in a separate enclosed track.

9.    Describe in detail how the alleged removal of the security cameras damaged the exterior and the roof and whether the same damage would have occurred by "unplugging" the security cameras.

**ANSWER:**  Plaintiffs incorporate by reference their response to interrogatory number 8.  Further they state that additional damage occurred to the building roof in the location where the camera cables fed into the building through sealed conduits. The defendants' forceful pulling on the camera cables disturbed the sealed conduit allowing water intrusion into the building which damaged the ceiling above the ladies' bathroom. Similar to the conduit used for the led lighting which is located approximately 10-15 feet from the conduit for the security cameras, there was no need whatsoever to pull on the camera cables because the cameras easily could have been disconnected at the junction of their one foot leads and the longer cables which run to the DVR units.  The only possible reason to pull the cameras from the wall in the way that was done, was to cause maximum damage.

10.    Describe in detail all parts missing from the Store 2 ATM as alleged in paragraph 81 of the Complaint.

**ANSWER:**  The lock mechanism is missing from Store 2 ATM, and a variety of parts were left in the bottom of the unit, making it unusable.

11.    Describe in detail the purpose of the Wiring described in Paragraphs 98 through 106. In particular, identify the specific "electronic equipment" in Paragraph 98 for which the Wiring was used.

**ANSWER:**  The purpose of the Cat 5E wiring in Store 1 that was damaged, was to network the computers that were located in that store.  Simply unplugging the cables from the nearby switch, which was in the same room, would have saved this cabling. It would have been no more difficult than unplugging a phone from a phone jack. Instead the defendants chose to destroy these cables by cutting them into pieces.  This was a gratuitous action which served no purpose but to cause damage.

12.    State the basis of your contention in paragraph 108 of the Complaint that Sheriff McVicker's "primary goal ... with regard to the Raids was to publicly humiliate Holly and Jeffrey Smith ...."

**ANSWER:**  Objection.  Plaintiffs object to this request on the grounds that it misquotes paragraph 108 of the Complaint.  Without waiving this objection, Plaintiffs state that Sheriff McVicker helped pre-plan a press conference which he held jointly held with defendant David and others involved in the raid, and conducted that conference before his deputies even had finished their raid, and before he even knew what evidence, if any, of a crime had been collected. He also had a helicopter present during the raid, had far more officers involved in the raid than was necessary, contacted the media and gave interviews about the raid to both the newspapers and television stations, and instructed his deputies to "take every f**king thing" from the businesses of which Mr. and Mrs. Smith are the principals.  His office also released Mr. and Mrs. Smith's mugshots to the public and the press.  Given the questionable nature of his personal relationship with Mr. and Mrs. Smith, the Sheriff's intentions will be evident to any reasonable juror.

13.    State the basis of your contention in paragraph 109 of the Complaint that Sheriff McVicker's "primary goal ... with regard to the Raids was to cause damage to Plaintiffs' property in order to cause the Smiths and Plaintiffs gratuitous pain and suffering in the hopes of forcing them to close their" businesses.

**ANSWER:**  Objection.  Plaintiffs object to this request on the grounds that it misquotes paragraph 109 of the Complaint.  Without waiving this objection, Plaintiffs incorporate by reference their responses to the previous interrogatories.  In addition, they state that the instruction to deputies to "seize everything" regardless of the scope of the actual search warrants being executed (which included such inoffensive items as a wall clock, recently delivered unopened UPS packages, a time clock, the "open" sign for the business, the computer network

equipment infrastructure serving the building, the time warner cable television modem, the HVAC remotes, and the ordinary television screen on the wall, and radio speakers which were doing nothing more offensive than playing music), all were designed to inflict gratuitous pain and suffering on the Plaintiffs, and also clearly were designed to make it impossible for them to operate any business in the building. Further, Plaintiffs state that shelves were upended, items knocked to the floor and the interior of the building otherwise vandalized for no purpose. For example, the water line to the ice machine which served the building was cut, the wiring for the magnetic locks securing the building was cut, the coax cable for the cable TV was cut. The Smiths and the Plaintiffs took pride in the appearance of the building, and it is clear that the Sheriff and his deputies made special efforts to be unnecessarily destructive in the execution of the search warrants. The Sheriff's intent will be manifest to any reasonable juror.

