IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:16-cv-00016-RJ

| | |
|---|---|
| CYBERNET LLC; and ALADDIN REAL ESTATE, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>JONATHAN DAVID, in his personal capacity and his official capacity as District Attorney for the 13th Prosecutorial District of North Carolina; JAMES McVICKER, in his personal and his official capacity as Sheriff of Bladen County, North Carolina; and TRAVIS DEAVER, in his personal and official capacity as a Deputy Sheriff of Bladen County, North Carolina,<br><br>    Defendants. | |

**PLAINTIFFS' LOCAL CIVIL RULE 56.1 RESPONSE TO DEFENDANTS
JAMES McVICKER AND TRAVIS DEAVER'S STATEMENT OF MATERIAL FACTS**

Plaintiffs Cybernet, LLC and Aladdin Real Estate Services, LLC (collectively, "Plaintiffs"), by and through counsel, hereby respond to Defendants James McVicker and Travis Deaver's Statement of Material Facts [#93] pursuant to Local Rule 56.1 (a)(2):

**RESPONSE TO STATED FACTS**

1. Admitted that Cybernet operates two stores in Dublin, NC known as Big Aladdin and Little Aladdin. Defendants' description of certain aspects of store exteriors is not disputed, although it is disputed that the description is complete.

2. Admitted, except for the following clarifications: Holly Smith is the sole owner of Cybernet. Plaintiffs object to the extent that Defendants are mischaracterizing Jeff Smith's role with regard to Cybernet. He testified that his in charge of keeping the machines and

equipment running, and that he helps out with certain tasks like paying the water bills. Smith Dep. pp. 31-33.

3. Admitted.

4. Admitted. Those matters are not at issue in this litigation. This case is about the destruction of Plaintiffs' property, not the legality of those sweepstakes and rewards promotions. *See* 12(b)(6) Order [DE# 31] p. 20 ("Plaintiffs' claims related to the destruction of property during the execution of the search warrants do not turn on the legality of the sweepstakes games.").

5. It is not disputed that Sheriff McVicker's first meaningful interaction related to this case occurred in fall 2014. It is disputed that McVicker did not receive money from Jeff and Holly Smith for his campaign. there was an election for Bladen County Sheriff, in which McVicker challenged Sheriff Benston. McVicker Dep. p. 12. The campaign was hard fought and close, and in early September 2014, Mr. Jeffrey Smith, one of the Plaintiffs' owners, was approached by the "Campaign to Elect Jim McVicker" through McVicker's campaign manager, Landon Bordeaux, seeking Mr. Smith's financial support for McVicker's candidacy. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 59, 63-69; McVicker Dep. pp. 27-37. In order to entice Mr. Smith's to support McVicker, McVicker's campaign told Mr. Smith that it had inside information that Sheriff Benston was planning to raid the Plaintiffs' businesses in Dublin, in order to make a splash going into the final phase of the campaign. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 65-69. This turned out not to be true, but the Plaintiffs closed down in response, and Mr. Smith accepted a meeting with McVicker and various members of his campaign team to discuss supporting his campaign. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 68-72, 75-77, 79, 87-89; McVicker Dep. pp. 37-38.

During that meeting, McVicker told Mr. Smith that the Plaintiffs' businesses were not a priority for him, and Mr. Smith told McVicker that he was not looking for favors because he was confident that Plaintiffs' businesses were operating lawfully. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 65-66, 139; McVicker Dep. pp. 38-40. What he did request, was that if McVicker became Sheriff, that he not conduct any large-scale raids on the Plaintiffs' businesses, but rather that he let Mr. Smith know that he wanted them to shut down, and that they would be shut down while the issue of their legality was investigated and litigated if necessary. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 108. Mr. Smith told McVicker that David had been out to get him since the hung jury prosecution, and that he was concerned that David would try to instigate some other prosecution of him and the Plaintiffs. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 91-92; McVicker Dep. pp. 41-42. Little did he know that David was working with Sheriff Benston to do that very thing. Dep. Ex. 34. Mr. Smith also offered to let McVicker or anyone in his department visit the Plaintiffs' businesses to inspect them and receive a demonstration of how the promotions operated, and then spent over an hour discussing how the promotions worked and why he considered them to be legal. Dep. Ex. 81 (Int. Resp. No. 14); McVicker Dep. pp. 39-41. McVicker reassured Mr. Smith that no such raids would occur on his watch, and then accepted a campaign contribution for $4,000 from Mr. Smith and his wife. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 90-93; McVicker Dep. pp. 43-44.

