```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      SOUTHERN DIVISION
                 CASE NO. 7:16-cv-00016-RJ
 3                                                   )
   CYBERNET LLC; and ALADDIN REAL ESTATE,            )
 4 LLC,                                              )
                                                     )
 5                                                   )
      Plaintiffs,                                    )
 6                                                   )
   VS.                                               )
 7                                                   )
                                                     )
 8 JONATHAN DAVID, in his personal                   )
   capacity and his official capacity as             )
 9 District Attorney for the 13th                    )
   Prosecutorial District of North                   )
10 Carolina; JAMES McVICKER, in his                  )
   personal and his official capacity as             )
11 Sheriff of Bladen County, North                   )
   Carolina; and TRAVIS DEAVER, in his               )
12 personal and official capacity as a               )
   Deputy Sheriff of Bladen County, North            )
13 Carolina,                                         )
                                                     )
14                                                   )
      Defendants.                                    )
15
```

DEPOSITION OF CHAD BRITT

At Elizabethtown, North Carolina
August 17th, 2017
2:06 p.m.
Reported by: Leslie Christian

```
 1      A.    That is correct, sir.
 2      Q.    Did you have any other sort of duties,
 3 obligations as a corporal other than being assigned to
 4 the courtroom?
 5      A.    I was assigned to the courtroom, and the
 6 day this here occurred I was actually a corporal in the
 7 courtroom.  My sergeant came to me Thomas Atkinson and
 8 asked if I could help with the search warrants.
 9      Q.    Thomas Atkinson?
10      A.    That's correct, sir.
11      Q.    And that's who you reported to?
12      A.    That is correct.
13      Q.    What time did he come to you?
14      A.    I had to be at work -- let me see.  What
15 time did I report.  It was between 8:30 and 9:00.
16      Q.    So between 8:30 and nine is when he told
17 you to participate?
18      A.    That is correct, sir.
19      Q.    What did he tell you at the time?
20      A.    At the time he told me that I needed to
21 meet near Jeff Bridgers' house and we would have a
22 briefing and I needed to get up with Captain Jeff
23 Tyler.
24      Q.    I'll come back to that in just a moment.
25 With respect to those raids that are at issue that
```

1 we'll be talking about, do you understand that they
2 were conducted pursuant to search warrants?
3     **A.    Yes, sir.**
4     Q.    Are you aware that there was an
5 investigation that was done before those search
6 warrants were issued?
7     **A.    I'm not aware of that, sir.**
8     Q.    I take it then you had no involvement with
9 respect to the investigation that was done?
10    **A.    No, sir.**
11    Q.    Did you have any involvement with respect
12 to the application for the search warrant?
13    **A.    No, sir.**
14    Q.    So your first involvement that you had was
15 when you were told to meet on May 29th, 2015, to help
16 out with the raids?
17    **A.    That is correct.**
18    Q.    So you were told to go to a briefing at
19 Jeff Bridges' house?
20    **A.    Near Jeff Bridges' house, yes.**
21    Q.    Where was that location?
22    **A.    That is off of Rice Pond Road near Dublin**
23 **Speedway which would probably be a mile and a half from**
24 **the stores -- the Sweepstakes stores.**
25    Q.    Was this a meeting in a building or an

1 outside location?
2     A.    Outside, and it was very hot that day.
3     Q.    Who all was at that meeting?
4     A.    Travis Deaver, Chris Brisson, Captain
5 Tyler, Richard Allen.  I want to say -- I want to say
6 Tommy Lynn and Jim Ray Marlowe, and I want to say Sue
7 Lucas but I'm not sure.
8     Q.    What about Jeff Bridgers?
9     A.    I can't remember if he was there or not.
10    Q.    What about Sheriff McVicker?
11    A.    No.
12    Q.    Given your work in the courtroom are you
13 familiar with various members of the D.A.'s Office?
14    A.    Am I familiar with them?
15    Q.    Um-hm.  Do you know who they are?
16    A.    At that time, yes.
17    Q.    Do you know Glenn Emery?
18    A.    I do, sir.
19    Q.    Irene Riel?
20    A.    I do, sir.
21    Q.    Jon David?
22    A.    I do sir.
23    Q.    Do you know who Scott Pait is?
24    A.    Yes, sir.
25    Q.    Were any of those people present at that

