IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:16-CV-16-RJ

CYBERNET, LLC and                            )
ALADDIN REAL ESTATE, LLC,                    )
                                             )
    Plaintiffs,                               )
                                             )
       v.                                  )
                                             )
JONATHAN DAVID, *in his personal*            )
*capacity and his official capacity as*      )
*District Attorney for the 13th Prosecutorial* )      O R D E R
*District of North Carolina*, JAMES          )
MCVICKER, *in his personal capacity and*     )
*his official capacity as Sheriff of Bladen* )
*County, North Carolina*, and TRAVIS         )
DEAVER, *in his personal capacity and his*   )
*official capacity as a Deputy Sheriff of*   )
*Bladen County, North Carolina*,             )
                                             )
    Defendants.                               )

This matter comes before the court on the motions for summary judgment of Defendant

Jonathan David [DE-87] and Defendants James McVicker and Travis Deaver [DE-91]. All

responsive briefing is complete, and the matters are ripe for disposition. For the reasons set forth

below, the motions for summary judgment are allowed as to the federal claims and the court

declines to exercise jurisdiction over the state law claims, which are remanded to Bladen County

Superior Court.

## I.  STATEMENT OF THE CASE

Cybernet, LLC ("Cybernet") and Aladdin Real Estate, LLC ("Aladdin") (collectively,

"Plaintiffs") filed a verified complaint in the Superior Court of Bladen County against Jonathan

David, the District Attorney for the 13th Prosecutorial District of North Carolina ("David" or the "District Attorney"), James McVicker, the Sheriff of Bladen County ("McVicker" or "Sheriff McVicker"), and Travis Deaver ("Deaver"), a Deputy Sheriff of Bladen County, asserting claims for conversion, declaratory judgment, takings under the United States and North Carolina Constitutions, and deprivation of federal constitutional rights under 42 U.S.C. § 1983, all stemming from the alleged destruction of Plaintiffs' property during the execution of search warrants by the Bladen County Sheriff's Office (the "BCSO"). [DE-1-1]. Sheriff McVicker and Deaver (collectively, the "Sheriff Defendants") removed the action to this court [DE-1] and filed an answer to the complaint [DE-5], and David filed a motion to dismiss [DE-12]. The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in the case in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [DE-25 through -28].

The court allowed in part David's motion to dismiss and dismissed Plaintiffs' takings claim under the United States Constitution and individual capacity takings claim under the North Carolina Constitution but allowed to proceed Plaintiffs' official capacity takings claim under the North Carolina Constitution and individual capacity claims for conversion, declaratory judgment, and violation of 42 U.S.C. § 1983. [DE-31]. David then filed a motion for summary judgment [DE-32] and Plaintiffs filed a motion for entry of default against David [DE-42], both of which were denied [DE-55]. The court entered a scheduling order providing for two phases of discovery—Phase I focusing on Defendants' liability and immunity defenses, and Phase II focusing on all remaining issues should immunity not be case dispositive. [DE-58]. After the completion of Phase I discovery, Defendants filed the instant motions seeking summary judgment on all remaining claims.

## II. STATEMENT OF FACTS

The undisputed facts, as well as the disputed facts viewed in the light most favorable to Plaintiffs, are summarized as follows. Cybernet operated two stores, "Big Aladdin" and "Little Aladdin" (collectively, the "stores"), that offered internet sweepstakes promotions to the public. Compl. [DE-1-1] ¶¶ 9–11. The stores are located in in Dublin, Bladen County, North Carolina, and are in separate buildings that are across the street from one another. *Id.* ¶¶ 9–10. Cybernet leased the space for the stores from Aladdin, which owns the buildings. *Id.* ¶ 12. Jeffrey Smith ("Smith") owns Aladdin, Holly Smith (together with Jeffrey Smith, "the Smiths") owns Cybernet, and both have some role in operating the stores, with Holly Smith acting as an operations manager and Jeffrey Smith maintaining the equipment and paying bills. *Id.* ¶¶ 12–14; Dep. of Jeffrey Smith ("Smith Dep.") [DE-94-2] at 32:16–33:13.

In the fall of 2014, James McVicker was running for sheriff of Bladen County and met with Smith to discuss a potential campaign contribution. Dep. of James McVicker ("McVicker Dep.") [DE-94-4] at 30:25–31:15; Smith Dep. [DE-97-9] at 59:1–8, 90:8–20. Smith gave McVicker a campaign contribution that was later returned so that it could be resubmitted in another manner not traceable to the Smiths. Smith Dep. [DE-97-9] at 90:21–93:17, 140:4–142:14. Smith also explained to McVicker how the promotions at the stores worked and why he believed they were legal, and Smith offered to allow McVicker to view the stores and to demonstrate the promotions offered. McVicker Dep. [DE-97-8] at 38:9–41:17, Interrog. No. 14 & Answer [DE-97-26]. McVicker was ultimately elected sheriff and, after he took office, he received complaints from some local residents about the stores. McVicker Dep. [DE-94-4] at 76:10–77:3.

The District Attorney for Bladen County also had concerns regarding the legality of the sweepstakes promotions offered at the stores, and, in January 2013, he authored a memorandum to law enforcement regarding the enactment of N.C. Gen. Stat. § 14-306.4, Electronic machines and devices for sweepstakes prohibited, effective January 3, 2013. [DE-95-15]. The memorandum addressed the state of case law regarding the sweepstakes statute, the roles of the various branches of government and law enforcement related to the statute, the duty of prosecutors to advise law enforcement but to refrain from giving advisory opinions to gaming establishments or their attorneys, potential remedies, and notice to video gaming businesses regarding the new law. *Id.* The District Attorney's Office subsequently prosecuted Smith in 2014, related to a sweepstakes promotion in Bladen County, resulting in a hung jury. 2d Decl. of Jeffrey Smith ("2d Smith Decl.") [DE-96-2] ¶ 13.

In March 2015, Sheriff McVicker and Captain Jeffery Tyler of the BCSO met with members of the Cumberland County Sheriff's Office ("CCSO") and the Bladen County District Attorney's Office (the "District Attorney's Office"), including David and Glenn Emery (an Assistant District Attorney), regarding a potential investigation to determine whether the stores were violating any gaming laws. June 10, 2015 Report of Jeffrey Tyler ("Tyler Report") [DE-94-5]; Dep. of Jeffrey Tyler ("Tyler Dep.") [DE-94-6] at 25:2–25. Sheriff McVicker appointed Tyler to lead the investigation. McVicker Dep. [DE-94-4] at 73:20–75:12. Neither Sheriff McVicker, nor anyone else involved in the investigation, including any member of the District Attorney's Office, informed Smith the stores were under investigation or ever took him up on his offer to demonstrate how the promotions worked. *Id.* at 84:16–85:9; Tyler Dep. [DE-94-6] at 33:1–20. Instead, Tyler utilized an undercover officer, David Borresen from the CCSO, to investigate

because Borresen and the CCSO had specialized gambling training and experience with similar investigations.  Dep. of David Borresen ("Borresen Dep.") [DE-94-7] at 20:17–23:18, 24:17–25:4; Tyler Dep. [DE-94-6] at 23:25–24:16; McVicker Dep. [DE-94-4] at 75:17–76:9.  Borresen went to the stores in an undercover capacity on May 4 and 8, 2015 and played some of the games offered.  Borresen Reports [DE-94-8, -9].  At a May 18, 2015 meeting with members of the BSCO, the CCSO, and Emery, it was decided that Borresen would visit the stores another time before seeking search warrants [DE-97-15], and he did so on May 26, 2015 [DE-94-10].

After Borresen's final undercover operation, Tyler decided to apply for search warrants for both Big Aladdin and Little Aladdin.  Tyler Dep. [DE-95-11] at 86:4–19.  Tyler prepared search warrant applications, incorporating some, but not all, of the information from Borresen's reports, and sought review of the applications from Borresen and Ronnie Mitchell, a Cumberland County attorney who advised Sheriff McVicker, the BCSO, and the CCSO on legal matters.  *Id.* at 87:7–16; Tyler Dep. [DE-97-10] at 104:14–113:21.  On May 28, 2015, a North Carolina Superior Court judge issued search warrants for Big Aladdin and Little Aladdin, which authorized the seizure of items including, but not limited to, gaming machines and other devices as defined in N.C. Gen. Stat. § 14-306.1A, financial proceeds from the operations of illegal gaming, related documents, photographs, videos, and electronic media, and other fruits or instrumentalities of the crime.  [DE-97-16, -18].