14.      Identify as alleged in paragraph 110 of the Complaint each communication in which the Plaintiffs invited Sheriff McVicker to "visit both Store 1 and Store 2 to view everything in both buildings and to review the manner in which Cybernet conducted its business." Specifically, identify who made the statement, to whom the statement was made, the exact contents of the statement, when the statement was made, the manner in which the statement was made (in-person, telephone, email, etc.), and where the statement was made.

**ANSWER:** In the early part of September 2014, Mr. Jeff Smith was approached by the "Campaign to Elect Jim McVicker" through the Sheriff's campaign manager. Sheriff McVicker was seeking Mr. Smith's support in the upcoming election, as well as a substantial contribution to his campaign. Sheriff McVicker's campaign manager told Mr. Smith that Sheriff McVicker had information that the incumbent Sheriff was planning to do a raid on Plaintiffs' businesses in order to make a splash in Mr. Smith's voting precinct to garner votes just prior to the election. Plaintiffs subsequently have determined that this statement was false. Mr. Smith, believing that there was no basis on which any raid of the Plaintiffs' businesses could be ordered because they were operating in full compliance with the law, accepted a meeting with then candidate McVicker to discuss his business and also to discuss supporting his campaign. Sheriff McVicker's campaign manager set up the meeting and said that Sheriff McVicker needed a large contribution to push him to victory on election day. The meeting took place at a residence located off of Owen Hill Rd. In attendance at the meeting was Sheriff McVicker, his wife Landon Bordeaux, and Mr. Smith. Sheriff McVicker stated to Mr. Smith that the promotions being offered by the Cybernet stores was not an issue for him, and that he intended to focus as sheriff upon drugs and the cost of running the jail. Mr. Smith immediately told Sheriff McVicker in response that Mr. Smith neither was seeking nor did he need any favors because the promotions being offered by the Cybernet stores were legal. Mr. Smith stated to the Sheriff that those promotions would not be in use if he or his wife had any reason to believe that they were not legal. Mr. Smith spent over an hour explaining how those promotions operated and complied with the law, and also that he felt that law enforcement was poorly trained in applying the laws applicable to those promotions. Mr. Smith and Sheriff McVicker also discussed the fact that defendant David had been out to get Mr. Smith and the Plaintiffs for some time. Mr. Smith

invited Sheriff McVicker to contact him at any time to discuss Plaintiffs' businesses and promotions and offered to demonstrate and permit him to inspect any aspect of those businesses that he would like to inspect. Mr. Smith specifically stated that he wanted to avoid any misunderstanding and also to avoid "SWAT" style raids that had been conducted against other businesses that may be using unlawful promotions or sweepstakes. Sheriff McVicker assured Mr. Smith that no such raid would occur, and that he would contact Mr. Smith if he had ANY problems with the operations of the Plaintiffs' businesses or promotions before taking any enforcement action against those businesses. Mr. Smith considered this to be a gentleman's agreement with what appeared to him to be an honest man. That night he gave Sheriff McVicker a check from a joint account for him and Mrs. Smith for $4,000.00 for his campaign.

Two days later Mr. Smith again was contacted by Sheriff McVicker's campaign manager, who asked that he take back the check he had given the Sheriff, and replace it with cash, so that Mr. Smith's "information" would not show up on the Sheriff's campaign contribution reports. Mr. Smith reluctantly complied with this request, the potential legal implications of which he did not fully understand. Mr. Smith then was told again by the Sheriff's campaign manager that the incumbent Sheriff was preparing to do a raid on the Plaintiffs' businesses, and told him that the Cybernet stores should close down until after the election. Cybernet complied with this request based upon this understanding that information was coming from Sheriff McVicker, and as a result, the Cybernet stores were closed for the entire month of October 2014 and through election day in early November 2014.