Two days later, McVicker's campaign manager returned the Smiths' check and asked if there was a way to get the money to the campaign in some other manner so that McVicker would not have to admit that he accepted a donation from the Smiths. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep. pp. 140-142. Mr. Smith arranged for the original $4,000.00 to be donated by one of his business associates, and then responded to further requests for donations as the campaign entered its final days with an additional $1,800.00. Dep. Ex. 81 (Int. Resp. No. 14); Smith Dep.

p.146. Plaintiffs and their staffs also contributed substantial "sweat equity" to the McVicker campaign at its request.

6. Not disputed, except as to the characterization of Captain Tyler's leading the investigation for BCSO. Plaintiffs dispute this characterization to the extent that it suggests that McVicker did not play an active and central role with regard to this investigation. *See* Responses to paragraphs 22, 25, 26, and 28 below.

7. Not disputed.

8. Not disputed that McVicker did not send a target letter or that McVicker discussed this matter with Ronnie Mitchell. Plaintiffs dispute that it would not have been helpful to have Jeff Smith conduct a demonstration of his promotions and business operations as part of the Defendants' investigation. Borreson Dep. pp. 118-121.

9. It is not disputed that Borreson has some experience with respect to gambling investigations.

10. It is not disputed that Borreson conducted an undercover operation at Big Aladdin and Little Aladdin on May 4, 2015. It is admitted that he prepared a report which describes what happened during this operation. It is denied that the search warrant applications are based upon what happened during the undercover investigation on this day. *See* Dep. Exs. 38 and 51.

11. It is not disputed that Borreson conducted an undercover operation at Big Aladdin and Little Aladdin on May 8, 2015. It is admitted that he prepared a report which describes what happened during this operation. It is denied that the search warrant applications are based upon what happened during the undercover investigation on this day. *See* Dep. Exs. 38 and 51.

12. It is note disputed that Borreson conducted an undercover operation at Big Aladdin and Little Aladdin on May 26, 2015. It is admitted that he prepared a report which

4

describes what happened during this operation. Defendants' description of the games and dexterity test are an oversimplification of those matters. *See* Borreson Dep. pp. 98-113.

13. Objection. This paragraph relates to a statement made by the Court of Appeals in dicta in *Crazie Overstock Promotions LLC v. McVicker*, 808 S.E.2d 927 (N.C. App. 2018). That case involves the intentional and false statements made by the Sheriff and Deputy Jeffrey Tyler in the applications for search warrants that were used in connection in this case. The issue of the legality of the sweepstakes was not before the Court on the matter on appeal, and had not been explained or argued to the Court. Moreover, the Court's stated description of its understanding of the Crazie Overstock Rewards Promotion is incorrect. Defendants are aware of these points, but chose to reference that statement in the hopes of prejudicing the Court against Plaintiffs, which is improper.

14. It is disputed that Captain Tyler, the Defendants, or CCSO determined that there was probable cause to apply for a search warrants. Tyler made false statements and material omissions in his applications for search warrants. He based his applications on undercover reports prepared by Borreson. Depositions Exs. 52, 53, 54, and 55. Borreson stated in his reports that most of the promotions in which he had participated had a chance meter or dexterity test, which, to his credit, he described in some detail. *Id.* Based upon Borreson's reports, one of McVicker's deputies, Jeffery Tyler, put together the applications and supporting affidavits for warrants to search Plaintiffs' businesses. Dep. Exs. 38, 51. McVicker assigned Tyler to head this investigation and work. McVicker Dep. pp. 73-75. However, although he otherwise copied the language of Borreson's reports verbatim, Tyler left out all reference to the skill components of the various promotions in which Borreson had participated, and also added language and descriptions of other components of the promotions that were not in Borreson's reports. *Compare* Dep. Exs. 67 *and* 68 (highlighting in original deposition exhibit); Tyler Dep. pp. 104-

5

4841-8656-3167.1
Case 7:16-cv-00016-RJ   Document 98   Filed 03/30/18   Page 5 of 18

13. The search warrants duly were issued on the basis of these false and misleading affidavits. *See* Dep. Exs. 38, 51.

15. It is not disputed that Tyler did not apply for a search warrant for Smith's house. It is disputed that Tyler believed that a Court would have granted a search warrant if he provided a truthful presentation of the facts with respect to the dexterity test and chance meters based upon the evidence identified in Paragraph 14 above.