1  -- they said we were finished -- we were finished with
2  little Aladdin, and there were already deputies and
3  investigators and stuff over there at the little
4  Aladdin.  They were already there.  At the big Aladdin.
5  Excuse me.
6       Q.   Okay.
7       A.   And then I went there.  The time is pretty
8  -- right here at 13:10, 1:00.  It seems like I was
9  there earlier than that, sir.  And there again that's
10 not my handwriting.
11      Q.   So you started out at the little Aladdin
12 store and at some point you moved over to the big
13 Aladdin store?
14      A.   That is correct.
15      Q.   In terms of the time that you would have
16 arrived on scene, does 10:21 sound somewhere about
17 accurate?
18      A.   That does sound accurate, yes.
19      Q.   And you mentioned earlier that Sheriff
20 McVicker pulled up in a U-Haul?
21      A.   That is correct.
22      Q.   Do you recall what time he pulled up?
23      A.   I don't recall that, sir.  Not the exact
24 time.  I remember him pulling up.  I can draw it out
25 where he pulled in and everything.

```
 1       Q.   Was it at the little Aladdin store or the
 2  big Aladdin store?
 3       A.   Big Aladdin.
 4       Q.   So it was at some point after you moved to
 5  the big Aladdin?
 6       A.   That is correct.
 7       Q.   What did he -- did you have a conversation
 8  with him?
 9       A.   I spoke to the sheriff.  He asked me how I
10  was doing and told me I looked sharp with my hat on.
11  He's very prestigious.  He loves the uniform and loves
12  the prestige.
13       Q.   Can you explain that to me a little bit
14  more.  What do you mean by "he loves the prestige"?
15       A.   He loves for a man to look sharp in his
16  uniform -- and a woman.  He loves for you to look sharp
17  in uniform, and whenever you're outside your vehicle on
18  duty he wants you to have your hat out.
19       Q.   And by that you mean your sheriff issued?
20       A.   That is correct, sir.
21       Q.   Did Sheriff McVicker make any other
22  comments generally to law enforcement officers?
23       A.   I mean, he would -- you know, he would
24  thank each and every one of us.  I mean, he walked by
25  -- thank you; I appreciate you; thank you.  You know,
```

1 stuff like that.
2     Q.   Earlier we were talking about statements
3 that Captain Tyler -- if I recall correctly, it was
4 Captain Tyler who was providing instructions at the
5 pre-raid meeting?
6     A.   Yes, sir.
7     Q.   And you were talking about comments that
8 Captain Tyler was making.  And my recollection is that
9 you started referring to comments made by Sheriff
10 McVicker when he pulled up --
11     A.   Um-hm.
12     Q.   -- in the U-Haul?
13     A.   Whenever he pulled up in the U-Haul, he
14 told us don't be tearing stuff up.  Don't be messing
15 stuff up.  Don't just take the stuff and throw it in
16 the back of the trucks.  Set it in the back of the
17 trucks.
18     Q.   Have you been involved in other executions
19 of search warrants?
20     A.   Yes, sir.
21     Q.   How many would you say you've been involved
22 in?
23     A.   I would say 10 to 15.
24     Q.   Has Sheriff McVicker been present at any of
25 those?

1 that operation?
2     A.   Well, it wasn't an actual search warrant.
3 It was like a crime scene.  This happened years ago.
4 Two houses had been caught on fire, and I remember the
5 D.A.'s Office was out there.
6     Q.   What about specifically with regard to the
7 execution of search warrants?
8     A.   No, sir.
9     Q.   This was the first time with respect to the
10 execution of a search warrant where somebody from the
11 D.A.'s Office was present?
12     A.   To my knowledge.
13     Q.   In your experience?
14     A.   To my knowledge, sir.
15     Q.   How does this raid at these two stores
16 compare to the other execution of search warrants that
17 you've experienced?  Does it seem to involve a bigger
18 deal than the other ones?
19          MR. SPAUGH:  Objection.  You can
20 answer.
21          THE WITNESS:  What stood out about
22 this here to me, sir, was the sheriff was there.  Out
23 of all my years working with the Sheriff's Department I
24 had never seen the actual sheriff at a search warrant.
25 With that being said, the sheriff that we have now is

1  **very proactive.  The sheriffs I worked for in the past,**
2  **they weren't as proactive.**
3  (BY MR. ANTHONY)
4      Q.   You mentioned earlier that you understood
5  that this search warrant involved allegations of
6  gambling; is that correct?
7      **A.   That is correct.**
8      Q.   Did you ever have any conversations with
9  the sheriff about issues of gambling?
10     **A.   No, sir.**
11     Q.   Have you heard the sheriff make any
12 statements about gambling?
13     **A.   No, sir.**
14     Q.   Have you heard the district attorney make
15 any statements about gambling?
16     **A.   No, sir.**
17     Q.   Any members of the D.A.'s Office?
18     **A.   No, sir.  I don't stay around the office**
19 **much.**
20     Q.   Did you observe anybody on the roof of the
21 big Aladdin store?
22     **A.   I did, sir.**
23     Q.   Who did you observe up there?
24     **A.   Travis Deaver.**
25     Q.   What did you observe him doing?