On the morning of May 29, 2015, the BCSO held an operational briefing  prior to executing the search warrants, at which Tyler distributed a memorandum containing, among other things, a reminder to "*** **Be professional,** remember people are watching and cameras will be everywhere. ***."  [DE-94-12]; Dep. of Morgan Johnson ("Johnson Dep.") [DE-94-13]

at 101:10–102:12, 114:23–115:5.  Sheriff McVicker was present for a portion of the meeting, reminded his deputies to be professional, McVicker Dep. [DE-94-4] at 111:14–113:6, but also told them to "take every [f***ing] thing out," Decl. of Randy Deaver ("Randy Deaver Decl.") [DE-98-2] ¶ 6.[1]  Subsequently, Tyler held a staging meeting near the stores, at which several members of the BCSO, Emery, and Scott Pait (an investigator for the District Attorney's Office) were present, but Sheriff McVicker did not attend.  McVicker Dep. [DE-94-4] at 117:18–118:1; Dep. of Chad Britt ("Britt Dep.") [DE-94-1] at 14:14–15:11; Dep. of Glenn Emery ("Emery Dep.") [DE-85-1] at 149:1–150:19.[2]  The search warrants were then executed, with Tyler, Morgan Johnson of the BCSO, Borresen, and Lieutenant Jenkins of the CCSO overseeing the collection of evidence.  Britt Dep. [DE-94-1] at 34: 1–10; Borresen Dep. [DE-94-7] at 155:12–25.  The stores were secured, security cameras were redirected upward and later seized, the scene was

---

[1] Defendants contend Sheriff McVicker's alleged statement to his deputies to "take every [f***ing] thing out" is inadmissible double hearsay.  Defs.' Reply [DE-102] at 5 (citations omitted).  Smith obtained Sheriff McVicker's alleged statement from Randy Deaver, who had worked for the Smiths at the stores and lived near Chad Britt, a BCSO deputy involved in the search.  Randy Deaver Decl. [DE-98-2] ¶¶ 3–4, 8.  Randy Deaver's declaration stated that in the summer of 2017, he spoke with Britt, who began talking about the search at the stores and said Sheriff McVicker directed the deputies present to "take every [f***ing] thing out" of the stores.  *Id.* ¶ 6.  Defendants argue that Britt testified Sheriff McVicker never gave such direction and Britt did not attend the meeting where the statement was allegedly made.  Defs.' Reply [DE-102] at 5.  Plaintiffs argue that McVicker's and Britt's statements are nonhearsay because they are admissions against a party opponent under Fed. R. Evid. 801(d)(2)(A), and the statement from Britt to Randy Deaver is also admissible under Fed. R. Evid. 801(d)(2)(D) because Britt was an employee of the Sheriff's Office at all times relevant.  Pls.' Mem. [DE-97] at 9, n.3.

       The court agrees with Plaintiffs that Sheriff McVicker's statement to Britt is nonhearsay under Fed. R. Evid. 801(d)(2)(A), as a statement by a party opponent, and Britt's statement to Randy Deaver is nonhearsay under Fed. R. Evid. 801(d)(2)(D), because Britt was McVicker's employee and the statement was on a matter within the scope of their relationship.  Therefore, the statements are not excluded pursuant to Fed. R. Evid. 805.  *See Yohay v. City of Alexandria Emps. Credit Union, Inc.*, 827 F.2d 967, 970 (4th Cir. 1987) (finding "[t]he fact that Martin testified that Hatton had told Martin what Filopovich had said provides no basis for exclusion" where the statements from Hatton to Martin and from Filopovich to Hatton were not hearsay pursuant to Fed. R. Evid. 801(d)(2)(D)); *Templeton v. First Tenn. Bank, N.A.*, No. CIV. WDQ-09-3280, 2013 WL 3873180, at *4 n.23 (D. Md. July 24, 2013) (finding the plaintiff's hearsay within hearsay statement that "Reichhart had told O'Donnell-and O'Donnell told her" was not excluded, pursuant to Rule 805, because each part of the statement fell under an exception to hearsay, specifically Fed. R. Evid. 801(d)(2)(D)).  It is immaterial for purposes of summary judgment that Defendants dispute Britt was present at the meeting or that Sheriff McVicker made the statement, because at this stage "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

[2] The parties filed only excerpts rather than complete deposition transcripts in support of their briefing.  Therefore, the court references the complete transcripts filed elsewhere in the docket where necessary.

cordoned off with crime scene tape, the customers were told to leave, and law enforcement removed the items to be seized. Britt Dep. [DE-97-3] at 16:5–15, 28:1–29:10, 30:1–12, 20–31:17; Smith Dep. [DE-97-9] at 16:7–18:8; Borresen Dep. [DE-94-7] at 162:3–25; Dep. of Travis Deaver ("Deaver Dep.") [DE-94-15] at 29:4–16. Neither of the Smiths was present during the search. Smith Dep. [DE-97-9] at 148:5–8.

Sheriff McVicker was not present at the stores when the warrants were executed but later drove a storage trailer to the stores, at the request of Tyler, because there was more equipment to seize than originally anticipated. McVicker Dep. [DE-94-4] at 118:9–120:1; Tyler Dep. [DE-94-6] at 162:16–163:10. Scott Long, a contractor performing work for Smith in the space adjacent to Little Aladdin at the time of the search, saw David with Sheriff McVicker walking across the street to Little Aladdin while the two talked and looked at papers. Dep. of Scott Long ("Long Dep.") [DE-95-7] at 40:2–3, 42:19–43:18. Emery, Irene Riel (an Assistant District Attorney), and Pait were present at various times during the search and spoke to BCSO members conducting the search. Emery Dep. [DE-95-5] at 154:6–155:21; Dep. of Irene Riel ("Riel Dep.") [DE-95-9] at 55:6–56:14. Travis Deaver (a deputy sheriff with the BCSO) assisted with the collection of evidence, but did not supervise or give orders. Deaver Dep. [DE-94-15] at 60:3–8. Deaver, whose background includes electrical training and work as a volunteer fire fighter, was directed to and did remove security cameras from the exterior and roof of Big Aladdin. *Id.* at 29:4–18, 57:23–25, 65:20–66:15. The rooftop cameras were mounted on two by fours, and Deaver removed the cameras by pulling the two by fours from the roof. *Id.* at 60:9–18, 64:13–65:5. Deaver also removed LED lighting from tracks attached to the roof, but the lighting was not seized and was left on the ground. *Id.* at 36:24–39:2, 39:25–40:14. During the search,

Johnson of the BCSO was attempting to remove a mounted television and stood on a table causing the table to break. Johnson Dep. [DE-94-13] at 75:4–76:15. Additionally, two ATMs and two safes containing cash were seized, and a locksmith opened them by drilling or picking the locks. Pls.' Disc. Resps. [DE-94-11] at 4 ¶¶ 15–17; Tyler Dep. [DE-94-6] at 211:6–214:9. Among the other items seized were a neon "open" sign, remote controls for the HVAC units at Little Aladdin, a wall clock, and two unopened boxes from an online store. Inventory of Items Seized [DE-94-21]; Smith Dep. [DE-95-10] at 213:3–18, 218:2–22, 219:21–24, 227:22–11.

A helicopter owned by the BCSO took some aerial photographs and landed near the stores during the search but left prior to the search's conclusion. Britt Dep. [DE-94-1] at 44:5–24, McVicker Dep. [DE-94-4] at 126:18–128:3, 129:18–25. David held a press conference later in the day, praising the manner in which the raids were conducted and stating that "the last bet has been placed and the game is over." [DE-95-14] at 6 ¶ 6; 1st Decl. of Jeffery Smith ("Smith Decl.") [DE-47-2] ¶¶ 20–23. Sheriff McVicker did not believe a press conference was necessary but attended at David's request. McVicker Dep. [DE-94-4] at 146:10–147:3.

Smith arrived at the stores shortly after the search concluded and discovered the following: 3500 feet of LED tract lighting had been removed from the roof line of Big Aladdin and left behind the building; sections of LED track were pulled from the roof when the lighting was removed; conduit was damaged from pulling on security camera wires, which later allowed a water intrusion that damaged the ceiling above a bathroom; the pulling of wires also damaged the power supply for the LED lights; the internal wiring was cut for magnetic locks on the front door to Big Aladdin; stucco and conduit were damaged from the removal of security cameras; a mural was torn from the window of Big Aladdin and left in a trash dumpster; computer wiring in

both stores was cut; a coaxial cable to a television and a water hose to an ice machine in Big Aladdin were cut; and a wooden table in Little Aladdin was broken. 2nd Smith Decl. [DE-96-2] ¶¶ 5–12. On the Monday following the search, Smith reported a fire at Big Aladdin. Smith Dep. [DE-97-9] at 169:4–171:14. When the fire marshal arrived, there was no active fire or smoldering, and he observed "little damage . . . and very little soot on the ceiling in the store." Aff. of Kenneth Clark ("Clark Aff.") [DE-94-18] ¶¶ 3–6. The fire marshal was unable to determine the cause of the fire. *Id.* ¶ 7.

The Smiths were ultimately arrested and charged with 20 counts related to the operations at Big Aladdin and Little Aladdin, and Riel sought high bond amounts from the magistrate. Decl. of Sonya Silvas ("Silvas Decl.") [DE-96-3]; Decl. of Alan Maynard ("Maynard Decl.") [DE-96-4] ¶¶ 3–8. In August 2016, during the jury selection phase of a criminal trial unrelated to the events at issue in this case, David pointed out to prospective jurors that Smith was in the gallery, asked them if they knew him or had visited his businesses in Dublin, and stated that video sweepstakes businesses are illegal. Maynard Decl. [DE-96-4] ¶¶ 12–13.

### III. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate, with specific evidence, that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Only disputes

between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247–48.

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255 (citation omitted); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion."). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created" and summary judgment should be denied. *Id.* at 489–90.