Mr. Smith later received another call from Sheriff McVicker's campaign manager, this time desperately asking him for more money. Apparently, the Sheriff's internal polling information showed him running neck and neck with the incumbent and his campaign needed financial help with early voting. Mr. Smith complied by giving the Sheriff's campaign another $1,800.00. During this conversation, Mr. Smith again offered to let the Sheriff inspect the Plaintiffs' businesses and was told that it would not be necessary.

Neither Mr. Smith, Mrs. Smith nor the Plaintiffs know how the Sheriff and his campaign reported all of these various cash contributions to his campaign.


15.     Describe in detail the "direction" the Sheriff provided as alleged in Paragraph 127 of the Complaint.

ANSWER: Objection. This interrogatory is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above.

16. Describe in detail all "property destruction" that occurred within the "plain sight" of the Sheriff as alleged in Paragraph 127 of the Complaint.

**ANSWER:** Objection. This interrogatory is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above. Plaintiffs state further that the destruction of the LED lighting, the cutting of cables, the seizing of the open sign, the destruction of the decorative mural, and a variety of other actions detailed above and it their complaint, all should have been in plain sight of the Sheriff.

17. Describe in detail how the Sheriff "encouraged the Sheriff's deputies to destroy Aladdin's and Cybernet's personal property and otherwise to be needlessly destructive during the" searches. Specifically, identify whether the "encourage[ment]" was verbal, in writing, or via physical gestures. Identify who observed the Sheriffs alleged "encourage[ment]." Identify when the "encourage[ment]" occurred. Identify to whom the "encourage[ment]" was given.

**ANSWER:** Objection. This interrogatory is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above.

18. Describe in detail the alleged "unnecessary fanfare and publicity" that occurred *during* the execution of the search warrants.

**ANSWER:** Objection. This interrogatory is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above.

19. State the basis for your contention in paragraph 131 of the Complaint that Sheriff McVicker "directed the searches to be performed with unnecessary fanfare and publicity in order to embarrass the Smiths and the Plaintiffs."

**ANSWER:** Objection. This interrogatory is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above.

20. State the basis for your contention in Paragraph 135 that the searches "were performed by the Defendants in a manner designed to create a public spectacle and thereby direct public attention to the ... Sheriffs efforts to prevent ... sweepstakes and their promotions within Bladen County."

**ANSWER:** Objection. This interrogatory is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above.

21. State the basis for your contention in Paragraph 135 that the Sheriff's Office performed the searches in a certain manner to "influence the jury pool in Bladen County."

**ANSWER:** Objection. This interrogator is duplicative of prior interrogatories posed above, and therefore is beyond the scope of proper discovery pursuant to FRCP 26. Without waiving this objection, Plaintiffs incorporate by reference their responses to the interrogatories stated above.

22. For each of the following individuals identified in Plaintiffs' Initial Disclosures, identify (1) the specific timeframe for which the individual observed the searches by identifying a start and stop time, (2) the location from which the individual observed the searches, (3) the individual's job title and job responsibilities if they were Plaintiffs' employee, (4) the individual's professional or personal relationship with Plaintiffs, Jeff Smith, and/or Holly Smith if they were not Plaintiffs' employee, and (5) the discoverable information that the individual has regarding the execution of the searches and the Defendants' motivations for, and during, the execution of the searches:

    a. Sonya Silvas;

    b. Tori Regans;

    c. Brittany Meshaw;

    d. Jeffery Gurganious;

    e. Billy Jackson;

    f. Randy Deaver;

    g. Timothy McDaniel;

h.  Tina Eason;

i.  Wayne Eason; and

j.  Robert Britt.