16. It is disputed that McVicker had "no role" in preparing the search warrant applications. He is the elected sheriff and assigned this investigation to Tyler. McVicker Dep. pp. 73-75.

17. It is admitted that on May 28, 2015, a Superior Court Judge issued to two search warrants for the Big Aladdin and Little Aladdin stores. It is not disputed that the search warrants identify the categories of items to be seized, which include the ones identified in paragraph 17. It is disputed that a Court would have granted a search warrant if he provided a truthful presentation of the facts with respect to the dexterity test and chance meters based upon the evidence identified in Paragraph 14 above.

18. It is not disputed that the search warrant applications contain that language, among other things. It is disputed that there were "illegal gambling operations" at Big Aladdin or Little Aladdin.

19. Admitted.

20. It is not disputed that a memorandum distributed at a pre-raid meeting says "Be professional, remember people are watching and cameras will be everywhere." It is not disputed that McVicker was present at that meeting and addressed the deputies with respect to the raid. It is disputed that his message to them was to be professional. At the meeting, he also told deputies "take every fucking thing out," without regard for the scope of the search warrant. Deaver Decl.

6

¶ 6. The significance of the statement also is disputed because there was nothing particularly special about making this statement – it is a statement that is made as a matter of routine. Borreson Dep. p. 146; Tyler Dep. p. 143.

21. Not disputed.

22. Disputed. McVicker attended a pre-raid meeting in which he addressed the deputies before commencement of the raids. Tyler Dep. pp. 146-47; McVicker Dep. pp. 111-13. During that meeting, he told them to "take every fucking thing out," without regard for the scope of the search warrant. Deaver Decl. ¶ 6. He was present on scene during the raids and spoke to members of his office and DA's office. Defendants caused substantial to Plaintiffs' Property. See Dep. Ex. 81 (Int. Resp. Nos. 3, 6 -13); Smith 2nd Decl. ¶¶ 6-11.

23. Objection. Defendants' evidence does not support this contention. The photograph shows items being collected at one moment in time from only limited angles. One cannot tell from the photograph whether there is damage to the computer equipment, or whether there was any damage to the computer equipment that is not depicted in the photograph, or whether there was any subsequent damage that occurred to this equipment after the photograph was taken.

24. Disputed. Security camera wires were cut. Smith 2nd Decl. ¶ 10. Cat5e wiring for the computers inside both Cybernet stores was cut for no reason. These wires could have been unplugged from the nearby switches easily. It would have been no more difficult than unplugging a phone from a phone jack. Dep. Ex. 81 (Int. Resp. No. 11); Smith 2nd Decl. ¶ 6. After access already had been gained to the Big Aladdin store, theft-deterrent magnetic locks installed on front door to that building were intentionally destroyed by cutting their internal wiring. Dep. Ex. 81 (Int. Resp. No. 13); Tyler Dep. p. 161; Borreson Dep. pp. 183-184; Smith 2nd Decl. ¶ 7; Sheriff Ans. ¶¶ 41, 46. A coaxial cable to a television in the Big Aladdin store was

cut for no reason. This wire could have been unscrewed easily without difficulty. Dep. Ex. 81 (Int. Resp. No. 13); Smith Dep. p. 13; Smith 2nd Decl. ¶ 8. A water hose to an ice machine in the Big Aladdin store was cut for no reason. The hose could have been disconnected easily if there was some reason to move the ice machine. Dep. Ex. 81 (Int. Resp. No. 13); Smith Dep. p. 165-166; Smith 2nd Decl. ¶ 9.

25. Disputed. McVicker attended a pre-raid meeting in which he addressed the deputies before commencement of the raids. Tyler Dep. pp. 146-47; McVicker Dep. pp. 111-13. During that meeting, he told them to "take every fucking thing out," without regard for the scope of the search warrant. Deaver Decl. ¶ 6. He was present on scene during the raids and spoke to members of his office and DA's office. Long Dep. pp. 42-43, 54. Britt testified that McVicker's presence at the scene was peculiar, because the elected sheriff rarely attended raids of any kind. Britt Dep. p. 47. Based upon this evidence, a reasonable juror may find that McVicker oversaw all aspects of the execution of the search warrants.