1    A.   If you're standing facing the big Aladdin
2 he was on top of that one -- on top of big Aladdin.  I
3 heard the guys talking inside with the guys.  That
4 would be the people -- inside big Aladdin there was
5 some wiring going up.  I guess you would call it a
6 firewall.
7         There was some wires going up and you could
8 see the wires.  Morgan Johnson said don't cut them, you
9 know, because they were wanting to cut them.  He said
10 do not cut them wires because if you cut them wires you
11 could damage something.
12        So Travis Deaver goes to the top.  And
13 where the wires are connected to the top I guess there
14 was something they said was hung -- like, an adapter
15 plug or something was hung and he was up there trying
16 to unhook that.
17    Q.   When you say "they," who are you referring
18 to?
19    A.   "They" would be Morgan Johnson, Richard
20 Allen, and Matt Hester.
21    Q.   And so those were the ones who were looking
22 to cut the wires before Morgan Johnson said no?
23    A.   It wasn't to cut the wires.  He didn't want
24 anything messed up.  That was the whole thing.  He
25 didn't want none of the stuff messed up.  And where the

1 wires were coming down, I mean, you could have took a
2 knife and cut it.  If they would have had -- suppose
3 the electricity wire would have been there.  If we cut
4 that wire it's going to shock the fire out of you.
5 And, plus, they didn't want to damage Mr. Jeff's
6 equipment.
7     Q.   So if you cut the wires you would, in
8 effect, damage that equipment?
9     A.   You would damage it and you could also hurt
10 yourself especially if it's an electrical wire.  We
11 didn't know what the wires were.  I'm standing there at
12 the front door looking.
13     Q.   I'll have you turn to Exhibit 16.
14     A.   Exhibit 16?
15     Q.   Yeah.  They should all be in there.
16     A.   Yes, sir.
17     Q.   Exhibit 16 consists of four photographs; is
18 that correct?
19     A.   Yes, sir.
20     Q.   And these are generally of the big Aladdin
21 store; is that correct?
22     A.   Yes, sir.
23     Q.   And if you turn to the third picture it's
24 DSC_0005.
25     A.   Yes, sir.

1  Q.  Did that artwork pose any kind of threat to
2 the officers?
3  **A.  I can only speak for myself; no, sir.**
4  Q.  It did not pose a threat to you?
5  **A.  No, sir.**
6  Q.  Do you think it was necessary to tear down
7 that artwork?
8      MR. SPAUGH:  Objection.
9 (BY MR. ANTHONY)
10  Q.  Do you think it was necessary for any law
11 enforcement officer on the day of the raid to tear down
12 that artwork off of that window?
13  **A.  Can I ask Mr. Jeff a question?**
14      MR. SPAUGH:  No.
15      **THE WITNESS:  Can I ask you a**
16 **question?  If this here -- if I'm on the inside of this**
17 **building right here and this right here is up, can I**
18 **see through this right here?  If I can see through this**
19 **right here it would not be a threat to me.  If I can**
20 **look through and see through, it's not a threat.**
21          **But, now, if it's a sticker over the**
22 **glass, yes, because we're in there conducting a search**
23 **warrant and we would like to see what's on the outside.**
24 **But if you can actually look through it, no, it would**
25 **be pointless.**

1 remove that artwork?
2            MR. SPAUGH: Objection. He's not an
3 expert.
4 (BY MR. ANTHONY)
5     Q.   You can answer the question if you can.
6     **A.**   **I think it would be pointless to tear**
7 **something down. I mean, as long as you can see and**
8 **even if it's glass that leads to the outside of a**
9 **building, I mean, if it's secure on the outside why --**
10 **the building was secure, sir.**
11     Q.   Are you aware of any cables being cut
12 inside the building related to any of the equipment?
13     **A.**   **No, sir.**
14     Q.   Did you observe anybody cut any wires?
15     **A.**   **No cutting.**
16     Q.   Did you hear anybody talk about cutting
17 wires other than what you discussed earlier?
18     **A.**   **Just about not cutting them.**
19     Q.   Are you aware of any damage that occurred
20 during the execution of the search warrants?
21     **A.**   **Not that I recall, sir.**
22     Q.   Had you heard any discussion about damage
23 that had occurred during execution of search warrants?
24     **A.**   **Not any damage. Just Travis said he about**
25 **busted his ass up there on top of the roof.**

1     **A. Go ahead.**

2     Q. You can answer.

3     **A. Since I have been working here, that's the**
4 **first time a sheriff that I have worked for has shown**
5 **up to a crime scene, and his reasoning behind that is**
6 **how proactive he is.**

7     Q. And the question I have on that is how many
8 of these searches did you participate in prior to
9 Sheriff McVicker becoming the sheriff out of those 10
10 to 15?

11     **A. I've only been on one with him, sir, out of**
12 **all of them.**

13     Q. And how many searches have you participated
14 in since he was elected?

15     **A. Prior to him being elected, ten.**

16     Q. Can you recall how many searches you've
17 participated in since he's been elected?

18     **A. Since he's been elected, approximately four**
19 **or five.**

20     Q. Is there any prohibition against the
21 sheriff being present at the execution of a search
22 warrant?

23     **A. It's his department. He can do as he**
24 **pleases. We work under the sheriff's discretion in**
25 **North Carolina.**