## IV. DISCUSSION

David contends there is no genuine issue of material fact and he is entitled to judgment as

a matter of law because Plaintiffs (1) have produced no evidence that he was involved in the drafting, review, or execution of the search warrants at issue in this case, or that he was directly or indirectly involved in the destruction of Plaintiffs' property; and (2) have not alleged action pursuant to a policy or custom. Def.'s Mem. [DE-88] at 8–21. In support of the motion, David filed a brief [DE-88], statement of material facts [DE-89], and appendix [DE-90] with 18 exhibits, which include, among other things, affidavits from David [DE-90-13], Sheriff McVicker [DE-90-14], Major Larry Guyton [DE-90-15], Captain Jeff Bridgers [DE-90-16], Captain Jeff Tyler [DE-90-17], and Lieutenant Morgan Johnson [DE-90-18].

Plaintiffs oppose David's motion, asserting that material facts are in dispute regarding his involvement in the search at issue and there is sufficient direct and circumstantial evidence from which a jury could find that David instigated, directed, or supervised the search and the destruction of Plaintiffs' property. Pls.' Mem. [DE-95] at 11–25. In support of their position, Plaintiffs filed a memorandum in opposition [DE-95] with 17 exhibits, which include, among other things, deposition excerpts from Smith [DE-95-10], Scott Long [DE-95-7], Emery [DE-95-5], Riel [DE-95-9], and several members of the BCSO [DE-95-3, -95-4, -95-6, -95-8, -95-11], response to movant's statement of material facts [DE-96], and appendix [DE-96-1] with declarations from Smith [DE-96-2], Sonya Silvas [DE-96-3], and Alan Maynard [DE-96-4].

Sheriff McVicker and Deaver contend there is no genuine issue of material fact and they are entitled to judgment as a matter of law because (1) they did not violate Plaintiffs' constitutional rights and are entitled to qualified immunity; (2) Plaintiffs cannot show an unconstitutional policy, practice, or custom of the Bladen County Sheriff's Office, or a failure to train; (3) Plaintiffs' property was lawfully seized pursuant to a search warrant and has not been

converted to the Sheriff Defendants' use; (4) Plaintiffs are not entitled to declaratory judgment because their underlying claim of a constitutional violation fails; (5) there can be no cognizable Fifth Amendment takings claim because Plaintiffs' property was seized pursuant to a lawful search warrant and Plaintiffs failed to allege that no adequate state remedy exists; (6) they are entitled to public officer's immunity in their individual capacities from Plaintiffs' state common-law claims because there is no evidence that they were malicious or corrupt; and (7) they are entitled to governmental immunity in their official capacities from Plaintiffs' state common-law claims because the Bladen County insurance policy in effect for the Sheriff at the time of the events alleged preserves this immunity. Defs.' Mem. [DE-92] at 9–29. In support of the motion, the Sheriff Defendants filed a memorandum [DE-92], statement of material facts [DE-93], and appendix [DE-94] with 22 exhibits, which include, among other things, deposition excerpts from Sheriff McVicker [DE-94-4] and several members of the BCSO [DE-94-1, -94-6, -94-13, -94-15], and investigative reports from Tyler [DE-94-5] and Borresen [DE-94-8, -94-9, -94-10].

Plaintiffs oppose the Sheriff Defendants' motion, asserting that material facts are in dispute and summary judgment is not appropriate on the remaining claims with the exception of the conversion claim against Sheriff McVicker in his official capacity. Pls.' Mem. [DE-97] at 12–30. In support of their position, Plaintiffs filed a memorandum in opposition [DE-97] with 25 exhibits, which include, among other things, deposition excerpts from Smith [DE-97-9], Long [DE-97-7], Emery [DE-97-5], Borresen [DE-97-2], Sheriff McVicker [DE-97-8], and several members of the BCSO [DE-97-3, -97-4, -97-6, -95-10], response to movant's statement of material facts [DE-98], and appendix [DE-98-1] with a declaration by Randy Deaver [DE-98-2].

## A. Section 1983 Claims

Section 1983 imposes liability on anyone who, under the color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. However, § 1983 is not a "source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000) (citations omitted). Thus, to state a claim under § 1983, a plaintiff must allege facts indicating a deprivation of rights guaranteed by the Constitution and laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted).

"Generally, qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions." *Raub v. Campbell*, 785 F.3d 876, 880–81 (4th Cir. 2015) (citation omitted). "The protection extends to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 881 (citation and internal quotation marks omitted). The Fourth Circuit has "emphasized repeatedly, '[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Id.* (citations omitted). The qualified immunity analysis considers "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Id.* (citations omitted). However, the court need not address both inquiries and can take them in "the order . . . that will best facilitate the fair and efficient disposition of each case."

*Id.* (citation omitted).

In *United States v. Ramirez*, the Supreme Court recognized that the use of excessive force resulting in property damage, during an otherwise lawful search, may constitute a Constitutional violation cognizable under § 1983. 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment . . . ."); *see Wood v. Se. Penn. Transp. Auth.*, No. CV 14-4183, 2016 WL 2619411, at *6 (E.D. Pa. May 6, 2016) (rejecting qualified immunity defense and denying summary judgment to defendants on § 1983 claim, where during a lawfully initiated automobile search the officers caused unreasonable property damage); *Koller v. Hilderbrand*, 933 F. Supp. 2d 272, 278 (D. Conn. 2013) (stating the standard of liability for a § 1983 claim under the Fourth Amendment for property damage during a lawful search) (quoting *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995)). However, the "[d]estruction of property does not necessarily violate the Fourth Amendment; for instance, 'officers executing search warrants on occasion must damage property in order to perform their duty.'" *Gary M. v. City of N. Charleston*, No. 2:16-CV-01087-DCN, 2017 WL 4236542, at *4 (D.S.C. Sept. 25, 2017) (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)). "The touchstone . . . is reasonableness; destruction of property that is not reasonably necessary to effectively execute a search warrant may violate the Fourth Amendment." *Id.* (quoting *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982)). "Importantly, a 'plaintiff has no cause of action under § 1983 for the alleged negligent conduct of defendants which could have resulted in the destruction or deprivation of his personal property.'" *Id.* (quoting *Ferrell v. Lewis*, No. 5:12-CT-3220-F, 2013 WL 12114471, at *2 (E.D.N.C. Apr. 9, 2013)).

### 1. District Attorney David

David presented the following evidence in support of his entitlement to qualified immunity. No one involved with the investigation or search testified that David had any role in instigating, directing, or supervising the search or the destruction of Plaintiffs' property. David claimed he was not present at and did not participate in, personally observe, or direct the execution of the search warrants. Aff. of Jonathan David ("David Aff.") [DE-90-13] ¶ 5. Sheriff McVicker, as well as four members of his office who were present at and participated in the search, all stated they did not see David at the stores and he had no role in directing the execution of the search warrants. Aff. of James McVicker ("McVicker Aff.") [DE-90-14] ¶¶ 2–3; Aff. of Larry Guyton ("Guyton Aff.") [DE-90-15] ¶ 2; Aff. of Jeff Bridgers ("Bridgers Aff.") [DE-90-16] ¶ 2; Aff. of Jeff Tyler ("Tyler Aff.") [DE-90-17] ¶ 2; Aff. of Morgan Johnson ("Johnson Aff.") [DE-90-18] ¶ 2. Other members of the BCSO search team testified they did not recall seeing David at the stores on the day of the search. Dep. of Chad Britt ("Britt Dep.") [DE-90-6] at 42:2–3; Deaver Dep. [DE-90-8] at 22:23–23:1. Riel and Emery also testified they did not see David at the stores during the search. Riel Dep. [DE-90-11] at 57:13–16; Dep. of Glenn Emery ("Emery Dep.") [DE-90-12] at 288:8–289:4.

Sheriff McVicker stated the investigation of the stores and execution of the search warrants were carried out and supervised by the BCSO, with assistance from the CCSO; he sought and received legal counsel regarding the investigation from Ronnie Mitchell; and Tyler was in charge of the investigation. McVicker Aff. [DE-90-14] ¶ 3; McVicker Dep. [DE-94-4] at 73:20–76:14, 100:18–111:11. Tyler testified he drafted the search warrant applications with no input from David or anyone else in the District Attorney's Office. Tyler Dep. [DE-95-11] at

86:4–87:20. Borresen, the CCSO officer who conducted the undercover visits to the stores, testified he did not meet David until after the search, sometime in 2016, and Ronnie Mitchell was the only person from whom he would seek legal advice. Borresen Dep. [DE-88-11] at 32:3–12, 37:1–16. Emery and Riel did not assist in the investigation or the application for and execution of the search warrants, although Emery may have had some advisory role with reference to which statutes to investigate, and the two were present as observers at certain pre-search meetings and for a period of time during the search. Emery Dep. [DE-85-1] at 116:10–24, 146:1–17, 154:6–155:21, 164:2–6, 179:8–20, 192:2–7, 193:3–7; Riel Dep. [DE-85-2] at 31:12–32:7, 33:1–34:12, 39:1–9, 43:23–44:3, 44:13–20, 46:24–48:14, 55:6–56:14.