**ANSWER:** Objection. This interrogatory is unduly burdensome and causes the interrogatories served by the Defendants to exceed the maximum number in violation of the applicable provisions of the Federal Rules of Civil Procedure and the Scheduling Order entered in this case. Without waiving this objection, Plaintiffs state the people identified were present during the raids at issue in this lawsuit and have knowledge of the amount of law enforcement officers and vehicles present, the use of the helicopter:

a.  Sonya Silvas: Ms. Silvas was a customer service employee of Cybernet. She was working the day of the raid and was arrested. She left the site with a sheriff deputy at some time in the morning.

b.  Tori Regans: Ms. Regans is a customer service employee of Cybernet. She observed raid from the time that it began. It is believed that she observed the raid from across the street until sometime in the afternoon.

c.  Brittany Meshaw: Ms. Meshaw was a customer service employee of Cybernet. She was working the day of the raid, was arrested, and departed the site with a sheriff deputy at some time in the morning.

d.  Jeffery Gurganious: Mr. Gurganious was a customer service employee of Cybernet. He was working the day of the raid, was arrested and departed the site with a sheriff deputy at some time in the morning.

e.  Billy Jackson: Mr. Jackson was a contract worker for Aladdin Real Estate. He was working on the day of the raid at 40 3rd Street, Dublin, NC, which at the time was a vacant unit adjacent to the Store 2 store. He was doing construction related work on the building, and was there before the raid began. He observed the raid for a period of time after it began and departed at unknown time. He has knowledge of the large number of law enforcement officers and vehicles present during the raids, including the use of the helicopter. Mr. Jackson is familiar with the installation and configuration of the LED lights, the security cameras, and the location of the wires for both of those items. He also has knowledge of damage caused by the defendants. Mr. Jackson also discovered the electrical fire Store 1 store a couple of days after the raid, and was present when the fire marshal visited that store.

f.  Randy Deaver. Mr. Deaver was an employee of Cybernet. He was on site shortly after the raid began and observed law enforcement activity until some point in the afternoon. He has knowledge of the large number of law enforcement officers and vehicles present during the raids, including the use of the helicopter. He positively identified Travis Deaver, who is a relative, ripping LED lights off roof of Store 1 in a forceful and destructive manner. He observed scene from across the street of Store 1.

13

Mr. Deaver also had a conversation with Deputy Chad Britt after the raid, in which Deputy Britt stated to him that Sheriff McVicker instructed the officers at the raid to "take every f**king thing" from the stores.

g. Timothy McDaniel: Mr. McDaniel is a local Dublin, NC resident. He is not employed by Plaintiffs, Mr. Smith or Ms. Smith. It is believed that he observed the raid shortly after it began some time after noon. Mr. McDaniel also identified Travis Deaver as the person who forcefully ripped the LED lights off the roof line of Store 1. It is believed that he observed the scene from across the street of Store 1.

h. Tina Eason: Ms. Eason was an employee of Cybernet. She observed the scene from across the street of Store 1. It is believed that she arrived shortly after the raid began and left the scene at some time after noon. She also observed Travis Deaver forcefully ripping the LED lights off the roof line of Store 1.

i. Wayne Eason: Mr. Eason is Tina Eason's spouse. He observed scene from across the street of Store 1. It is believed that he arrived shortly after the raid began and left the scene at some time after noon. He also observed Travis Deaver forcefully ripping the LED lights off the roof line of Store 1.

j. Robert Britt. Mr. Britt was a laborer hired by Aladdin Real Estate to assist the contractors working at building unit located at 40 3rd Street, Dublin, NC. He was there prior to the raid. His departure time is unknown.

23. To the extent you do not admit or deny any of the following Request for and what steps you took to investigate to determine you could not admit or deny the matter.

**ANSWER:** Plaintiffs examined the materials in their possession, the materials in the possession of their attorneys, and otherwise made a reasonable effort to give accurate answers to RFAs which, in some cases, were not carefully tailored. Explanations for each denial are set forth below, in spite of the objectionable nature of the request made.