26. It is not disputed that Deaver was not responsible for the collection, documentation and transport of evidence. It is disputed that, McVicker as the elected sheriff, is not responsible for overseeing all activities of his office. McVicker played an active role in the raids. He attended a pre-raid meeting in which he addressed the deputies before commencement of the raids. Tyler Dep. pp. 146-47; McVicker Dep. pp. 111-13. During that meeting, he told them to "take every fucking thing out," without regard for the scope of the search warrant. Deaver Decl. ¶ 6. He was present on scene during the raids and spoke to members of his office and DA's office. Long Dep. pp. 42-43, 54. Britt testified that McVicker's presence at the scene was peculiar, because the elected sheriff rarely attended raids of any kind. Britt Dep. p. 47. Based upon this evidence, a reasonable juror may find that McVicker oversaw all aspects of the execution of the search warrants.

27. Admitted. However, after access already had been gained to the Big Aladdin store, theft-deterrent magnetic locks installed on front door to that building were intentionally destroyed by cutting their internal wiring. Dep. Ex. 81 (Int. Resp. No. 13); Tyler Dep. p. 161; Borreson Dep. pp. 183-184; Smith 2nd Decl. ¶ 7; Sheriff Ans. ¶¶ 41, 46.

28. It is not disputed that McVicker drove a storage trailer to the site of the raids. It is disputed that McVicker did not personally oversee the operation of the execution of the search warrants. McVicker played an active role in the raids. He attended a pre-raid meeting in which he addressed the deputies before commencement of the raids. Tyler Dep. pp. 146-47; McVicker Dep. pp. 111-13. During that meeting, he told them to "take every fucking thing out," without regard for the scope of the search warrant. Deaver Decl. ¶ 6. He was present on scene during the raids and spoke to members of his office and DA's office. Long Dep. pp. 42-43, 54. Britt testified that McVicker's presence at the scene was peculiar, because the elected sheriff rarely attended raids of any kind. Britt Dep. p. 47.

29. Not disputed.

30. Disputed. Deaver cut wires while on the roof of Big Aladdin. Smith 2nd Decl. ¶ 10. Doug Britt testified that he heard officers talking about cutting wires rather than unplugging wires. Britt Dep. p. 49.

31. Plaintiffs do not dispute that Deaver was instructed by someone with the Defendants to go on to Big Aladdin's roof to remove security cameras. It is disputed that Deaver had to disentangle wires in order to unplug the security cameras. Each of the security cameras had wires approximately 12" in length leading from the base of the cameras ending in electrical plugs that were plugged into long extension cords. The cameras could have been removed easily by unplugging them from the extension cords without cutting any wires. Also, the cords for the security cameras were not entangled with the LED lighting wires. Dep. Ex. 81 (Int. Resp. Nos.

6, 8); Smith 2nd Decl. [DE# 96-2] ¶ 10; Deaver Dep. pp. 28-29, 38-40; Smith Dep. pp 101,103; Sheriff Ans. [DE# 5] ¶¶ 31-34.

32. It is admitted that LED lighting was on the roof of Big Aladdin and that the lighting was used to attract business. It is admitted that Deaver was on the roof of the Big Aladdin store during the raid and that he removed the LED lighting from the roof, that he did not seize the lighting, and discarded it off of the roof. It further is admitted that the LED lighting can be removed from the track without damaging the lights. It is disputed that Deaver used reasonable force to remove the LED lighting. Deaver used enough force that he detached the track for the lighting from the building and further damaged the stucco. It is disputed that the LED lighting was entangled with the security camera wires, and it is disputed that LED lighting had to be removed in order to seize the security cameras. There also is evidence that Deaver cut wires for the LED lighting and security cameras. Dep. Ex. 81 (Int. Resp. Nos. 6, 8, 9); Smith 2nd Decl. ¶ 10, 11; Deaver Dep. pp. 28-29, 38-40; Smith Dep. pp 101,103; Sheriff Ans. [DE# 5] ¶¶ 31-34.