In attempting to demonstrate a material question of fact to preclude summary judgment, Plaintiffs suggest David and his office played a "central role" in the investigation, search, and later events. Pls.' Mem. [DE-95] at 5. Plaintiffs' overarching theory is that David and members of his office conspired with Sheriff McVicker, involving several members of the BCSO and CCSO, to destroy Plaintiffs' property in retribution for the prior failed prosecution. *Id.* at 12. However, the evidence Plaintiffs present, summarized below and taken in the light most favorable to them, fails to bear this out, as their theory is based on speculation and unreasonable inferences that are insufficient to preclude summary judgment.

David believed all sweepstakes promotions were illegal, he authored a memorandum to law enforcement espousing this position, and his office undertook a well-publicized, but ultimately failed, prosecution of Smith for operating an electronic sweepstakes business. [DE-95-15]; 2d Smith Decl. [DE-96-2] ¶ 13. Thereafter, Cybernet began doing business in Bladen County. [DE-95-16]. David asked the Sheriff at that time, Prentis Benston, to investigate, and

David made a statement to the media that Smith faced criminal exposure if he was operating the stores in Bladen County as he had previously done in Columbus County. *Id.* After Sheriff McVicker took office, David and Emery were present at a meeting with members of the BCSO and CCSO to discuss investigating the stores. [DE-95-7]; Emery Dep. [DE-95-5] at 127:20–128:17. Emery was also present at another meeting just before Tyler applied for the search warrants. Emery Dep. [DE-95-5] at 130:4–133:22. Scott Long, a contractor performing work for Smith in the space adjacent to Little Aladdin during the search, saw David walk across the street with Sheriff McVicker to Little Aladdin while the two talked and looked at papers. Dep. of Scott Long ("Long Dep.") [DE-95-7] at 40:2–3, 42:19–43:18. Emery, Riel, and Pait were also present at the stores for a period of time during the search and spoke to members of the BCSO. Emery Dep. [DE-95-5] at 154:6–155:21; Riel Dep. [DE-95-9] at 55:6–56:14. Riel, although an experienced prosecutor, had never been on-site during a search before, and certain BCSO members stated it was unusual for so many people from the District Attorney's Office to be at a search when it was not a high-profile case like a murder. Riel Dep. [85-2] at 62:13–63:12; Johnson Dep. [DE-90-5] at 83:15–84:7; Tyler Dep. [95-11] at 155:18–157:18. As the search was concluding, David held a press conference, praising the manner in which the search was conducted and stating "the last bet has been placed and the game is over." [DE-95-14] at 6 ¶ 6; Smith Decl. [DE-47-2] ¶¶ 20–23. Sheriff McVicker did not believe the press conference was necessary but was present at David's request. McVicker Dep. [DE-94-4] at 146:10–147:3.

After the Smiths were arrested, Riel asked the magistrate to set unreasonably high bonds for the Smiths but not for the other store employees. Decl. of Sonya Silvas ("Silvas Decl.") [DE-96-3]; Decl. of Alan Maynard ("Maynard Decl.") [DE-96-4] ¶¶ 3–7. Emery was aggressive in

bringing 20 charges against the Smiths before examining the evidence collected during the search, and the Smiths sought to dismiss the charges on the grounds of prosecutorial vindictiveness. Maynard Decl. [DE-96-4] ¶¶ 3–4, 8–10. More than a year after the search, during the jury selection phase of a criminal trial unrelated to the events at issue in this case, David pointed out to prospective jurors that Smith was in the gallery, asked them if they knew Smith or had visited his businesses in Dublin, and stated that video sweepstakes businesses are illegal. *Id.* ¶¶ 12–13.

Plaintiffs argue David had motive and opportunity to engage in the conduct alleged. They point to circumstantial evidence, such as the "seize and freeze" of the stores and Borresen's redirection of the cameras and his donning of a balaclava, as evidence of opportunity for wrongdoing. Pls.' Mem. [DE-95] at 12–13. Assuming that securing a scene during a search, Britt Dep. [DE-97-3] at 28:5–23, and an undercover officer attempting to protect his identity, Borresen Dep. [DE-103-6] at 151:1–153:14, are a prelude to nefarious conduct, there is nothing directly or indirectly linking David or anyone in his office to these acts carried out by members of the BCSO and CCSO. The suggestion that David was motivated to destroy Smith's businesses because David was embarrassed by the failed prosecution of Smith, Pl.'s Mem. [DE-95] at 13–14, is speculative. Plaintiffs' evidence may demonstrate that David was a zealous prosecutor, unbending in his belief that electronic sweepstakes violate North Carolina law, and wanted Smith's businesses shut down. Drawing the inference from this evidence, however, that David played a role in damaging Plaintiffs' property is unreasonable. *See Petersen v. Midgett*, 140 F. Supp. 3d 490, 507 (E.D.N.C. 2015) ("'[I]t is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation

and conjecture' in order to prevent the jury's 'impermissible but understandable resort to such factors as sympathy and the like' to draw inferences where sufficient evidentiary support is absent.") (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982)).

Plaintiffs also claim that David was directly involved in the investigation based on evidence that he asked the former sheriff to investigate the stores, attended a meeting to discuss an investigation of Plaintiffs' businesses by Sheriff McVicker's office, and remained engaged throughout the investigation. Pls.' Mem. [DE-95] at 14–15. Evidence of minimal involvement, however, does not support the inference that David, or members of his office, directed or were in any way involved in the destruction of Plaintiffs' property. Sheriff McVicker testified that Emery was likely at the meetings because "he's with the District Attorney's Office" and "would be the one prosecuting if we made any charges[.]" McVicker Dep. [DE-94-4] at 94:8–12. McVicker also testified that it is routine for the District Attorney's Office to have some communication with detectives about the cases they will be prosecuting. *Id.* at 94:13–95:14. The evidence shows that David and his office stayed apprised of the BCSO's investigation, but there is no evidence that David or anyone from his office played a substantial role. Thus, the inference Plaintiffs ask the court to draw is unsupported and too speculative to create a genuine issue of material fact. *See Hicks v. Cassilly*, 153 F.3d 720, 1998 WL 433299, at *4 (4th Cir. July 27, 1998) (Table) (reversing denial of qualified immunity where the plaintiff's evidence was "too remote and too tenuous to create a genuine issue of material fact.") (quoting *Ennis v. Nat'l Assoc. of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995)).

Plaintiffs infer that David and his office oversaw the search based on evidence that David, Emery, Riel, and Pait were present for some period of time during the search and spoke to

members of the BCSO and CCSO. Pls.' Mem. [DE-95] at 15–16. However, when this evidence is viewed in context of the full testimony given, it is insufficient to support the inference that David or his staff oversaw the search. Plaintiffs cite the testimony of Emery, Riel, and Long in support of their contention that they interacted and spoke with sheriff's deputies during the search. Emery's testimony on this issue was as follows:

> Q. So what role did you play in the raid itself?
> A. Observer.
> Q. Did you speak to anybody during the raid?
> A. I'm sure I spoke to a lot of people. Hi, how are you. I believe Chad[] Britt was -- is it Chad[]? Deputy Britt, a big guy. I think it's Chad[]. I think he was keeping the log, the crime scene log, if I'm not mistaken. So I'm sure I said hi to him. [] I probably said hello to everybody who was in there. I probably knew everybody in there or most everybody in the building.
> Q. Okay. Did you speak to them about anything of substance?
> A. No.
> Q. Did you speak to anybody there about anything having to do with the raid itself?
> A. No.
> Q. Were you consulted in any way on the conduct of the raid?
> A. You mean the conduct of the officers while they're -- like inside the area you mean?
> Q. (Nods head.)
> A. You don't mean the actual --what do you mean by that?
> Q. On the day of the raid while you were at the raid, did anybody come up to you and ask your opinion about anything?
> A. I don't recall that happening.
> Q. Were you asked to consult with them in the process of the raid I guess is what I'm saying?
> A. No, I would have if they had, but I don't recall it.
> Q. Okay.
> A. If they would have asked me advice, I would have given it, but I don't recall being asked any advice.
> Q. All right.
> A. I recall walking around the first store, the big store and then leaving, walking across the street and walking around the smaller store.

Emery Dep. [DE-95-5] at 154:6–155:21. Similarly, Riel testified that she "briefly talked with some law enforcement officers that were in there," but did not remember who they were, and

recalled that she "walked in one door, and . . . walked out another door" and the stores were already empty. Riel Dep. [DE-95-9] at 55:6–56:14. Finally, Scott saw David walking across the street to Little Aladdin while talking to Sheriff McVicker about some papers. Long Dep. [DE-95-7] at 42:19–43:18. The only reasonable inference from this evidence is that David and the members of his office were present as observers and did not oversee or provide direction to those effectuating the search. *See Griffin v. Hartford Life & Accident Ins. Co.*, No. 17-1251, 2018 WL 3624872, at *9 (4th Cir. July 31, 2018) (finding "a few statements plucked from [defendant's] records [], when given their appropriate context, do not support any reasonable inference of bias or self-interest.").