24. To the extent you deny a Request for Admission, set forth in detail all facts and circumstances supporting the denial.

**ANSWER:** Objection. This interrogatory is unduly burdensome and causes the interrogatories served by the Defendants to exceed the maximum number in violation of the applicable provisions of the Federal Rules of Civil Procedure and the Scheduling Order entered in this case. Without waiving this objection, Plaintiffs state the following:

a. [RFA #1] The power supply to the LED lighting was destroyed as a result of the actions of the Defendants during the raid and therefore the LED lighting no longer is functional.

b. [RFA #4] Plaintiffs never have received any written or oral notice that the HVAC remotes are available for them to retrieve from the Defendants.

c. [RFA #6] The cabling for the cameras was destroyed by being cut into pieces. Therefore, although Plaintiffs have not examined the camera bodies which are in the possession of the Defendants, they have examined other components of the camera system and know that it was destroyed by the Defendants for no reason.

d. [RFA #7] Plaintiffs do not know the condition of the store 1 ATM because they have not examined it since it was seized. At this point, it is a mystery to Plaintiffs why the ATM still is being held by the Defendants.

e. [RFA #9] The quoted statement in the RFA's from the "application" for a search warrant were made in the accompanying affidavit of Jeff Tyler. However, large portions of that affidavit were false, and the search warrant itself specifies the items to be searched and seized on pages 11 and 12 of the accompanying affidavit.

f. [RFA # 12] Cameras are not among the specified items to be seized on pages 11 and 12 of the affidavit on which the search warrant was based.

g. [RFA # 23] The Plaintiffs have no personal or specific knowledge of when the Sheriff left the premises in question.

h. [RFA # 25] The wiring for the security cameras and the wiring for the LED lighting were kept separate from one another, and were not in any way entwined or entangled.

i. [RFA # 28] The conduit for the wiring in question was sealed to prevent water intrusion and therefore was not "open."

## REQUEST FOR PRODUCTION OF DOCUMENTS

     1.     All documents identified in your answers to the preceding interrogatories.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.


     2.     All documents and pictures demonstrating that the LED Lighting was "destroyed."

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.


     3.     All documents reflecting payment from Plaintiffs, Jeff Smith, and/or Holly Smith to (1) potential witnesses identified in Plaintiffs' Initial Disclosures and answers to the preceding interrogatories, (2) Scott Long, and (3) Robert Britt from 2005 to the present.

**RESPONSE:** Objection. This request is not reasonably calculated to lead to the discovery of admissible evidence, and seeks the production of confidential commercial information in the form of personnel records and income and expense information about the Plaintiffs' businesses. Without waiving this objection, plaintiffs do not oppose producing this information if a mutually agreeable protective order is entered prohibiting the improper use of this information.


     4.     All communications between Jeff Smith or Holly Smith and Scott Long since and including May 29, 2015.

**RESPONSE:** Objection. This request is not reasonably calculated to lead to the discovery of admissible evidence, and seeks the production of confidential commercial information in the form of personnel records and income and expense information about the Plaintiffs' businesses. Without waiving this objection, plaintiffs do not oppose producing this information if a mutually agreeable protective order is entered prohibiting the improper use of this information.


     5.     All documents relied upon in answering the preceding interrogatories.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.

6.    All communications between Jeff Smith, Holly Smith, Plaintiffs, and potential witnesses regarding the execution of the search warrant.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.


7.    All communications between Jeff Smith, Holly Smith, Plaintiffs, and potential witnesses regarding Plaintiffs' lawsuit.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.


8.    All communications between Jeff Smith, Holly Smith, Plaintiffs, and the Defendants regarding the operation of Store 1 or Store 2 prior to May 29, 2015 and all communications with Defendants after May 29, 2015.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.


9.    Produce copies of all recorded or written statements, narratives, affidavits, and declarations made by persons you anticipate you may call as witnesses or who have information or knowledge about the allegations asserted in your Complaint.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.