33. Disputed. Deaver ripped off the LED lighting and discarded the lights on behind the building. He used enough force to detach and damage the track that was installed on the Big Aladdin building and which houses the lighting. Deaver does not have personal knowledge as to whether the lighting present works after he ripped them off the building, and instead testified that it could have been damaged. Deaver Dep. p. 61. Plaintiffs have not been able to test the lighting because its power source was destroyed in the fire that was caused by the Defendants' pulling of wires through a conduit on the roof. Dep. Ex. 81 (Int. Response Nos. 6, 7); Smith 2nd Decl. ¶ 10; Smith Dep. p. 221.

34. Admitted.

35. It is admitted that a wooden table broke. Plaintiffs do not dispute that it was broken by Johnson climbing on it.

36. It is not disputed that officers used tools to remove the televisions in the store. Those officers also used tools to cut a coaxial cable for one of the televisions, and to cut Cat5e wires and other cables in the stores. Dep. Ex. 81 (Int. Resp. Nos. 11, 13); Smith Dep. p. 13; Smith 2nd Decl. ¶¶ 6, 8.

37. It is admitted that Cybernet owned the ATMs in the Big Aladdin and Little Aladdin, and that those ATMs and the safes in those stores had cash. It is not disputed that Downie Dallas opened the ATMs and the Little Aladdin safe to access cash. Plaintiffs are unaware of the condition of the ATMs and safe, except to know that holes had been drilled into them. (Tyler Dep. p. 212).

38. It is admitted that BCSO owns a helicopter, that the helicopter was present for a portion, but not all of the raids, that it left before the raids were completed, and that Johnson testified that it had been used 10 to 12 times in searches in which he participated. Johnson admits that those times include the use of the helicopter to take photographs or video. Johnson Dep. pp. 35-36. The helicopter was used to take photographs with respect to these raids at Big Aladdin and Little Aladdin. *Id.* There is sufficient evidence for a juror to conclude that a primary purpose for the helicopter to be present at site was to assist with the raids and to make a public spectacle. McVicker directed the helicopter to land at the site. McVicker Dep. pp. 127-28. McVicker's explanation for the helicopter is that it had landed for lunch on its way to assist in a search for a missing person. McVicker Dep. pp. 129-130. This rings hollow given the tight area in which the helicopter had to land and the leisurely attitude this stay indicates toward a time-sensitive search for a missing person. Smith Dep. pp. 97-99. In short, it is reasonable to infer that the helicopter was part of the effect being created for the raids.

39. It is not disputed that McVicker testified to these points. However, a reasonable juror might not believe McVicker's testimony on the grounds that McVicker was present at and participated in the press conference. McVicker Dep. pp. 150-51; Dep. Ex. 60.

40. Not disputed.

41. It is admitted that Mr. Smith called Kenneth Clark on June 1, 2015 to report a fire at Big Aladdin and that there was damage to the building and the power supply for the LED lighting. Fortunately, the fire was caught early by people working for Mr. Smith while it still was smoldering, before it could cause even greater damage. Dep. Ex. 81 (Int. Resp. No. 7); Smith Dep. p. 157, 168-170; Long Dep. pp. 57-59; Sheriff Ans. ¶ 40. The cause of the fire is disputed. Plaintiffs contend that the fire was caused by the Defendants' pulling of wires on the roof. *Id.*

42. It is not disputed that the Underground weather report for Lumberton, NC for May 29, 2015 through June 1, 2015 says what it says. It is disputed that Plaintiffs would have discovered that Defendants damaged the roof of the Big Aladdin building in such a manner as to cause a leak until such time that it rains.

43. Admitted.

44. Admitted.

45. Disputed. Tyler testified that <u>he</u> did not have anything to do with the Smiths being charged with sixteen additional charges. (Tyler Dep. pp. 249-50). He does not say that BCSO did not have anything to with the additional charges. *Id*.

46. It is admitted that Smiths' concealed weapons permits ended up not being revoked. However, McVicker sent a notice to the Smiths seeking to revoke their concealed weapons permit, which the Smiths had to then take action through their attorneys to prevent from happening. Sheriff Answer ¶ 122.

12

4841-8656-3167.v5  Case 7:16-cv-00016-RJ   Document 98   Filed 03/30/18   Page 12 of 18

47. Disputed as to the evidence. McVicker's cited testimony states that Ronnie Mitchell told him that not all electronic sweepstakes are illegal.