Plaintiffs additionally argue that the damage done occurred in plain sight and members of the District Attorney's Office did nothing to stop it. Pls.' Mem. [DE-95] at 16. However, the evidence presented indicates that these individuals were not present when the search warrants were first executed and David was seen only briefly, Long Dep. [DE-95-7] at 42:19–43:18; the stores were mostly empty by the time Riel arrived, and she did not see any destructive behavior occurring, Riel Dep. [DE-95-9] at 55:15–56:11, 62:2–6; and Emery observed documents being collected, photographs being taken, and electrical equipment being seized, but he did not see anyone cutting cables, removing LED lights, drilling open a safe, opening an ATM, or being on the roof, and he would have reported improper behavior, Emery Dep. [DE-85-1] at 177:4–178:20, 218:1–14, *id.* [DE-88-13] at 289:5–15. In sum, the evidence that David and others from his office were present at the stores and spoke to members of law enforcement during the search is insufficient to create an inference that they were involved in or witnessed any wrongdoing.

Finally, Plaintiffs repeatedly contend they were denied discovery that prevented them

from obtaining additional evidence to support their claims and "vehemently disagree with the Court's ruling and may be compelled to address it on appeal." Pls.' Mem. [DE-95] at 14 n.6, 15 n.7, 16 n.8, 19. During the discovery period, Plaintiffs sought to reopen the depositions of Emery and Riel because they refused to answer certain questions and asserted a variety of privileges Plaintiffs believed were improper. [DE-74]. The court denied Plaintiffs' motion, concluding that Emery and Riel, non-parties to this action, testified extensively regarding their knowledge of, and the extent of any involvement in, the execution of the search warrants at issue in this case, the BCSO's investigation, the preparation of the search warrants, the press conference, the Smiths' criminal cases, and the bond issue. [DE-86]. The court, citing Rule 26(b)(2)(C)(i) and (iii), found the questions deponents refused to answer—on issues such as the legality of sweepstakes games, the legality of the search warrants, prosecutorial decisions related to Smith's criminal case, and the inner workings of the District Attorney's Office—to be either not relevant to the claims and defenses at issue in this case, not proportional to the needs of the case, or sufficiently addressed in response to other questions and, thus, cumulative or duplicative. *Id.* at 15. The court has no cause to reconsider its ruling, and Plaintiffs are afforded a right of appellate review under 28 U.S.C. § 636(c)(3). [3]

In sum, Plaintiffs' evidence fails to demonstrate a genuine issue that David, or any member of the District Attorney's Office, violated Plaintiffs' constitutional rights by instigating, directing, or supervising the search and the destruction of Plaintiffs' property. At most, one could reasonably conclude that David believed the internet sweepstakes offered at the stores

---

[3] Plaintiffs also make the bald assertion that "[i]t is hard to imagine that such a ruling would have been issued had the Defendants been anything other than the Sheriff and District Attorney." Pls.' Mem. [DE-95] at 19. While disagreeing with a ruling and taking an appeal are commonplace in litigation, questioning the court's integrity is not, and counsel is cautioned against making such unsupported remarks. *See* N.C. Rev. R. Prof'l Conduct 0.1[5] ("A lawyer should demonstrate respect for the legal system and for those who serve it[.]").

were illegal, wanted the sheriff to investigate, stayed apprised of the investigation, was present during a portion of the search, and prosecuted Smith for conduct he believed was illegal. No reasonable jury could conclude, based on the evidence taken in the light most favorable to Plaintiffs, that David or his staff had any part in violating Plaintiffs' constitutional rights by causing the destruction of their property. Accordingly, David is entitled to qualified immunity, and his motion for summary judgment on the § 1983 claim is allowed.

### 2. Sheriff McVicker

#### i.     Individual Capacity Claim

Sheriff McVicker presented the following evidence in support of his entitlement to qualified immunity. McVicker met with Smith during the campaign for sheriff, but did not cash a campaign check from Smith or his wife. McVicker Dep. [DE-94-4] at 30:25–31:15, 44:5–45:25. After Sheriff McVicker took office, he received complaints about the stores and subsequently initiated an investigation to determine if illegal gambling was taking place. *Id.* at 76:10–77:3; Tyler Report [DE-94-5]. Sheriff McVicker tasked Tyler with leading the investigation. McVicker Dep. [DE-94-4] at 73:20–75:12. After conducting an undercover investigation, Tyler decided to obtain search warrants, and Sheriff McVicker had no role in preparing the search warrant applications. Tyler Dep. [DE-95-11] at 86:4–19; McVicker Dep. [DE-94-4] at 96:15–18. Sheriff McVicker attended a pre-search briefing and reminded his deputies to act professionally during the search, but was not present at the subsequent staging meeting. McVicker Dep. [DE-94-4] at 111:14–113:21, 117:18–118:1. No instructions were given to destroy property or to create a public spectacle. Johnson Dep. [DE-94-13] at 103:8–23; Borresen Dep.[DE-94-7] at 199:24–200:7; Britt Dep. [DE-94-1] at 38:13–39:7. Sheriff

McVicker was not present when the warrants were first executed but later drove a storage trailer to the stores at the request of Tyler because there was more equipment to seize than originally anticipated. McVicker Dep. [DE-94-4] at 118:9–120:1; Tyler Dep. [DE-94-6] at 162:16–163:10. Sheriff McVicker did not personally oversee the execution of the search warrants, Britt Dep. [DE-94-1] at 34:1–6; Johnson Dep. [DE-94-13] at 80:25–81:8; Deaver Dep. [DE-94-15] at 27:5–10, Borresen Dep. [DE-94-7] at 199:14–20, and shortly after dropping off the storage trailer he left to eat lunch at a restaurant next door and did not return to the stores, Tyler Dep. [DE-94-6] at 163:21–164:8. Sheriff McVicker attended a press conference later in the day at David's request, although McVicker believed that the press conference was unnecessary. McVicker Dep. [DE-94-4] at 146:10–147:3.

Plaintiffs presented the following evidence that conflicts with Sheriff McVicker's version of events. McVicker's campaign informed Smith that then Sheriff Benston was planning to raid Plaintiffs' businesses in Dublin, and during a subsequent meeting between Smith and McVicker, Smith was told his businesses would not be a priority for McVicker and that he would not raid his businesses without warning. Smith Dep. [DE-97-9] at 65:2–72:21, 108:12–21. Smith gave McVicker a campaign contribution that was later returned so that it could be resubmitted in another manner not traceable to the Smiths. *Id.* at 90:21–93:17, 140:4–142:14. After McVicker was elected sheriff, he assigned Tyler to investigate the stores. McVicker Dep. [DE-97-8] at 73:20–75:12. At the pre-search meeting, Sheriff McVicker directed is deputies to "take every [f***ing] thing out," Randy Deaver Decl. [DE-98-2] ¶ 6, when conducting the search of the stores. Sheriff McVicker was present during the search and spoke to members of the BCSO and the District Attorney's Office, and Britt indicated he had never before seen an elected sheriff

24

present when a search warrant was executed. Britt Dep. [DE-97-3] at 47:15–48:2. Substantial damage was done to Plaintiffs' property: 3500 feet of LED lighting was removed from the roof line of Big Aladdin and left behind the building; sections of LED track were pulled from the roof when the lighting was removed; conduit was damaged from pulling on security camera wires that later resulted in a water intrusion damaging the ceiling above a bathroom; the power supply was damaged for the LED lights; the internal wiring was cut for magnetic locks on the front door to Big Aladdin; stucco and conduit were damaged from the removal of security cameras; a mural was torn from the window of Big Aladdin and left in a trash dumpster; computer wiring in both stores was cut; a coaxial cable to a television and a water hose to an ice machine in Big Aladdin were cut; and a wooden table in Little Aladdin was broken. 2nd Smith Decl. [DE-96-2] ¶¶ 5–12. During the search, Sheriff McVicker directed the BCSO's helicopter to land near the search site to make a public spectacle. McVicker Dep. [DE-97-8] at 127:2–128:3. Later, Sheriff McVicker sent a notice advising the Smiths that their concealed weapons permits were subject to revocation. Answer [DE-5] ¶ 122.

The Sheriff Defendants contend that Sheriff McVicker cannot be personally liable for the alleged property destruction and is entitled to qualified immunity because he did not remove or destroy any property during the search. Defs.' Mem. [DE-92] at 11. Plaintiffs respond that the BCSO excluded potential witnesses from observing the search by securing the scene with crime scene tape, removing employees, preventing members of the public from entering the area, and redirecting and disabling security cameras, and, therefore, it is appropriate to rely on circumstantial evidence that Sheriff McVicker personally participated in damaging Plaintiffs' property. Pls.' Mem. [DE-97] at 14–16. The evidence, taken in the light most favorable to

Plaintiffs, does not support the inference that Sheriff McVicker was personally involved in damaging Plaintiffs' property. At most, one could reasonably conclude that McVicker initiated an investigation, put Tyler in charge, stayed apprised of its progress, told his deputies at a pre-search meeting to seize everything, came on the scene sometime after the search warrants were executed for the purpose of delivering a storage trailer at the request of Tyler, and left shortly thereafter. Judge Wilkinson's observation in *Evans v. Chalmers* is instructive:

> [T]he plaintiffs' allegations here *could* be "consistent with" a scenario in which the supervisory officials somehow participated in their subordinates' allegedly unconstitutional conduct. But the "obvious alternative explanation[]" for the supervisors' conduct in assigning the case to certain investigators and attending meetings where the case was discussed is that they wanted to facilitate the investigation, stay abreast of recent developments, and bring the case to closure on a reasonable timeline. That, after all, is their job.