10.    All documents referring, reflecting, or related to the property damage alleged in the Complaint.

**RESPONSE:** The requested documents, if any, will be produced at a time and place mutually agreeable to the parties' counsel.

## REQUESTS FOR ADMISSION

    1.      Admit that the LED Lighting is still functional.

**RESPONSE:** Denied.


    2.      Admit that Jeff Smith was not present during the execution of the search warrants.

**RESPONSE:** Admitted.


    3.      Admit that Holly Smith was not present during the execution of the search warrants.

**RESPONSE:** Admitted.


    4.      Admit that the Sheriff's Office informed you that you could pick up the HVAC Remotes and that you never responded.

**RESPONSE:** Denied.


    5.      Admit that you have not examined the Store 1 ATM since its seizure.

**RESPONSE:** Admitted


    6.      Admit that you have not examined the Security Cameras since their seizure.

**RESPONSE:** It is admitted that the actual camera bodies have not been examined. However, it is denied that other components of the cameras have not be examined.

7. Admit that the Store 1 ATM was not damaged during the execution of the search at Store 1.

**RESPONSE:** The Plaintiffs are without knowledge upon which to base a belief as to whether this statement is true or not, and therefore it is denied.

8. Admit that the search warrants for Store 1 and Store 2 stated "You are commanded to search the premises ... and other place or item described in the application for the property ... in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law."

**RESPONSE:** Admitted.

9. Admit that the search warrant applications for Store 1 and Store 2 stated "such cache is . . . often hidden in various small enclosures, safes, cabinets, drawers, and other enclosures. . .. In addition, such gambling operations use, computers, peripherals, digital or electronic media, automated teller machines, money counting devices, smartphones, and other devices . . .. The location to be searched have deployed and continue to use counter surveillance equipment such as video cameras, monitors, hard drives, modems, and communications equipment ...."

**RESPONSE:** Denied.

10. Admit that automated teller machines were included as items to be seized in the executed search warrants for Store 1 and Store 2.

**RESPONSE:** Admitted.

11. Admit that safes were included as items to be seized in the executed search warrants for Store 1 and Store 2.

**RESPONSE:** Denied.

12.    Admit that video cameras were included as items to be seized in the executed search warrants for Store 1 and Store 2.

**RESPONSE:** Denied.

13.    Admit that the executed search warrants permitted Sheriff Defendants to enter Store 1 and Store 2.

**RESPONSE:** Admitted.

14.    Admit that you have not examined the Store 2 Safe since it was seized.

**RESPONSE:** Admitted.

15.    Admit that the Store 2 Safe contained cash.

**RESPONSE:** Admitted.

16.    Admit that the Store 1 ATM contained cash.

**RESPONSE:** Admitted.

17.    Admit that the Store 2 ATM contained cash.

**RESPONSE:** Admitted.

18.    Admit that video monitors were mounted to the wall in Store 2 on May 28, 2015.

**RESPONSE:** Denied.

19.     Admit that the Sheriff was authorized to execute the search warrants for Store 1 and Store 2 that were executed.

**RESPONSE:**  It is admitted that a judge signed the search warrants for Store 1 and Store 2, which authorized the Sheriff to execute those warrants at those stores.  It is denied that the search warrants were lawfully procured, because the applications for search warrants contained false statements and material omissions intended to deceive the judge into issuing the warrants when he otherwise would not.

20.     Admit that the search warrants for Store 1 and Store 2 "commanded" "any officer with authority and jurisdiction" to "conduct the search authorized by th[e] Search Warrant."

**RESPONSE:**  It is admitted that the search warrants for Store 1 and Store 2 contain the quoted words, among others.  It is denied that the search warrants were lawfully procured, because the applications for search warrants contained false statements and material omissions intended to deceive the judge into issuing the warrants when he otherwise would not.