48. Admitted.

49. Not disputed.

**ADDITIONAL MATERIAL FACTS TO WHICH THERE IS A GENUINE DISPUTE OR WHICH SUPPOR THE EXISTENCE OF A GENUINE DISPUTE**

1. A large mural that covered windows on the front of the Big Aladdin store was torn down (leaving shreds still stuck to the window) for no reason. The mural was not seized, and instead was tossed into a trash dumpster. Dep. Ex. 81 (Int. Resp. No. 3); Smith Dep. pp. 101-102.

2. Cat 5E wiring for the computers inside both Cybernet stores was cut for no reason. These wires could have been unplugged from the nearby switches easily. It would have been no more difficult than unplugging a phone from a phone jack. Dep. Ex. 81 (Int. Resp. No. 11); Smith 2nd Decl. ¶ 6.

3. A coaxial cable to a television in the Big Aladdin store was cut for no reason. This wire could have been unscrewed easily without difficulty. Dep. Ex. 81 (Int. Resp. No. 13); Smith Dep. p. 13; Smith 2nd Decl. ¶ 8.

4. A water hose to an ice machine in the Big Aladdin store was cut for no reason. The hose could have been disconnected easily if there was some reason to move the ice machine. Dep. Ex. 81 (Int. Resp. No. 13); Smith Dep. p. 165-166; Smith 2nd Decl. ¶ 9.

5. Several items were seized from the stores pursuant to the search warrants for no apparent reason:

   a. A neon "open" sign was seized. Smith Dep. p. 219.

b. Two remote devices which control the HVAC units for Little Aladdin were seized. These remotes were not listed as an item to be seized during the raids. *Id.* ¶¶ 62-67; Dep. Ex. 81 (Int. Resp. No. 13); Smith Dep. p. 213; Sheriff Ans. ¶ 65.

c. A wall clock from Big Aladdin was seized. Dep. Ex. 81 (Int. Resp. No. 13); Smith Dep. p. 228.

d. Two boxes from the online store tigerdirect.com that were unrelated to the Cybernet stores were seized, without ever being opened, in violation of proper procedure for the Sheriff's office. Dep. Exs. 49, 81 (Int. Resp. No. 13); Smith Dep. 218; Tyler Dep. p. 209; McVicker Dep. p. 155.

6. McVicker's motives for promising Mr. Smith that raids would not be conducted without warning, and then turning around to plot raids against Mr. Smith and the Plaintiffs are not entirely clear, but can be inferred from the circumstances Having accepted large sums of money and other assistance from Mr. Smith for his campaign, which he either did not properly report, or at least handled in a very questionable manner, McVicker then was confronted by David who insisted that strong action be taken against Mr. Smith and the Plaintiffs. Had McVicker resisted David's pressure, David no doubt would have looked into the matter and discovered that McVicker had financed his campaign through Mr. and Mrs. Smith. Putting aside whether this would have led to a criminal investigation of McVicker himself, it at least would have been very embarrassing to McVicker, whose political position is not overly secure given the narrow margin by which he won the election. Therefore, it is reasonable to infer that McVicker chose what he thought was the lesser of two evils, threw in his lot with David, and decided to launch a raid upon the Plaintiffs, in spite of the assurances he had given Mr. Smith.

14

4841-8656-3167.1 Case 7:16-cv-00016-RJ   Document 98   Filed 03/30/18   Page 14 of 18

7. Before seeking search warrants for the raid, it was decided by McVicker, David, Emery and members of the Cumberland County Sheriff Office that an undercover investigation of Plaintiffs' businesses should be undertaken. Dep. Ex. 37. Borreson was tasked with conducting a number of undercover insertions into Plaintiffs' businesses, complete with hidden cameras and microphones, and prepared a series of reports about what he saw there. Dep. Exs. 37, 52, 53, 54 and 55; Borreson Dep. pp. 61-62. Notably, Borreson stated in his reports that most of the promotions in which he had participated had a chance meter or dexterity test, which, to his credit, he described in some detail. *Id*.

8. Based upon Borreson's reports, one of McVicker's deputies, Jeffery Tyler, put together the applications and supporting affidavits for warrants to search Plaintiffs' businesses. Dep. Exs. 38, 51. McVicker assigned Tyler to head this investigation and work. McVicker Dep. pp. 73-75. However, although he otherwise copied the language of Borreson's reports verbatim, he left out all reference to the skill components of the various promotions in which Borreson had participated, and also added language and descriptions of other components of the promotions that were not in Borreson's reports. *Compare* Dep. Exs. 67 *and* 68 (highlighting in original deposition exhibit); Tyler Dep. pp. 104-13.