703 F.3d 636, 662 (4th Cir. 2012) (Wilkinson, J., concurring) (internal citations omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 682 (2009)). Here, it is simply not reasonable to infer from the evidence that Sheriff McVicker personally participated in the destruction of Plaintiffs' property.

Plaintiffs' claim of direct evidence demonstrating Sheriff McVicker "supervised and directed the raids and the destruction of Plaintiffs' property" is unsupported. Pls.' Mem. [DE-97] at 16. No one involved in the search indicated that Sheriff McVicker was in charge at the scene. Morgan Johnson's deposition testimony is typical of others as to McVicker's lack of any substantive role in the search:

Q.    Did you talk to Sheriff McVicker while you were there?
A.    I sure might have spoken to him, but I had my own duties to attend.
Q.    Did he give you any instructions while you while you were there?
A.    No.
Q.    What do you recall that he was doing while he was there?
A.    Being the sheriff.

Q. Was there any specific activities that he was engaged in that you recall?
A. No.

Johnson Dep. [DE-94-13] at 80:21–81:8. Chad Britt identified Tyler and Johnson as being in charge of the search operation, Britt Dep. [DE-94-1] at 34: 1–10, and David Borresen indicated he and Lieutenant Jenkins were providing direction as to what to seize, Borresen Dep. [DE-94-7] at 155:12–25. For purposes of § 1983, Sheriff McVicker cannot be held personally responsible simply because as "sheriff" he indirectly oversees all activities in his office. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Koller*, 933 F. Supp. 2d at 280 ("It is well established that the personal involvement of a defendant-police officer is an essential prerequisite to money damages under 42 U.S.C. § 1983.").

Plaintiffs also assert Sheriff McVicker's direct involvement can be inferred from his motive and opportunity:

> McVicker's motives for promising Mr. Smith that raids would not be conducted without warning, and then turning around to plot raids against Mr. Smith and the Plaintiffs are not entirely clear, but can be inferred from the circumstances[.] Having accepted large sums of money and other assistance from Mr. Smith for his campaign, which he either did not properly report, or at least handled in a very questionable manner, McVicker then was confronted by David who insisted that strong action be taken against Mr. Smith and the Plaintiffs. Had McVicker resisted David's pressure, David no doubt would have looked into the matter and discovered that McVicker had financed his campaign through Mr. and Mrs. Smith. Putting aside whether this would have led to a criminal investigation of McVicker himself, it at least would have been very embarrassing to McVicker, whose political position is not overly secure given the narrow margin by which he won the election. Therefore, it is reasonable to infer that McVicker chose what he thought was the lesser of two evils, threw in his lot with David, and decided to launch a raid upon the Plaintiffs, in spite of the assurances he had given Mr. Smith.

Pls.' Additional Mat. Facts in Dispute [DE-98] at 14 ¶ 6. This inference is pure conjecture, too

speculative to reach the jury, *Petersen*, 140 F. Supp. 3d at 507, and insufficient to establish the requisite causation on the part of Sheriff McVicker, *see Kane v. Lewis*, 604 F. App'x 229, 234 (4th Cir. Mar. 13, 2015) ("A plaintiff asserting a constitutional tort under § 1983 must [] satisfy the familiar element of proximate causation," and "[s]ection 1983 tort defendants are certainly 'responsible for the natural consequences of [their] actions.") (citations omitted). Furthermore, the case of *Rodriguez v. Geradot*, No. 1:12-CV-151-PPS, 2014 WL 1794560 (N.D. Ind. May 5, 2014), cited by Plaintiffs for the proposition that "a reasonable juror could find that [a] law enforcement officer personally damaged the interior of a vehicle during a search even though plaintiffs did not witness the officer damaging the vehicle," is inapposite because defendant Geradot was the only officer who entered the vehicle during the relevant time. Pls.' Mem. [DE-97] at 17; *Rodriguez*, 2014 WL 1794560, at *3. Here, there were several law enforcement officers assisting in the search, making this case more akin to the Seventh Circuit's decision in *Molina ex rel. Molina v. Cooper*, 325 F.3d 963 (7th Cir. 2003), discussed in *Rodriguez*, in which the court upheld the grant of summary judgment to the defendant "because the plaintiffs had no evidence that the defendant, out of the seventeen police officers on the scene, was the one officer who actually searched the truck." *Rodriguez*, 2014 WL 1794560, at *4.

Plaintiffs also suggest that *res ipsa loquitur* "seems appropriate" at this juncture, because Smith inspected the stores minutes after the search concluded and "was able to conclude that all the damage was caused by the Defendants, and nobody else." Pls.' Mem. [DE-97] at 16 n.7. "The doctrine of res ipsa loquitur applies when '(1) direct proof of the cause of an injury is not available, (2) the instrumentality involved in the accident [was] under the defendant's control, and (3) the injury is of a type that does not ordinarily occur in the absence of some negligent act

or omission.'" *Robinson v. Duke Univ. Health Sys., Inc.*, 229 N.C. App. 215, 224, 747 S.E.2d 321, 329 (2013) (citation omitted). Plaintiffs cite no case law applying the doctrine of *res ipsa loquitur* to a § 1983 claim such as this, and the court has independently found none. *See Ash v. Boone Cty., Ky.*, No. CIV.A. 09-190-DLB, 2011 WL 4431820, at *6 (E.D. Ky. Sept. 22, 2011) ("[I]t is well-settled that *res ipsa loquitur* does not apply to § 1983 excessive force claims, because the standard of care is not negligence.") (citing *Clark–Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006)); *Ferrell*, 2013 WL 12114471, at *2 ("[A] plaintiff has no cause of action under § 1983 for the alleged negligent conduct of defendants which could have resulted in the destruction or deprivation of his personal property."). Accordingly, the court declines to apply *res ipsa loquitur* in this case.

Likewise, Plaintiffs' suggestion that the Restatement (Second) of Torts, § 433B(3) applies to shift the burden to Sheriff McVicker to prove that he did not cause the damage lacks merit. Pls.' Mem. [DE-97] at 17–18. Even assuming § 433B(3) is appropriately applied to a § 1983 claim, and Plaintiffs cite no case law to suggest that it is, the Restatement only governs,

> Where the conduct of two or more actors is tortious, *and it is proved that harm has been caused to the plaintiff by only one of them*, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Restatement (Second) of Torts, § 433B(3) (emphasis added). Here, there were several law enforcement officers present. With respect to the alleged roof damage, Deaver is the only officer alleged to have been involved in removal of the cameras and lights, and there is no evidence he did anything inside the stores. With respect to the alleged interior damage, Plaintiffs have no evidence as to whether one actor or several caused the damage. Accordingly, by its own terms, § 433B(3) does not apply under the circumstances presented in this case.

29

Finally, Plaintiffs contend that supervisory liability attaches to Sheriff McVicker, not because of supervisory indifference, tacit authorization, or inadequate supervision, but rather because he personally directed his deputies to damage Plaintiffs' property. Pls.' Mem. [DE-97] at 18–19. "In a § 1983 suit . . .—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014) (citing *McWilliams v. Fairfax Cnty. Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir. 1996) (supervisors may not be held liable under 42 U.S.C. § 1983 for actions of subordinate employees unless the supervisors have "direct culpability" in causing the plaintiff's injuries), *overruled on other grounds by Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)). As discussed above, the evidence Plaintiffs suggest demonstrates Sheriff McVicker directed his deputies to damage Plaintiffs' property is too speculative to support the inference.

In sum, there is insufficient evidence for a jury to reasonably conclude that Sheriff McVicker played any material role in the investigation or the search and seizure of evidence, or that he directed his deputies to damage Plaintiffs' property. Accordingly, Sheriff McVicker is entitled to qualified immunity, and summary judgment on the § 1983 individual capacity claim against him is allowed.

### ii. Official Capacity Claim

A plaintiff's claim against a government official in his official capacity is treated as a claim against the government entity of which the official is an agent. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be

treated as a suit against the entity."). "In North Carolina, Sheriffs' Departments are local government units." *Howell v. Gagnon*, No. 5:09-CT-3087-FL, 2010 WL 3239058, at *3 (E.D.N.C. Aug. 16, 2010) (citing *S. Ry. Co. v. Mecklenburg Cnty.*, 56 S.E.2d 438, 440 (N.C. 1949) ("The sheriff is the chief law enforcement officer of the county.")). "Liability attaches to local government units only if conduct directly causing the alleged deprivation is undertaken to effectuate official policy or custom." *Id.* (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see Jones v. Houston*, No. 4:08-CV-121-F, 2010 WL 3835147, at *8 (E.D.N.C. Sept. 28, 2010) (citing *Monell*, 436 U.S. at 691). "A policy or custom for which a local government entity may be held liable may arise in four ways: (1) through an express policy, such as written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). An official capacity claim "fails as a matter of law where there is no underlying constitutional violation." *Russ v. Causey*, 732 F. Supp. 2d 589, 604 (E.D.N.C. 2010) (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420–21 (4th Cir. 1996)).