21.     Admit that the Sheriff did not revoke Jeff Smith's concealed weapons permit.

**RESPONSE:**  Admitted.

22.     Admit that the Sheriff did not revoke Holly Smith's concealed weapons permit.

**RESPONSE:**  Admitted.

23.     Admit that the Sheriff was not present for the entire duration of the search on May 29, 2015.

**RESPONSE:**  Plaintiffs lack information on which to base a belief as to the truth or falsity of this request and the same therefore is denied.

24.     Admit that the Bladen County Sheriffs Office internal memorandum dated May 29, 2015 and produced as bates numbers BCSO 241 and 366 stated, "*** Be professional, remember people are watching and cameras will be everywhere. ***"

**RESPONSE:** Admitted.

25.     Admit that the security camera wiring and LED Lighting wiring at Store 1 were intertwined.

**RESPONSE:** Denied.

26.     Admit that the helicopter was not present for the entire duration of the searches.

**RESPONSE:** Admitted.

27.     Admit that a plastic (PVC) pipe extending through the roof of Store 1 housed the LED Lighting wiring on May 28, 2015.

**RESPONSE:** Admitted.

28.     Admit that the plastic (PVC) pipe protruding through the roof of Store 1 was open-ended as of May 28, 2015.

**RESPONSE:** Denied.

29.     Admit that the LED Lighting could be detached and reattached without damage.

**RESPONSE:** Admitted.

30.     Admit that no LED Lighting bulbs were broken.

**RESPONSE:** Denied.

31.     Admit that Jeff Smith delivered to Scott Long the affidavit that Scott Long executed for use in support of Plaintiffs' Response in Opposition to Defendant Jonathan David's Motion for Summary Judgment.

**RESPONSE:** Admitted.


32.     Admit that Scott Long did not edit the affidavit that Jeff Smith provided him.

**RESPONSE:**     Objection.  As stated, this request suggests a process by which the affidavit of Scott Long was obtained that is misleading and incomplete.  His affidavit was prepared based upon information provided directly by Mr. Long.  Mr. Smith subsequently presented the affidavit to Mr. Long for review and execution.  It is admitted that Mr. Long signed the affidavit without making further edits after Mr. Smith presented it to him.


This the  25th  day of August, 2017.


                    MORNINGSTAR LAW GROUP

                    _Keith Anthony_
                    _____
                    William J. Brian, Jr.
                    N.C. State Bar No. 16570
                    bbrian@morningstarlawgroup.com
                    Keith P. Anthony
                    N.C. State Bar No. 28405
                    kanthony@morningstarlawgroup.com
                    Morningstar Law Group
                    112 West Main Street, Second Floor
                    Durham, NC 27701

                    *Attorneys for Cybernet, LLC and Aladdin Real
                    Estate, LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing PLAINTIFFS' RESPONSES TO DEFENDANTS JAMES MCVICKER AND TRAVIS DEAVER'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION was served by depositing a copy of the same in the United States mail, first-class postage prepaid, in the manner prescribed by Rule 5 of the Federal Rules of Civil Procedure, addressed as follows:

Josh Stein, Esq.
Attorney General of North Carolina
David J. Aldinofi II, Esq.
Special Deputy Attorney General
North Carolina Attorney General's Office
Post Office Box 629
Raleigh, NC 27602-0629
daldinofi@ncdoj.com

Christopher J. Geis, Esq.
Patrick G. Spaugh, Esq.
Womble Carlyle Sandridge & Rice, LLP
One West Fourth Street
Winston-Salem, NC 27101
cgeis@wcsr.com
pspaugh@wcsr.com

This the 25⁺ day of August, 2017.

MORNINGSTAR LAW GROUP

Keith P. Anthony
N.C. State Bar No. 28405
kanthony@morningstarlawgroup.com
Morningstar Law Group
112 West Main Street, Second Floor
Durham, NC 27701

*Attorneys for Cybernet, LLC and Aladdin Real Estate, LLC*