9. Members of the Sheriff's department acknowledged that it was unusual to have so many members of the district attorney's office present during the execution of a search warrant. Johnson Dep. pp. 83-84; Tyler Dep. pp. 155-57. They also noted that McVicker's presence was peculiar, because the elected sheriff rarely attended raids of any kind. Britt Dep. p. 47.

10. Deputy Chad Britt overheard a discussion among his brother officers about cutting, rather than unplugging, the various wires. *Id*. at 49-50. He also saw officers "yanking" on wiring that ran outside of the store from inside the store. *Id*. at 52. Frustrated that the

15

"yanking" had not had the desired effect, Britt saw Deaver go to the roof to pull the wires out from that vantage point. *Id*.

11. The Sheriff's office secured the Big Aladdin and Little Aladdin stores, put crime scene tape up around them, removed the employees from inside the stores, and prevented members of the public from entering the stores. Tyler Dep. pp. 136-37, 142, 147-51; Britt Dep. pp. 16-18, 28-30, 35, 56; Emery Dep. pp. 155-56; Dep. Ex. 4.

12. Although there were security cameras inside the Big and Little Aladdin stores, those cameras deliberately were pushed upward to restrict their view, which prevented the deputies' activities from being recorded. Smith Dep. pp. 16-17; Borreson Dep. pp. 198-199. The Sheriff's office then cut the power or disabled the video recording devices for the security cameras to prevent any further recording of their activities. Smith Dep. pp. 14-18; Deaver Dep. pp. 52-53.

13. Jeffrey Smith visited the Big Aladdin and Little Aladdin stores minutes after the raids were concluded, secured the stores and began inspecting the damage to them. Smith 2nd Decl. ¶¶ [DE# 96-2] ¶ 5; Smith Dep. pp. 159-62. Smith was familiar with the condition of the stores and their content prior to the raids, so he was able to conclude that all of the damage that he identified could only have been caused by the Defendants, and nobody else. *Id*.

14. Plaintiffs also incorporate by reference the facts set forth in their Objection and Response to David's Statement of Material Facts with Appendix. [DE # 96].

[Signature Page Follows]

Respectfully submitted this the 30th day of March, 2018.

        MORNINGSTAR LAW GROUP

        /s/ Keith P. Anthony
        William J. Brian, Jr.
        N.C. State Bar No. 16570
        bbrian@morningstarlawgroup.com
        Keith P. Anthony
        N.C. State Bar No. 28405
        kanthony@morningstarlawgroup.com
        Morningstar Law Group
        112 West Main Street, Second Floor
        Durham, NC 27701

        *Attorneys for Cybernet, LLC and Aladdin Real Estate, LLC*

17
4841-8656-3167.v5  Case 7:16-cv-00016-RJ   Document 98   Filed 03/30/18   Page 17 of 18

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **PLAINTIFFS' LOCAL CIVIL RULE 56.1 RESPONSE TO DEFENDANTS JAMES McVICKER AND TRAVIS DEAVER'S STATEMENT OF MATERIAL FACTS** was filed with the Clerk of Court for the Eastern District of North Carolina using the CM/ECF system, which will send notification of such filing to the following:

>David J. Adinolfi II
>Special Deputy Attorney General
>North Carolina Attorney General's Office
>114 W. Edenton Street
>Post Office Box 629
>Raleigh, NC 27602-0629
>dadinolfi@ncdoj.com
>
>Christopher J. Geis, Esq.
>Patrick G. Spaugh, Esq.
>Womble Bond Dickinson (US), LLP
>One West Fourth Street
>Winston-Salem, NC 27101
>Chris.Geis@wbd-us.com
>Patrick.Spaugh@wbd-us.com

This the 30th day of March, 2018.

>MORNINGSTAR LAW GROUP
>
>/s/ Keith P. Anthony
>Keith P. Anthony
>N.C. State Bar No. 28405
>kanthony@morningstarlawgroup.com
>Morningstar Law Group
>112 West Main Street, Second Floor
>Durham, NC 27701
>
>*Attorneys for Cybernet, LLC and Aladdin Real Estate, LLC*