Sheriff McVicker seeks summary judgment on the grounds that there is no allegation or evidence of an unconstitutional policy, practice, or custom, or failure to train, on the part of the BCSO. Defs.' Mem. [DE-92] at 14–15. Plaintiffs indicate they are not pursuing an official capacity claim against Deaver, only against Sheriff McVicker on the grounds that, as sheriff, he directed and oversaw the destruction of Plaintiffs' property. Pls.' Mem. [DE-97] at 20–22. As

discussed above, the evidence indicates Sheriff McVicker had minimal involvement in the investigation and search of the stores, and the evidence Plaintiffs rely on to infer that Sheriff McVicker directed his deputies to damage Plaintiffs' property is too speculative to create a genuine issue of fact. Thus, assuming Sheriff McVicker is a "person with final policymaking authority," there is insufficient evidence to conclude that his decisions resulted in the destruction of Plaintiffs' property. Further, Plaintiffs point to no express policy, omission, or widespread and persistent practice that could give rise to a policy or custom. *Lytle*, 326 F.3d at 471. Accordingly, Plaintiffs have failed to create a genuine issue of material fact that the damage to their property was the result of municipal policy or custom, and Sheriff McVicker is entitled to summary judgment on this claim.

### 3. Deputy Travis Deaver

Deaver presented the following evidence in support of his entitlement to qualified immunity. Deaver did not supervise or give orders during the search but was instructed to remove the security cameras from the roof of Big Aladdin, Deaver Dep. [DE-94-15] at 29:4–18, 60:3–8, and it is typical to seize security cameras in investigations such as this, Borresen Dep. [DE-94-7] at 162:3–9. It was necessary for Deaver to get on Big Aladdin's roof to remove the security cameras because their wiring was entangled with other wires on the roof. Britt Dep. [DE-94-1] at 49:1–50:12, 59:20–25. Deaver did not cut any cords while on the roof and was not aware that cords were in fact cut, and he disconnected the cords from the security cameras before removing them. Deaver Dep. [DE-94-15] at 47:15–48:6. Once on the roof, Deaver observed stray cords and wires and, in order to unplug the cameras and remove them, Deaver had to first disentangle a "big gum of wires" that were intertwined with the cords like "bird nests in a fishing

reel." *Id.* at 62:18–24; Deaver Dep. [DE-97-4] at 29:25–30:2, 32:2–34:1. After unplugging the cameras, Deaver removed them by pulling on the wood two-by-fours on which the cameras were mounted. Deaver Dep. [DE-94-15] at 60:9–18. Deaver was able to remove the two-by-four by simply picking it up because it was not well-secured to the building. *Id.* at 64:22–65:5. Deaver also removed all of the LED lighting by unclipping it from tracks attached to the roof, which was necessary because the lighting wires were entangled with the security camera wiring. *Id.* at 36:24–37:18, 38:20–39:20. The LED lighting wires were connected through the roof by a PVC pipe. Pls.' Resp. to RFA No. 27 [DE-94-11]. After removing the LED lighting, Deaver lowered it from the roof onto the ground and left it there. Compl. [DE 1-1] ¶ 32; Deaver Dep. [DE-94-15] at 39:21-40:11. Deputy Deaver did not believe he damaged the LED lighting, which is removable from the track without causing damage, and the lighting remains functional with a working power supply. Deaver Dep. [DE-94-15] at 61:23–25; Pls.' Resp. to RFA No. 29 [DE-94-11]; Pls.' Resp. Interrog. No. 24 [DE-94-17]. Deaver's background includes completion of basic electrical training classes at Bladen Community College and work as a volunteer firefighter for the past seven years. Deaver Dep. [DE-94-15] at 29:4–18, 57:23–25, 65:20–66:15.

Plaintiffs presented the following evidence that conflicts with Deaver's version of events. Smith, who was familiar with the security camera and LED lighting wiring, indicated that the wires were not, and could not have been, entangled because the wires for the security cameras and LED lighting fed into separate conduits on the roof that are 10–15 feet apart from each other. 2d Smith Decl. [DE-96-2] ¶ 10. It was unnecessary to remove the LED lighting in order to seize the security cameras, which could have been easily unplugged without pulling on or cutting any wires. *Id.* Although the LED lighting could have been removed without causing damage,

Deaver removed the lighting in such a way to pull certain portions of the lighting track from the building, damage the stucco, and damage the power supply to the LED lighting, which resulted in a smoldering fire. Pls.' Resp. to Interrog. Nos. 6, 8, 9 [DE-97-26]; Smith Dep. [DE-97-9] at 157:5–14, 168:21–172:6. Prior to the search, there were no leaks in the roof, but after the search, the seal for the security camera conduit was damaged, resulting in a water intrusion and damage in the ladies' bathroom. 2d Smith Decl. [DE-96-2] ¶ 11.

The Sheriff Defendants contend that (1) the damage allegedly caused by Deaver is "relatively minor" and "not unreasonable for purpose of the Fourth Amendment," Defs.' Mem. [DE-92] at 13 (citing *Neal v. Cal. City*, No. 1:14-CV-269-AWI-JLT, 2015 WL 4227466, at *11 (E.D. Cal. July 10, 2015)); (2) Deaver is entitled to qualified immunity because any damage was "reasonably necessary to effectuate" the removal of the security cameras pursuant to the search warrant due to the wiring being entangled, *id.*; (3) leaving the LED lighting, which Deaver believed was still functional, on the ground does not rise to a constitutional violation, *id.*; and (4) Deaver's actions amount to no more than negligence, which is insufficient to state a constitutional claim under 42 U.S.C. § 1983, *id.* at 14 (citing *Daniel v. Williams*, 474 U.S. 327 (1986)). Taking the evidence in the light most favorable to Plaintiffs, the court finds that Deaver is entitled to summary judgment on qualified immunity because his actions were, at most, negligent and he did not violate a clearly established right.

First, there is no evidence that Deaver took any actions with respect to property other than the removal of the LED lighting and cameras from the roof, and the court rejects Plaintiffs' suggestion that it can be inferred he cut wires and cables inside the buildings. Pls.' Mem. [DE-97] at 19 n.8; *see Chumley v. Miami Cty., Ohio*, No. 3:14-CV-16, 2015 WL 859570, at *11 (S.D.

Ohio Feb. 27, 2015) ("Plaintiffs bear the burden of establishing that individual officers are directly responsible for the alleged damage.") (citing *Gordon v. Louisville/Jefferson Cnty. Metro Gov't*, 486 F. App'x 534, 541 (6th Cir. 2012) (affirming summary judgment in favor of officers where plaintiff presented no evidence that any particular officer was responsible for the damage alleged)); *Koller*, 933 F. Supp. 2d at 280 ("It is well established that the personal involvement of a defendant-police officer is an essential prerequisite to money damages under 42 U.S.C. § 1983.").

Next, although Plaintiffs contend Deaver removed the security cameras in an unreasonable way by unnecessarily pulling on or cutting cords and causing damage to the conduit, there is no requirement "that officers use the least possible destructive means to execute a search warrant." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 335 (7th Cir. 2011) (finding the use of a jackhammer rather than a saw that would have done less damage was not unreasonable). "[S]o long as the officer's conduct remains within the boundaries of reasonableness, an officer has discretion over the details of how best to proceed with a search warrant's execution." *Id.* (citing *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997)); *see Dalia*, 441 U.S. at 257 ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant . . . ."). Moreover, "[t]he reasonableness of the damage must be evaluated with reference to the target of the search." *Koller*, 933 F. Supp. 2d at 278.

The security cameras were within the scope of the search warrants, and while pulling on or cutting cords in order to remove them may have been negligent, it was not sufficiently unreasonable or malicious to state a constitutional claim under the Fourth Amendment. *See Pac.*

35

*Marine Ctr., Inc. v. Silva*, 809 F. Supp. 2d 1266, 1283 (E.D. Cal. 2011) (finding wiring ripped from a panel during the seizure of a computer system was not unduly destructive where the search included computer systems and a reasonable officer could have believed the actions were necessary and constitutional), *aff'd*, 553 F. App'x 671 (9th Cir. 2014); *see also Soichet v. Toracinta*, 111 F.3d 124 (2d Cir. 1997) (plaintiff failed to state a § 1983 claim where she alleged the officers executing a search warrant related to drugs "ransacked" her apartment and destroyed furniture, because "officers executing search warrants on occasion must damage property in order to perform their duty.") (citation omitted). Likewise, removal of the LED lighting and leaving it on the ground, even if unnecessary as Plaintiffs contend, may have been negligent but does not rise to the level of a constitutional violation where there is no evidence of anything more than minimal damage to the lighting, track, and stucco. *See United States v. Wyatt*, No. 16-CR-00057-MSK, 2016 WL 6956632, at *6 (D. Colo. Nov. 29, 2016) (finding property left on the floor or in a pile was indicative of negligence, unlike the wholesale destruction of large numbers of items or smashing of glass or other fragile items that are indicia of purposeful damage); *Chumley*, 2015 WL 859570, at *11 (emptying the closets, dumping a coin collection onto the bed, and leaving the house in disarray is insufficient to state a constitutional claim); *Dockery v. Tucker*, No. 97-CV-3584 ARR RLM, 2008 WL 2673307, at *10 (E.D.N.Y. June 26, 2008) (finding alleged destruction of two toilets and some electrical fixtures was "tangential destruction" that did not state a claim of constitutional magnitude).

Finally, cases where courts have denied qualified immunity generally involve greater levels of destruction of property than what is alleged here, and Plaintiffs have provided no documentary evidence, such as pictures of the cut wires, damaged conduit, water or fire damage,

or any receipts from repairs, supporting that excessive destruction occurred. *See* Defs.' Reply [DE-102] at 2 (stating the Sheriff Defendants provided Plaintiffs with every photograph, amounting to more than 300 pictures, taken by Lieutenant Johnson during the execution of the search warrants); Clark Aff. [DE-94-18] ¶¶ 3–7 (the fire marshal found no active fire or smoldering and observed "little damage . . . and very little soot on the ceiling in the store."); *see also Gary M.*, 2017 WL 4236542 at *2 n.2, 5 (denying summary judgment where there was evidence SWAT officers kicked in the television and needlessly destroyed a multitude of other personal property, including laptops, a picture, a sofa, a washing machine, a bed and bedframe, a CPAP machine, and the wooden frame surrounding the attic door); *Jackson ex rel. Jackson v. Suffolk Cty.*, 87 F. Supp. 3d 386, 402 (E.D.N.Y. 2015) (denying summary judgment where there was evidence of significant damage, including "(1) that her kitchen was "totally destroyed," (2) that her living room furniture was flipped upside down and cut, (3) that Jeffrey's clothes were left in a bathtub, (4) that the basement carpet was ripped up, the basement furniture was cut open, and basement doors were taken off their hinges, and (5) that dishes and other items were broken and left in the driveway."); *Daniels v. City of New York*, No. 16-CV-190 (PKC)(JO), 2018 WL 4119191, at *7 (E.D.N.Y. Aug. 29, 2018) (denying summary judgment on claim for an unreasonably destructive search where the plaintiff took a video within hours of the search, documenting and explaining the alleged damage to the apartment and personal property, and distinguishing cases where no documentary evidence was produced to support the claim); *Smith v. City of New York*, No. 04 CIV.3286 (TPG), 2010 WL 3397683, at *13 (S.D.N.Y. Aug. 27, 2010) (allowing summary judgment on claim that law enforcement conducted an unduly destructive search in executing a search warrant where the plaintiff failed to produce any documentary

evidence, such as photos of broken tools or any bills or receipts documenting repairs, to support his testimony by declaration that the officers broke his tools and machines). Accordingly, because Deaver acted no more than negligently and clearly established law allows for some damage incidental to the execution of a search warrant, Deaver is entitled to qualified immunity and summary judgment is allowed.

**B.      Declaratory Judgment Claims**

Plaintiffs' declaratory judgment claim—seeking a declaration that "the actions of Defendants with regard to the Plaintiffs' property were excessive and unnecessary, and violated Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution," Compl. [DE-1-1] ¶ 154—fails as to all Defendants for the same reasons stated above with respect to the § 1983 claim. In response to the motion for summary judgment filed by the Sheriff Defendants, Plaintiffs note that their declaratory judgment claim was asserted to lay the foundation for, and is factually subsumed in, the § 1983 claim. Pls.' Mem. [DE-97] at 12–13 n.5. Accordingly, summary judgment on this claim is allowed.

**C.      Takings Claims - United States Constitution**

The Sheriff Defendants contend they are entitled to summary judgment as a matter of law because the Takings Clause does not apply when property is seized during a criminal investigation or pursuant to a lawful search warrant. Defs.' Mem. [DE-92] at 19–21. Plaintiffs respond that their claim does not relate to the property seized but rather to the damage caused to the buildings. Pls.' Resp. [DE-97] at 23–24. The court agrees that the Sheriff Defendants are entitled to summary judgment as a matter of law because the alleged damage was caused as a result of the exercise of police power rather than eminent domain power.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the taking of private property without just compensation. U.S. Const. amends. V. & XIV. "[T]he Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain." *Denby v. City of Casa Grande*, No. CV-17-00119-PHX-SPL, 2018 WL 1586650, at *3 (D. Ariz. Mar. 31, 2018) (citing *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1154 (Fed. Cir. 2008)). Here, the alleged damage to Aladdin's buildings was caused during the exercise of the government's "police power" and did not occur as a result of the government converting the property to a "public use" within the meaning the Fifth Amendment. *See Patty v. United States*, 136 Fed. Cl. 211, 214 (2018) ("The distinction between an exercise of the police power and a constitutional taking . . . [i]s 'whether the governmental action operates to secure a benefit for or to prevent a harm to the public.'" (quoting *Morton Thiokol, Inc. v. United States*, 4 Cl. Ct. 625, 630 (1984)). In *Patty v. United States*, the government, through a confidential informant who worked for plaintiffs, used the plaintiffs' truck without their consent in a DEA controlled drug delivery, and the truck was damaged and then impounded by the government. 136 Fed. Cl. at 212–13. The *Patty* court found that plaintiffs stated a claim under the Takings Clause because the plaintiffs' interest in the truck was infringed upon for public use in pursuing unrelated law enforcement, distinguishing cases where the government's action was directed toward property related to the law enforcement activity. *Id.* at 214–15. Thus, whereas here, the damage to Plaintiffs' property occurred during the execution of a search warrant for the damaged premises, the Takings Clause is not implicated and Plaintiffs' claims are more appropriately analyzed under the Fourth

Amendment.  *See Chumley*, 2015 WL 859570, at *10–11 (analyzing claim that plaintiff's property was damaged during a search under the Fourth Amendment rather than the Takings Clause).  Accordingly, the Sheriff Defendants are entitled to summary judgment on the Fifth Amendment Takings Clause claim as a matter of law.

**D.      State Law Claims**

Having allowed summary judgment on the federal claims, remaining against David and the Sheriff Defendants are Plaintiffs' takings claim under the North Carolina Constitution and state law conversion claim.  In removing this case from state court, Defendants invoked the court's federal question jurisdiction.  [DE-1] ¶ 3 (citing 28 U.S.C. § 1331).  "Pursuant to 28 U.S.C. § 1367(c)(3), this court has discretion to decline to exercise supplemental jurisdiction if the court 'has dismissed all claims over which it has original jurisdiction,'" and "[t]his statutory authorization grants the court the power to 'dismiss the claim or, if it was removed, remand it to State court.'"  *Berry v. S. States Coop., Inc.*, No. 5:17-CV-635-FL, 2018 WL 4365499, at *3 (E.D.N.C. Sept. 13, 2018) (quoting *Safar v. Tingle*, 859 F.3d 241, 257 (4th Cir. 2017)); *see Nelson v. Nationstar Mortg. LLC*, No. 7:16-CV-307-BR, 2017 WL 1167230, at *3 (E.D.N.C. Mar. 28, 2017) (dismissing plaintiff's federal claims over which the court had original jurisdiction and declining to exercise supplemental jurisdiction over plaintiff's state law claims) (citing *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) (holding a district court's power to remand pendent state law claims to state court is inherent in statutory authorization to decline supplemental jurisdiction under 28 U.S.C. § 1367(c)).

Remand is particularly appropriate here, where Plaintiffs' takings claim under the North Carolina Constitution appears to be a novel application of that law, which is generally not

applied when the damage results from an exercise of police power, but for some narrow exceptions not at issue in this case. *See Beroth Oil Co. v. N.C. Dep't of Transp.*, 367 N.C. 333, 342, 757 S.E.2d 466, 474 (2014) ("[D]amages resulting from the exercise of police power are noncompensable.") (citation omitted); *see also Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 854, 786 S.E.2d 919, 924 (2016) (recognizing "[p]olice power *regulations* must be enacted in good faith, and ha[ve] appropriate and direct connection with that protection to life, health, and property which each State owes to her citizens," and "[a]n exercise of police power outside these bounds may result in a taking.") (emphasis added) (some citations and internal quotation marks omitted) (citing *Responsible Citizens in Opposition to Flood Plain Ordinance v. City of Asheville*, 308 N.C. 255, 256, 302 S.E.2d 204, 205 (1983) (considering a takings claim in the context of "a city ordinance setting forth land-use regulations on property designated a flood hazard area")); *Letendre v. Currituck Cty.*, — N.C. App. —, 817 S.E.2d 73, 78 (2018) (considering a takings claim in the context of a county's Unified Development Ordinance); *Robinson v. N.C. Dep't of Transp.*, 89 N.C. App. 572, 574, 366 S.E.2d 492, 493 (1988) (considering a takings claim in the context of a public construction project that damaged the plaintiffs' property). Accordingly, because there no longer exists an independent basis for federal jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining state law claims and they are remanded to Bladen County Superior Court.

## V. CONCLUSION

For the reasons stated herein, Defendant David's motion for summary judgment [DE-87] and Defendants McVicker's and Deaver's motion for summary judgment [DE-91] are allowed as to the § 1983 claim, the declaratory judgment claim, and takings claim under the United States

Constitution, and the state law claims are remanded to Bladen County Superior Court.  The Clerk

is directed to close the case.

SO ORDERED, the 2nd day of November 2018.

_____
Robert B. Jones, Jr.
United States Magistrate Judge